No. 18-10035

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

MICHAEL CAREY CLEMANS
Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of California

Honorable John A. Mendez
United States District Judge

U.S. District Court Case No. 2:15-cr-227-JAM-1

---

## OPENING BRIEF OF APPELLANT

---

HEATHER E. WILLIAMS
Federal Defender
CAROLYN M. WIGGIN
Assistant Federal Defender
801 "I" Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS

Table of Contents

Table of Authorities ..................................................................iv

I.      Jurisdictional Statement ..................................................1

II.     Bail Status ........................................................................2

III.    Statement of Issues Presented for Review .....................2

IV.    Statement of the Case......................................................4

    A.    Statement of Facts........................................................4

        1.    2013 Events Involving Nelia Cruz and Juvy Malicdem ...........................4

        2.    2014-15 Events Involving Lyan Tandeg....................................................7

            a. Communication Between Mr. Clemans and Lyan Tandeg Leading
               Up to Production of Child Pornography Involving J.U., E.S., and M.Q...7

            b.    Production of Child Pornography Involving J.U., E.S., and M.Q........8

            c.    Communication Between Mr. Clemans and Tandeg Regarding a
                  Possible Visit to the Philippines Someday. .........................................12

            d.    Mr. Clemans' Assistance in Sting Operation Leading to Arrest of
                  Tandeg and Atad. ...............................................................................14

    B.    Procedural History ......................................................15

        1.    Second Superseding Indictment................................................15

        2.    Open Guilty Pleas as to Counts Three, Five, and Six..............17

        3.    Trial and Rule 29 Motion..........................................................17

        4.    Jury Instructions and Closing Arguments................................18

        5.    Verdict......................................................................................19

        6.    Denial of Mr. Clemans' Rule 29 Motion.................................19

7.   Sentencing ................................................................21

V.   Summary of the Argument.............................................27

VI.  Argument ...................................................................29

A.   Standards of Review ..................................................29

B.   The Evidence was Not Sufficient to Support Counts One or Two
     Because the Travel for Illicit Sex Mr. Clemans Either Undertook or
     Discussed Did Not Originate in the United States. .......................30

C.   The Evidence Was Not Sufficient to Support Count Four Because Any
     Offers to Purchase or Take Custody of Children Was Not
     Communicated or Transported in Interstate or Foreign Commerce. ............39

D.   The District Court Made Sentencing Errors that Require Vacation of the
     Sentence and a Remand for New Sentencing Proceedings. ...........................43

1.   With Respect to Counts Two and Three, the District Court Plainly
     Erred in Using U.S.S.G. Sections 2G1.3, 2G2.1, Rather than
     Section 2X1.1, to Calculate Mr. Clemans' Advisory Guidelines
     Range......................................................................43

2.   If the District Court's Use of U.S.S.G. Section 2G2.1 With Respect
     to Group Three Was Correct, the District Court Plainly Erred, or
     Violated *Ex Post Facto* Principles, in Adding Four Levels Under
     Section 2G2.1(4)(A) and (B) on the Ground that Mr. Clemans
     Possessed Other Images Portraying Sadistic or Masochistic
     Conduct or Images of Infants or Toddlers. .............................45

3.   With Respect to Groups Four and Five, the District Court Erred in
     Adding Two Levels Under Section 2G2.1(b)(2)(A) on the Ground
     that the Offenses Involved the Commission of a Sexual Act. .................47

4.   Count Four Should Have Been Placed Within Groups Three, Four,
     and Five. ................................................................48

ii

5. The District Court Misinterpreted the Guidelines or Abused Its Discretion in Failing to Deem Mr. Clemans Eligible for a Reduction in Offense Level for Acceptance of Responsibility. ..............49

VII. Conclusion ......................................................................................54

Table of Authorities

United States Constitution

United States Constitution,. Article I, Section 9, clause 3 ..................... 3, 28, 45, 46

Federal Cases

*Molina-Martinez v. United States*, __ U.S. __, 136 S. Ct. 1338 (2016) ................. 30

*Peugh v. United States*, 133 S. Ct. 2072 (2013) ...................................................... 46

*Rosales-Mireles v. United States*, __ U.S. __, 138 S. Ct. 1897 (2018) ................... 30

*United States v. Aldana*, 878 F.3d 877 (9th Cir. 2017),
   *cert. denied*, 139 S. Ct. 157, 202 L. Ed. 2d 96 (2018) ...................................... 29

*United States v. Bernhardt*, 903 F.3d 818 (8th Cir.),
   *cert. denied*, 139 S. Ct. 578 (2018) ..................................................................... 38

*United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006),
   *overruled by United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018) ............. *passim*

*United States v. Fowler*, 216 F.3d 459 (5th Cir. 2000) ........................................... 46

*United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2018) ................................... 50

*United States v. Jackson*, 480 F.3d 1014 (9th Cir. 2007) ................................... 34, 36

*United States v. Johnson*, 913 F.3d 793 (9th Cir. 2019) ......................................... 29

*United States v. Korab*, 893 F.2d 212 (9th Cir. 1989) ............................................ 42

*United States v. LaPierre*, 998 F.2d 1460 (9th Cir.1993) ....................................... 53

*United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018) .................................. 19, 33, 35

*United States v. Schmidt*, 845 F.3d 153 (4th Cir.),
  *cert. denied*, 138 S. Ct. 234 (2017) ......................................................31

*United States v. Simon*, 858 F.3d 1289 (9th Cir. 2017) ...........................43

*United States v. Vance*, 62 F.3d 1152 (9th Cir. 1995) ............................53

*United States v. Watt*, 910 F.2d 587 (9th Cir.1990) ...............................53

*United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011) .......................... 31, 36, 37

Federal Statutes

18 United States Code Section 2246........................................................47

18 United State Code Section2251 ............................................... *passim*

18 United States Code Section 2251A........................................... *passim*

18 United States Code Section 2252................................................. 1, 17

18 United States Code Section 2253...........................................................1

18 United States Code Section 2256........................................................20

18 United States Code Section 2423............................................... *passim*

18 United States Code Section 3402...........................................................1

18 United States Code Section 875........................................................42

28 United States Code Section 1291...........................................................1

Violence Against Women Reauthorization Act, Pub. L. 113-4,
  Section 1211(b) (2013) .........................................................................35

<u>Federal Rules</u>

Federal Rule of Appellate Procedure 4 ..................................................................2

Federal Rule of Criminal Procedure 29 ......................................................... *passim*

<u>United States Sentencing Guidelines</u>

United States Sentencing Guidelines Manual, Section 1B1.2 .................................43

United States Sentencing Guidelines Manual, Section 1B1.3 .................................46

United States Sentencing Guidelines Manual, Section 2G1.3 .............. 21, 22, 24, 43

United States Sentencing Guidelines Manual, Section 2G2.1 ........................ *passim*

United States Sentencing Guidelines Manual, Section 2G2.3 .................................24

United States Sentencing Guidelines Manual, Section 2X1.1 ................ 3, 43, 44, 45

United States Sentencing Guidelines Manual, Section 3B1.1 ................... 22, 23, 24

United States Sentencing Guidelines Manual, Section 3D1.2 ......................... 21, 48

United States Sentencing Guidelines Manual, Section 3D1.4 .................................25

United States Sentencing Guidelines Manual, Section 3E1.1 ........................ *passim*

Chapter 5, Part A, comment n. 2 ..............................................................................26

United States Sentencing Guidlines, Appendix C, Supplement,
 Amendment 801 (2016) .......................................................................................46

<u>Other Authorities</u>

House of Representatives Conference Report 108-66, at 51 (2002) ......................34

House Report for the Child Protection and Obscenity Enforcement Act of
 1988 (H.R. 5210), 134 Cong. Rec. E3750-01, 1988 WL 182584 (1988) ...........39

No. 18-10035

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | United States District Court Case No. 2:15-cr-227-JAM-1 |
| Plaintiff-Appellee, | |
| v. | United States District Court, Eastern District of California, Sacramento |
| MICHAEL CAREY CLEMANS, | |
| Defendant-Appellant. | |

### I.    Jurisdictional Statement

On August 24, 2017, the government filed a second superseding indictment charging Mr. Clemans with violations of 18 U.S.C. § 2423(b) and (e), 18 U.S.C. § 2251(c) and (e), 18 U.S.C. § 2251A(b)(1), and 18 U.S.C. § 2252(a) .  The district court had jurisdiction over this matter pursuant to 18 United States Code § 3231.

The district court's judgment is final because it resolved all disputes between the parties.  Because this is a direct appeal from a final district court judgment, this Court has jurisdiction pursuant to 28 U.S.C. Section 1291.

1

The district court issued the amended judgment on January 26, 2018.  ER II p. 42; CR 116.[1]  Mr. Clemans filed his Notice of Appeal on January 26, 2018.  ER II p. 41; CR 117.  The appeal is timely under Federal Rule of Appellate Procedure 4(b)(1)(A)(i).

## II.    Bail Status

Mr. Clemans is in the custody of the Federal Bureau of Prisons and is serving a life term.

## III.   Statement of Issues Presented for Review

1. Where any travel with intent to engage in illicit sexual conduct that Mr. Clemans either undertook or discussed did not include the United States, was the evidence sufficient to support Counts One and Two, travel and conspiracy to travel in foreign commerce with the intent to engage in illicit sex?

2. Where there was no evidence that any "offer" to obtain custody of a child was made in interstate or foreign commerce, was the evidence sufficient to support Count Four, making an offer in interstate or foreign commerce to obtain custody of a child for the purpose of producing pornography?

---

[1] Throughout this brief, "ER I" refers to Volume I of the Excerpts of Record, "ER II" refers to Volume II of the Excerpts of Record, and "CR" refers to the district court clerk's record.

3.  When calculating the advisory United States Sentencing Guidelines range for counts of conspiracy, did the district court plainly err by using the guideline for the substantive offense rather than U.S.S.G. § 2X1.1, which generally covers conspiracies?

4.  With respect to Group Three, did the district court plainly err in applying the offense characteristic offense for images involving sadism/masochism or infants and toddlers (U.S.S.G. § 2G2.1(b)(4)) where the images were not part of the relevant conduct and use of the characteristic created an *Ex Post Facto* clause violation?

5.  With respect to Groups Four and Five, did the district court plainly err in applying the offense characteristic for commission of a "sexual act" (U.S.S.G. § 2G2.1(b)(2)(A)) where the evidence did not support that characteristic?

6.  Did the district court plainly err by not placing Count Four within Groups covering closely related counts?

7.  Did the district court misconstrue the applicable guideline, or abuse its discretion, in failing to reduce Mr. Clemans' advisory guidelines range for acceptance of responsibility under U.S.S.G. § 3E1.1?

### IV.    Statement of the Case

### A. Statement of Facts

Michael Clemans is a United States citizen. He spent much of his adult life living and working abroad in his career as an airline pilot. At the time of the relevant events in this case, he worked for NewGen Airways, a Thai airlines. Presentence Investigation Report ("PSR") ¶ 119.[2] Mr. Clemans had an apartment in Bangkok, Thailand. Mr. Clemans' mother lived in Sacramento, California, and Mr. Clemans would sometimes visit her there.

### 1.   2013 Events Involving Nelia Cruz and Juvy Malicdem

For part of 2013, Mr. Clemans was in the United States staying at his mother's house in Sacramento. In June of 2013, while he was in the United States, he purchased an airline ticket from Korean Air for his September, 2013 travel from the United States to Seoul, South Korea. ER II pp. 73-74; CR 136-2, pp. 79-80 (RT pp. 425-26).

In early September of 2013, while he was in the United States, Mr. Clemans used Yahoo to "chat" with a person in the Philippines who used the account nelia.cruz09@yahoo.com ("Nelia Cruz"). ER II pp. 65-66; CR 136-2, pp. 71-72 (RT pp. 417-18). Mr. Clemans made requests for child pornography. ER II pp. 67-68; CR 136-2, pp. 73-74 (RT pp. 419-20). He also indicated that he wanted

---

[2] Filed under seal.

pictures of girls he could later "rent." ER II p. 68; CR 136-2, p. 74 (RT p. 420).

On September 9, 2013, Mr. Clemans chatted with Ms. Cruz about where she lived

in the Philippines and where they could meet in the Philippines. ER II p. 69; CR

136-2, p. 75 (RT p. 421). Later that day he asked Cruz whether her apartment was

suitable for a sexual encounter. ER II p. 70; CR 136-2, p. 76 (RT p. 422). He

discussed wanting an encounter with a virgin between the ages of 12 and 17. ER II

p. 71; CR 136-2, p. 77 (RT p. 423); ER II p. 122; Gov't Exh. 37.5-012 (admitted

into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)). On September 10,

2013, he explained to Cruz that he was preparing to leave the United States for

Thailand. ER II pp. 72-73; CR 136-2, pp. 78-79 (RT pp. 424-25). Mr. Clemans

had not made travel arrangements to visit the Philippines.

On September 11, 2013, Mr. Clemans flew from Seattle, Washington, to

Seoul, South Korea, using the airline ticket he had purchased in June. ER II p. 61;

CR 136-2, p. 67 (RT p. 413). He then proceeded from South Korea to Thailand.

ER II p. 107; CR 136-2, p. 163 (RT p. 509). By September 13, 2013, Mr. Clemans

was in Thailand. ER II p. 75; CR 136-2, p. 81 (RT p. 427). The FBI Special

Agent who investigated the case testified that Mr. Clemans resided in Thailand

beginning in September of 2013. ER II p. 106; CR 136-2, p. 157 (RT p. 503). Mr.

Clemans had an apartment in Bangkok, Thailand. ER II p. 121; CR 136-2, p. 198

(RT p. 544). In September of 2013, while living in Thailand, Mr. Clemans still had not made arrangements to visit the Philippines.

From October 7th through 8th, 2013, Mr. Clemans took a trip from Thailand to Laos and then back to Thailand. ER II pp. 133-34; CR 136-1, pp. 41-42 (RT p. 253-54); ER II p. 105; CR 136-2, p. 165 (RT p. 511). In mid-October, 2013, Mr. Clemans indicated to Cruz that he did not yet have a firm date for when he would come to the Philippines. ER II p. 76; CR 136-2, p. 92 (RT p. 438).

By November 5, 2013, Clemans told Cruz he was arranging for a ticket. ER II p. 76; CR 136-2, p. 93 (RT p. 439). On November 11, 2013, Mr. Clemans told Cruz he would be coming to the Philippines "shortly." ER II pp. 78-79; CR 136-2, pp. 94-95 (RT pp. 440-41). On or about November 13, 2013, Mr. Clemans finally bought a plane ticket for a trip from Thailand to the Philippines. ER II pp. 108-09; CR 136-2, pp. 166-67 (RT pp. 512-13).

On November 13, 2013, Mr. Clemans contacted Cruz and suggested a place for he and Cruz to meet on November 14, 2013. ER II p. 80; CR 136-2, p. 102 (RT p. 448). Apparently Cruz did not show up at any suggested meeting places and was not able to arrange a sexual encounter for Mr. Clemans. *Id*. On November 15, 2013, Clemans contacted a different individual in the Philippines, Juvy Malicdem. ER II p. 81; CR 136-2, p. 107 (RT p. 453). Communications between Malicdem and Mr. Clemans indicate that Mr. Clemans transferred money

to an associate of Malicdem's in exchange for Malicdem arranging for Mr. Clemans to have sex with at least one teenage girl while he was in the Philippines. ER II pp. 83-; CR 136-2, pp. 109-13 (RT pp. 455-59). It appears Mr. Clemans re-entered Thailand on November 17, 2013. Gov't Exh. 92.5-004 (admitted into evidence at ER II p. 134; CR 136-1, p. 134 (RT p. 246)).

## 2. 2014-15 Events Involving Lyan Tandeg

### a. Communication Between Mr. Clemans and Lyan Tandeg Leading Up to Production of Child Pornography Involving J.U., E.S., and M.Q.

During 2014, Mr. Clemans lived in Thailand and remained outside of the United States for most of the year.[3] In June of 2014, Mr. Clemans began communicating with Lyan Tandeg. Mr. Clemans was in Thailand and Ms. Tandeg was in the Philippines. ER II p. 90; CR 136-2, p. 116 (RT p. 462). Mr. Clemans told Tandeg he was interested in the possibility of entering a long-term arrangement with her in which she could help him arrange meetings with girls when he visited the Philippines. ER II pp. 92-93; CR 136-2, pp. 118-19 (RT pp. 464-65). Mr. Clemans asked Tandeg to send him pictures of underage girls and stated that "if I have an opportunity with someone beautiful, I will make plans to visit Manila often." ER II p. 95; CR 136-2, p. 121 (RT p. 467:7-9). Later in June

---

[3] Mr. Clemans was in the United States from May 1, 2014, to May 31, 2014, and August 31, 2014 to September 15, 2014. ER II p. 101; CR 136-2, p. 140 (RT p. 486).

of 2014, Mr. Clemans sent Tandeg money to buy a camera and a computer so that she could take pictures of girls and send them to him electronically.  ER II p. 100; CR 136-2, p. 126 (RT p. 472).  Mr. Clemans sent Tandeg messages asking her to either personally recruit girls to participate in photo sessions or to work with another recruiter or guardian of children to recruit girls to participate in photo sessions.  See, e.g., ER II p. 123; Gov't Exh. 41-012 (admitted into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)).  Mr. Clemans never suggested that he would personally communicate with a girl or her guardian to arrange for the girl to pose for pictures.

### b.  Production of Child Pornography Involving J.U., E.S., and M.Q.

The evidence showed that Tandeg and another woman she knew, Shellina Atad, found three girls who were all under the age of 12 and lived with their families in the Philippines.  Tandeg and Atad arranged "photo shoots" of the girls at Tandeg's home and at a hotel in the Philippines.  Tandeg took pornographic pictures of the girls and sent those pictures to Mr. Clemans.  Each of the three girls testified at trial.  The girls' real names were not used at trial.  They were referred to as (1) M.Q. or Angel, (2) E.S. or Nicole, and (3) J.U. or Ishin.

### i. J.U.'s Testimony

J.U. testified that when she was 11 years old Tandeg took nude pictures of her. ER II p. 150; CR 136-1, p. 66 (RT p. 278). J.U. met Tandeg through her aunt Sheila (Shellina Atad). ER II p. 151; CR 136-1, p. 67 (RT p. 279). Atad approached both J.U. and M.Q., who was her friend, when J.U. and M.Q. were at J.U.'s grandmother's home. ER II p. 151; CR 136-1, p. 67 (RT p. 279). One day J.U. and M.Q. decided to go with Atad to "do pictorials." ER II p. 152; CR 136-1, p. 68 (RT p. 280). J.U. and M.Q. left the grandmother's house with Atad as well as M.Q.'s mother and Atad's child. ER II p. 153; CR 136-1, p. 69 (RT p. 281). M.Q.'s mother and Atad's child were dropped off at a river, Sapa Sagala. *Id.* Using public transportation, J.U., M.Q. and Atad continued on to Tandeg's house. ER II pp. 153-54; CR 136-1, pp. 69-70 (RT pp. 281-82).

While J.U. and M.Q. were at Tandeg's house for a few hours, Tandeg took both clothed and nude pictures of the girls. ER II pp. 154-55; CR 136-1, pp. 70-71 (RT pp. 282-83). J.U. testified that while she was at Tandeg's home, she did not think she would have been able to use the telephone to call her mother, but if she had left Tandeg's home she would have known how to get home. ER II p. 158; CR 136-1 p. 74 (RT p. 286). Neither Tandeg or Atad told J.U. she could leave if she wanted to. ER II p. 159; CR 136-1 p. 75 (RT p. 287).

9

After the photo shoot, Atad took J.U. and M.Q. from the photo shoot to the river where M.Q.'s mother had been dropped off. ER II p. 160; CR 136-1 p. 76 (RT p. 288). When Atad dropped J.U. off at the river, it was still light outside. ER II p. 164; CR 136-1 p. 80 (RT p. 292). J.U. spent that night at her home with her parents. *Id*.

### ii. E.S.'s Testimony

When E.S. was 11 years old, she was in two of Tandeg's photo shoots. ER II pp. 165-66; CR 136-1 pp. 84-85 (RT pp. 296-97). E.S. knew Atad through her uncle and would see her about once a year during her son's birthday parties. ER II p. 166; CR 136-1 p. 85 (RT p. 297). Atad approached E.S.'s grandmother and was apparently given permission to take E.S. out of the home. ER II p. 167; CR 136-1 p. 86 (RT p. 298). Atad took E.S. to a hotel, and that was where E.S. first met Tandeg. ER II pp. 167-68; CR 136-1 pp. 86-87 (RT pp. 298-99). Tandeg took nude photographs of E.S. ER II p. 169; CR 136-1 p. 88 (RT p. 300). At the end of the photo shoot Atad took E.S. home on a bus. ER II p. 170; CR 136-1 p. 89 (RT p. 301).

E.S. did a second photo shoot with Atad and Tandeg at the same hotel, but this time M.Q. was with them. ER II p. 170; CR 136-1 p. 89 (RT p. 301). Tandeg took nude photographs of both girls. ER II p. 173; CR 136-1 p. 92 (RT p. 304). While she was at the hotel, E.S. knew she was going to go home at the end of the

10

photo shoot.  ER II p. 179; CR 136-1, p. 98 (RT p. 310).  Atad and Tandeg did not

tell E.S. she could leave the hotel, but she felt free to leave if she wanted to.  ER II

p. 174; CR 136-1 p. 93 (RT p. 305).  On the other hand, she testified that she did

not feel that she could walk out of the hotel and go home any time or that she

would know how to get home from the hotel.  ER II pp. 174-75; CR 136-1 pp. 93-

94 (RT p. 305-06).  At the end of the photo shoot, Atad took the girls home on a

bus.  ER II p. 175; CR 136-1, p. 94 (RT p. 306).

### iii.  M.Q.'s Testimony

Tandeg took nude pictures of M.Q. as well.  Atad was a neighbor of M.Q.'s.

ER II p. 180; CR 136-1, p.102 (RT p. 314).  Atad spoke to M.Q.'s mother in

M.Q.'s home, and then M.Q. and Atad took a bus to a hotel.  ER II p. 181; CR

136-1, p. 103 (RT p. 315).  Tandeg took nude pictures of M.Q. at the hotel.  ER II

p. 183; CR 136-1, p. 105 (RT p. 317).  On three other occasions Tandeg took

pictures of M.Q. at Tandeg's home.  ER II p. 185; CR 136-1, p. 107 (RT p. 319).

For each photo shoot, Atad picked M.Q. up from her home, took her to the session,

and on the same day brought her back to her home.   ER II p. 187; CR 136-1, p.

117 (RT p. 329).  During the photo shoots, M.Q. always knew she was going home

at the end.  ER II p. 187; CR 136-1, p. 117 (RT p. 329).  When M.Q. was at the

photo shoots, she felt like she could leave, but she did not feel that she could call

her mother and she would not have known how to get home on her own. ER II p. 186; CR 136-1, p. 110 (RT p. 322).

### c. Communication Between Mr. Clemans and Tandeg Regarding a Possible Visit to the Philippines Someday.

At various points from 2014 to 2015, Mr. Clemans communicated with Ms. Tandeg about a desire to have sex with the girls she photographed, or the price he would have to pay for that sex, when he visited the Philippines. *See*, *e.g.*, ER II p. 103; CR 136-2, p. 142 (RT p. 488). Mr. Clemans told Tandeg that Thailand was his home (ER II, p. 124; Gov't Exh. 42-024) (admitted into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)). While Mr. Clemans told Tandeg numerous times that he wanted to come to the Philippines to meet the girls in the photos (ER II p. 112; CR 136-2, p. 174 (RT p. 520)), from 2014-15, he never bought an airline ticket, made a concrete plan, created an itinerary to visit the Philippines, or actually visited the Philippines. ER II pp. 112-13; CR 136-2, pp. 174-75 (RT pp. 520-21). By contrast, in that timeframe he visited many other Asian countries, including China, Laos, Indonesia, Malaysia. ER II p. 114; CR 136-2, p. 176 (RT p. 522).

On April 27, 2015, Mr. Clemans flew from Thailand to the United States to visit his mother. ER II p. 104; CR 136-2, p. 149 (RT p. 495). United States law enforcement had become aware that Mr. Clemans was accessing child pornography. He was arrested by local law enforcement at the San Francisco

International Airport upon his arrival in the United States and his passport was seized. ER II pp. 132-34; CR 136-1, pp. 32-34 (RT pp. 244-46). Mr. Clemans' was released and allowed to live with his mother in Sacramento, California, until he was arrested in the federal case on July 24, 2015. Throughout the period from his arrival in the United States on April 27, 2015, through his arrest in the federal case on July 24, 2015, Mr. Clemans' passport was in the custody of the San Mateo County Superior Court. ER II p. 115; CR 136-2, p. 180 (RT p. 526).

On May 5, 2015, Mr. Mr. Clemans communicated with Tandeg and suggested maybe he could visit Tandeg in the summer of 2015 if she had free time and she said she would "let [him] know." ER II pp. 125-26; Gov't Exh. 52-006-007 (admitted into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)). He said he wanted to "make love with you and the girls" and asked her to "think about it" and "let me know." ER II p. 126; Gov't Exh. 52-007. Tandeg never replied that Mr. Clemans could come visit and meet with her or the girls over the summer. Later on May 5th, Mr. Clemans said he would try to return from the United States to Thailand on June 5, 2015 and understood he could not visit Tandeg in the Philippines at that time because she was busy. ER II p. 129; Gov't Exh. 52-010 (admitted into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)). On May 19, 2015, Mr. Clemans told Tandeg that after he retired he would still be able to visit Thailand, and it would be easier to travel to the Philippines from Thailand. ER II

13

p. 130; Gov't Exh. 52-026 . (admitted into evidence at ER II p. 60; CR 136-2, p. 23 (RT p. 369)).

In July of 2015, Mr. Clemans sent Tandeg a message in which he stated he will probably return to Thailand around September 1, 2015, but if not he would come to visit Tandeg in the Philippines before returning to Thailand.  ER II p. 105; CR 136-2, p. 154 (RT p. 500).  However, Mr. Clemans did not have a passport and did not make a specific plan to go to the Philippines.  ER II pp. 115-16; CR 136-2 pp. 180-81 (RT pp. 526-27).

### d.  Mr. Clemans' Assistance in Sting Operation Leading to Arrest of Tandeg and Atad.

After he was arrested in this federal case on July 24, 2015, Mr. Clemans allowed the FBI to assume his online identity without obtaining any benefit in exchange.  ER II pp. 119-20; CR 136-2, pp. 184-85 (RT pp. 530-31).  Using that identity, the FBI created a sting operation in the Philippines that led to the arrest and prosecution of Lyan Tandeg and her associate, Shellina Atad, in the Philippines.  ER II pp. 140-46; CR 136-1, pp. 46-52 (RT pp. 258-64); ER II p. 120; CR 136-2, p. 185 (RT p. 531).  The FBI Special Agent assigned to the case acknowledged that Mr. Clemans' willingness to allow the FBI to assume his online activity was "a big factor" in helping the FBI find Tandeg and Atad.  *Id*. Testimony as well as a videotape of the final moments of the sting operation were

introduced as evidence against Mr. Clemans at trial.  ER II p. 149; CR 136-1, p. 55
(RT p. 267).

### B. Procedural History

#### 1. Second Superseding Indictment

On August 24, 2017, the government filed a second superseding indictment
charging Mr. Clemans as follows:

**Count One**: 18 U.S.C. § 2423(b) and (e)-Travel and Attempted Travel with
Intent to Engage in Illicit Sexual Conduct:  The government alleged that between
September 10, 2013, and November 15, 2013, Mr. Clemans knowingly travelled
and attempted to travel in interstate and foreign commerce "from the United States,
through Thailand, to the Philippines," for the purpose of engaging in illicit sexual
conduct with another person under the age of 18.  ER II, p. 199; CR 79, p. 1.

**Count Two**: 18 U.S.C. § 2423(b) and (e)- Conspiracy to Travel with Intent
to Engage in Illicit  Sexual Conduct:  The government alleged that between June
24, 2014, and July 24, 2015, Mr. Clemans conspired with persons to travel in
interstate and foreign commerce "from the United States, through Thailand, to the
Philippines," for the  purpose of engaging in illicit sexual conduct with another
person under the age of 18.  ER II pp. 200-03; CR 79, pp. 2-5.

**Count Three**: 18 U.S.C. § 2251(c) and (e) - conspiracy to produce child
pornography:  The government alleged that between June 24, 2014, and July 24,

2015, Mr. Clemans conspired to produce child pornography of girls in the

Philippines.  ER II pp. 203-06; CR 79, pp. 5-8.

**Count Four**: 18 U.S.C. § 2251A(b)(1)- Buying of Children: the government

alleged that between June 24, 2014, and July 24, 2015, in the Eastern District of

California and elsewhere, Mr. Clemans "purchased and otherwise obtained custody

and control of at least one minor, and offered to purchase and otherwise obtain

custody and control of at least one minor, with knowledge that as a consequence of

the purchase and the obtaining of custody, the minor would be portrayed in a visual

depiction engaging in sexually explicit conduct," with the intent to promote that

conduct for production of images, "and the offer was communicated and

transported using any means and facility of interstate and foreign commerce, and in

and affecting interstate and foreign commerce by any means including by

computer."  ER II p. 206; CR 79, p. 8.

**Count Five**: 18 U.S.C. § 2251(c) and (e)- Attempted Production and

Production of Child Pornography: the government alleged that between June 24,

2014, and July 24, 2015, Mr. Clemans attempted to use a minor to engage in

sexually explicit conduct outside the United States for purpose of producing visual

depiction of the conduct with the intent that the depiction be transported to the

United States in interstate and foreign commerce.  ER II p. 207; CR 79, p. 9.

**Count Six**: 18 U.S.C. § 2252(a)(2)- Receipt of Child Pornography: the government alleged that between May 8, 2015, and May 24, 2015, in Sacramento, Mr. Clemans knowingly received child pornography through interstate and foreign commerce on his computer. ER II pp. 207-08; CR 79, pp. 9-10.

### 2. Open Guilty Pleas as to Counts Three, Five, and Six

On August 28, 2017, Mr. Clemans entered pleas of guilty to Counts Three, Five, and Six without the benefit of a plea agreement. The district court accepted the pleas and found him guilty of the offenses. ER II pp. 191-92; CR 136, pp. 30-31 (RT pp. 30-31). The factual basis Mr. Clemans filed with the court was largely used at the entry of plea. ER II pp. 193-98; CR 81.

### 3. Trial and Rule 29 Motion

Mr. Clemans had a four-day jury trial between August 28, 2017, and September 5, 2017. CR 89, 90, 92, 93. After the government rested its case, Mr. Clemans made a Motion for a Judgment of Acquittal under Federal Rule of Criminal Procedure 29 with respect to Counts One, Two, and Four. ER II p. 54; CR 136-3, p. 2 (RT p. 550). The district court decided to delay ruling on the Rule 29 motion until after the jury returned a verdict. ER II p. 55; CR 136-3, p. 37 (RT p. 585).

### 4. Jury Instructions and Closing Arguments

Prior to instructing the jury on Count Four, the district court determined that the government had only pled a "(c)(2)" theory of jurisdiction in the superseding indictment. ER II p. 56; CR 136-3, p. 45 (RT p. 593). It denied the government's request to instruct the jury on the jurisdictional element contained in (c)(1) and instead ruled that the jury would only be instructed as to (c)(2)—the theory that an offer to purchase or obtain custody or control of a minor was communicated or transported in interstate or foreign commerce. *Id*. The jury was instructed that it had to find "the offer was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer." ER II p. 58; CR 136-3, p. 117 (RT p. 665).

In its closing argument to the jury on Count Four, the government told the jury:

> You know the defendant's offers were communicated in foreign commerce because it's undisputed. There is a stipulation between the parties, which means the defendant has agreed, that all of his Yahoo messages, including e-mails and instant messages, traveled through the U.S.
>
> The stipulation, which you can read here, says that each of those messages during the time period we're talking about would necessarily have transited a Yahoo mail server located in the United States regardless of the physical location of the user of the account.

ER II p. 57; CR 136-3, p. 87 (RT p. 635).

18

### 5. Verdict

The jury returned a verdict finding Mr. Clemans guilty of Counts One, Two, and Four.  CR 97.

### 6. Denial of Mr. Clemans' Rule 29 Motion

The district court issued a written order denying Mr. Clemans' Rule 29 motion.  ER I p. 30; CR 99.  It determined that Mr. Clemans was a United States citizen who was a resident of Bangkok, Thailand at all times relevant to the charges in the Superseding Indictment.  ER I p. 32; CR 99 p. 3.  In 2013 he travelled from Thailand to the Philippines to engage in illicit sexual conduct.  ER I pp. 32-33; CR 99, pp. 3-4.  The district court framed the issue as whether a "two-month gap between travel and the sexual act fall[s] within §2423(b)'s temporal scope?"  ER I p. 33; CR 99, p. 4.  The court then denied the Rule 29 motion, finding that "Clemans took only one trip: it started in California and continued until he arrived in the Philippines."  ER I p. 34; CR 99 p. 5.  The district court relied on two district court rulings as well as this Court's decision in *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), *overruled by United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018), a case involving a United States citizen who resided in Cambodia, and who was convicted under 18 U.S.C. § 2423(c), not §2423(b).[4]

---

[4]  The version of Section 2423(c) at issue in *Clark* applied to "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce,

19

ER I p. 35; CR 99, p. 6.  The district court concluded that "the two-month gap between Clemans' departure from the United States to his arrival in the Philippines falls within § 2423(b)'s temporal scope. . . . [Clemans should not be immunized] from prosecution for mere stops along the way."  ER I pp. 36-37; CR 99, pp. 7-8.

With respect to Mr. Clemans' argument for acquittal on Count Two, the district court found that there were overt acts in furtherance of the conspiracy to travel to the Philippines to have illicit sex.   ER I pp. 37-38; CR 99 pp. 8-9.  The court reasoned that Clemans had taken steps to send his co-conspirator money so she could find, photograph, and arrange for sex with minors, and these were steps toward travel with intent to have illicit sex.  *Id.*

Finally, with respect to Count Four, the district court rejected Mr. Clemans' argument that "custody or control" under 18 U.S.C. § 2256(7) means something more than temporary supervision over a minor.  ER I pp. 39-40; CR 99 pp. 10-11. Thus the district court denied Mr. Clemans' Rule 29 motion with respect to Counts One, Two, and Four.

---

and engages in any illicit sexual conduct with another person." The *Clark* court noted that § 2423(c) had been specifically drafted to eliminate the requirement contained in § 2423(b) that the prosecution prove the travel was "for the purpose of engaging in illicit sexual conduct," an element of 18 U.S.C. § 2423(b).  *Clark*, 435 F.3d at 1108.

### 7. Sentencing

Mr. Clemans' was sentenced to a term of life imprisonment. ER II p. 44; CR 116, p. 3. The district court used the 2016 Guidelines Manual. PSR ¶ 16. The six counts of conviction were split into six separate groups under U.S.S.G. § 3D1.2.

Group One consisted of Count One, travel and attempted travel with intent to engage in illicit sexual conduct. The district judge, diverging from the PSR, used U.S.S.G. § 2G1.3 to determine the offense level for Group One and stated that the adjusted offense level for Group One was 34. ER I p. 4; CR 134, p. 4. Although the district judge did not explain how he reached this adjusted offense level, presumably he found a base offense level of 24, then added two levels under § 2G1.3(b)(4) on the ground that the offense involved a sex act, then added eight levels under § 2G1.3(b)(5) because the offense involved a minor under the age of twelve.[5]

Group Two consisted of Count Two, conspiracy to travel with intent to engage in illicit sexual conduct. Again, diverging from the PSR, the district judge used § 2G1.3 to determine the offense level for Group Two and stated that the adjusted offense level was 36. ER I p. 4; CR 134, p. 4. While the district judge

---

[5] This was the calculation suggested by the government in its opposition to Mr. Clemans' motion to correct the PSR. ER II pp. 51-52; CR 111, pp. 5-6.

21

did not explain how he reached this adjusted offense level, presumably he found a base offense level of 24, then added two levels under § 2G1.3(b)(4) on the ground that the offense involved a sex act, then added eight levels under § 2G1.3(b)(5) because the offense involved a minor under the age of twelve, then added two levels because Clemans was a supervisor of Tandag and Attad under § 3B1.1.[6]

Group Three consisted of Counts Three, Five, and Six (conspiracy to produce child pornography, attempted production and production of child pornography, and receipt of child pornography) with respect to M.Q/ Angel. PSR ¶¶ 43-55. U.S.S.G. § 2G2.1 was used to calculate the offense level. PSR ¶ 46. The base offense level is 32. PSR ¶ 47. Four levels were added under §2G2.1(b)(1)(A) on the ground that the victim was under twelve. PSR ¶ 48. Two levels were added under § 2G2.1(b)(2)(A) on the ground that the offense involved the commission of a sexual act. PSR ¶ 49. Four levels were added under § 2G2.1(4)(A) and (B) on the ground that Mr. Clemans had in his possession images and videos that portrayed sadistic or masochistic conduct and images including infants and toddlers. PSR ¶ 50. There is no indication these images had anything to do with the production or transmission of images involving M.Q. Two levels were added under § 2G2.1(b)(6)(B)(i) and (ii) on the ground that the offense

---

[6] This was the calculation suggested by the government in its opposition to Mr. Clemans' motion to correct the PSR. ER II pp. 51-52; CR 111, pp. 5-6.

involved use of a computer.  PSR § 51.  Finally, <u>two</u> levels were added on the

ground that Mr. Clemans had a leadership role in the offense under § 3B1.1(c).

PSR § 53.  The adjusted offense level was deemed to be <u>46</u>.  PSR § 55.

Group Four consisted of Counts Three and Five with respect to E.S./ Nicole.

PSR ¶¶ 56-64.  Again U.S.S.G. § 2G2.1 was used to calculate the offense level.

PSR ¶ 57.  The base offense level is <u>32</u>.  PSR ¶ 57.  <u>Four</u> levels were added under

§ 2G2.1(b)(1)(A)  on the ground that the victim was under twelve.  PSR ¶ 58.  <u>Two</u>

levels were added under § 2G2.1(b)(2)(A) on the ground that the offense involved

the commission of a sexual act (E.S. kneeling before M.Q. with her tongue

extended toward M.Q.'s vulva).  PSR ¶ 59.  <u>Two</u> levels were added under §

2G2.1(b)(6)(B)(i) and (ii) on the ground that the offense involved use of a

computer.  PSR § 60.  Finally, <u>two</u> levels were added on the ground that Mr.

Clemans had a leadership role in the offense under § 3B1.1(c).  PSR § 62.  The

adjusted offense level was deemed to be <u>42</u>.  PSR § 55.

Group Five consisted of Counts Three and Five with respect to J.U./ Ishin.

PSR ¶¶ 65-73.  Again U.S.S.G. § 2G2.1 was used to calculate the offense level.

PSR ¶ 88.  The base offense level is <u>32</u>.  PSR ¶ 88.  <u>Four</u> levels were added under

§ 2G2.1(b)(1)(A) on the ground that the victim was under twelve.  PSR ¶ 67.  <u>Two</u>

levels were added under § 2G2.1(b)(2)(A) on the ground that the offense involved

the commission of a sexual act, sitting on a tile surface and urinating.  PSR ¶ 68.

23

Two levels were added under § 2G2.1(b)(6)(B)(i) and (ii) on the ground that the offense involved use of a computer. PSR § 69. Finally, two levels were added on the ground that Mr. Clemans had a leadership role in the offense under § 3B1.1(c). PSR § 71. The adjusted offense level was deemed to be 42. PSR § 55.

Group Six consisted of Count Four, Buying of Children. PSR ¶¶ 74-79. Neither the PSR nor the district judge gave a reason this Count was grouped on its own rather than as part of Groups Three, Four, and Five. The guideline for 18 U.S.C. § 2251A(b)(1) offenses is U.S.S.G. § 2G2.3. PSR ¶ 74. The base offense level is 38 and the guideline provides for no specific offense characteristic. Thus the adjusted offense level for Group 6 was 38.

The combined offense level, taking into account the district judge's decision at the sentencing hearing to apply U.S.S.G. § 2G1.3 to Groups One and Two, was as follows:

| Group | Adjusted Offense Level | Units |
|-------|------------------------|-------|
| Group One | 34 | 0.0 |
| Group Two | 36 | 0.0 |
| Group Three | 46 | 1.0 |
| Group Four | 42 | 1.0 |
| Group Five | 42 | 1.0 |
| Group Six | 38 | 0.5 |
| **TOTAL UNITS** | | 3.5 |

Taking Group Three with its offense level of <u>46</u> and adding <u>four</u> levels due to the 3.5 units, the combined offense level would be 50. U.S.S.G. § 3D1.4. In his Objections and at the sentencing hearing, Mr. Clemans sought at least a two-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The district court, while recognizing Mr. Clemans pled guilty to three of the charges and "did cooperate somewhat," denied the reduction, stating,

> I acknowledge, fully acknowledge, that it was purely a -- almost purely a legal defense to the remaining charges. It wasn't a factual innocence defense. And I understand completely why Mr. Clemans exercised obviously his constitutional right to go to trial, but I don't see, as the government argues,[7] under these circumstances a full and

---

[7] The government had adopted the position of the PSR, which stated Mr. Clemans should not get the acceptance of responsibility reduction because he "has not clearly demonstrated acceptance of responsibility for all of the charges. Upon

> complete acceptance of responsibility of all these crimes. So I would
> not have given the two-level adjustment in any event, but I think it
> does create a close question on appeal if this does get appealed. So
> that is reserved for appeal.

ER I p. 6; CR 134, p. 6.

Pursuant to Chapter 5, Part A, comment n. 2, the offense level was be

deemed 43. Mr. Clemans had no criminal history at all and thus received a

criminal history score of 0 and was placed in Criminal History Category I. PSR ¶¶

92-94. On the basis of an offense level of 43 and a Criminal History Category of I,

Mr. Clemans' advisory Guidelines range was life imprisonment. PSR ¶ 25.

The court deemed the advisory Guidelines range to be life and noted that,

with respect to Count Four, there was a mandatory minimum sentence of 30 years.

ER I p. 23; CR 134, p. 23. The court declined to vary below the Guidelines range.

The court imposed a prison term of 360 months on each of counts 1, 2, 3, and 5,

and a term of life in prison on count 4, and a term of 240 months on count 6, all to

be served concurrently to each other for a total term of life in prison. ER I p. 26;

CR 134, p. 26.

---

advice of counsel, the defendant declined to make any statement regarding the
offense" although he entered guilty pleas to three counts and acknowledged his
need for treatment related to all of the charges. PSR ¶¶ 24-27.

26

## V.    Summary of the Argument

Mr. Clemans, a United States citizen who lived in Thailand for most of the timeframe at issue in this case, engaged in serious and harmful misconduct between 2013 and 2015.  As a result, underage girls in the Philippines were sexually exploited and depicted in child pornography.  In this appeal, Mr. Clemans in no way denies he violated some federal statutes and hurt children in the Philippines.  However, in its zeal to prosecute Mr. Clemans in every imaginable way, the government filed both charges that fit Mr. Clemans' conduct and charges that do not.  Mr. Clemans openly admitted and entered guilty pleas without plea agreements to three counts that involved his participation in the production and receipt of child pornography, Counts Three, Five, and Six.  He does not challenge his conviction for those three counts and, whatever the outcome of this appeal, he will serve a very substantial prison term for those counts of conviction.

Mr. Clemans *does* challenge his conviction for three counts he simply did not commit and the government did not prove: Counts One, Two, and Four.  Mr. Clemans put on no defense evidence and the parties do not dispute the basic facts, but Mr. Clemans contends that the facts do not prove the elements of Counts One, Two, and Four.  As to Counts One and Two, although the superseding indictment alleged he travelled or conspired to travel from the United States to the Philippines for the purpose of engaging in illicit sexual conduct, in fact both the 2013 trip he

27

took to the Philippines and a possible trip he discussed in 2014 and 2015 did not involve travel from the United States. As to Count Four, neither Mr. Clemans nor any unindicted individuals made an "offer" to obtain custody or control of a minor to produce child pornography in interstate or foreign commerce. Rather, all offers were made within the Philippines by in-person direct communication.

In addition, numerous errors were made in the calculation of Mr. Clemans' sentence. These include use of the wrong guideline for Counts Two and Three; the baseless application of specific offense characteristics for Counts Three, Four, and Five; a violation of the *Ex Post Facto* clause for Count Three, and the failure to properly group Count Four. In addition, the errors include a failure to give Mr. Clemans' an offense level reduction for acceptance of responsibility that was based on a misconstruction of U.S.S.G. § 3E1.1 and its commentary, the improper consideration of Mr. Clemans' decision to follow his counsel's advice and not discuss the offense with the probation officer, and a serious devaluation of Mr. Clemans' post-arrest assistance to law enforcement. As described below, although the district judge found this assistance barely worth noting, in fact it was critical to the arrest of two child predators in the Philippines, the rescue of three girls from those predators, the protection of future potential victims in the Philippines from the predators, and the development of evidence that was used by the government against Mr. Clemans.

28

## VI.  Argument

### A. Standards of Review

This Court reviews challenges to the sufficiency of evidence, including questions of statutory interpretation, *de novo*.  *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 157, 202 L. Ed. 2d 96 (2018). "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (internal quotations and citations omitted).

With respect to the sentencing errors, the only issue Mr. Clemans raised in district court that is included in this appeal is the district court's determination that Mr. Clemans was not entitled to a reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1.  Where a Guidelines issue is preserved below, this Court reviews the district court's construction and interpretation of the Guidelines *de novo* and its application of the Guidelines to the facts of a case for abuse of discretion.  *United States v. Johnson*, 913 F.3d 793, 799 (9th Cir. 2019). Where a Guidelines issue is raised for the first time on appeal, this Court reviews for plain error.  For purposes of plain error review, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most

29

often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, __ U.S. __, 136 S. Ct. 1338, 1345 (2016). A Guidelines error that affects substantial rights ordinarily satisfies the fourth prong of plain error review, that the error affects the "fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, __U.S. __, 138 S. Ct. 1897, 1908 (2018).

**B. The Evidence was Not Sufficient to Support Counts One or Two Because the Travel for Illicit Sex Mr. Clemans Either Undertook or Discussed Did Not Originate in the United States.**

18 U.S.C. § 2423(b) provides in relevant part that:

**(b) Travel with intent to engage in illicit sexual conduct.--**. . . a United States citizen . . . who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

In Count One, the government alleged that between September 10, 2013, and November 15, 2013, Mr. Clemans, a United States citizen, travelled or attempted to travel in foreign commerce "from the United States, through Thailand, to the Philippines," for the purpose of engaging in illicit sexual conduct. ER II, p. 199; CR 79, p. 1. In Count Two, the government alleged that between June 24, 2014, and July 24, 2015, Mr. Clemans conspired with other persons to travel in foreign commerce "from the United States, through Thailand, to the

30

Philippines," for the purpose of engaging in illicit sexual conduct. ER II pp. 200-03; CR 79, pp. 2-5. Both Count One and Two, then, relied on the proof of the fact that Mr. Clemans' actual or planned travel from Thailand to the Philippines originated in the United States.[8] The evidence was insufficient to support either Count One or Count Two because there was not sufficient evidence that the actual, attempted, or agreed upon travel with the intent to engage in illicit sexual conduct involved travel from the United States.

Turning first to Count One, there was no dispute that the travel was a trip Mr. Clemans took between November 13 and 17, 2013, between Thailand and the Philippines. Mr. Clemans purchased the plane ticket for this trip in early November, 2013, while he was in Thailand. ER II pp. 110-11; CR 136-2, pp. 166-67 (RT pp. 512-13). This trip had no connection to the United States.

There was also evidence that Mr. Clemans traveled from the United States to his home in Thailand on September 11-13, 2013. ER II pp. 61, 75, 107; CR 136-2,

---

[8] A nexus to the United States is critical for the purposes of jurisdiction. *See United States v. Schmidt*, 845 F.3d 153, 157 (4th Cir.), *cert. denied*, 138 S. Ct. 234 (2017) ("Travel in foreign commerce therefore encompasses movement abroad that maintains some nexus with the United States."); *United States v. Weingarten*, 632 F.3d 60, 70 (2d Cir. 2011) ("[I]t would be anomalous to construe the general definition of 'foreign commerce' in § 10 . . . as including all forms of commerce occurring outside the United States and without nexus whatsoever to this country."). The government appeared to accept this jurisdictional requirement by specifically alleging in Counts One and Two that Mr. Clemans' actual or planned travel originated in the United States.

31

p. 67, 81, 163 (RT pp. 413, 427, 509).  Before he left the United States, Mr. Clemans communicated with Nelia Cruz, a woman in the Philippines, about visiting the Philippines and having sex with minors in the Philippines on an unspecified date in the future.  ER II p. 71; CR 136-2, p. 77 (RT p. 423).  While he was in the United States, he had not bought an airline ticket or made a specific plan to travel to the Philippines.  It was not until two months after he traveled from the United States to his home in Thailand that Mr. Clemans bought a plane ticket from Thailand to Philippines and actually traveled between Thailand and Philippines for the purpose of illicit sexual activity.

The government argued that Mr. Clemans' trip from the United States to Thailand, and then his later trip between Thailand and the Philippines, was one continuous act of "travel."  In denying Mr. Clemans' Rule 29 motion, the district judge agreed with this argument, finding that "Clemans took only one trip: it started in California and continued until he arrived in the Philippines."  ER I p. 34; CR 99 p. 5.  It is clear from the undisputed facts that this is not accurate.  There never was a ticket, itinerary, or plan for a single trip that included the United States and the Philippines.  In September of 2013, over the course of some 48 hours, Mr. Clemans made one trip from the United States to his home in Thailand.   Two months later, he purchased an airline ticket and made a different trip from Thailand to the Philippines, and it was only this second incident of travel that was "for the

32

purpose of engaging in any illicit sexual conduct." While the government presented evidence showing Mr. Clemans began to form an intent to engage in illicit sexual conduct while he was still in the United States, it did not present evidence that he "travel[ed] in foreign commerce, for the purpose of engaging in any illicit sexual conduct" with respect to a trip that originated or ended in the United States.

The district court relied heavily on *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), *overruled by United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018), in deciding that Mr. Clemans' trip between the United States and Thailand, and his next trip between Thailand and the Philippines, could be considered one continuous instance of "travel in foreign commerce." In *Clark*, this Court interpreted the term "travel" in 18 U.S.C. § 2423(c), which at the time read:

> **(c) Engaging in illicit sexual conduct in foreign places.** Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

It should first be noted that the district court's reliance on *Clark* was problematic from its inception because the statutory subsection at issue in *Clark*, subsection 2423(c), unlike subsection 2423(b), does not require that the travel be done with the *mens rea* of intending to engage in illicit sexual conduct. Turning to *Clark* itself, the opinion was really about whether illicit sex had to take place

33

*during* travel, and not about the definition of travel. In *Clark*, the defendant

conceded that he "travel[ed] in foreign commerce" when he traveled between the

United States and Cambodia and that two months later he engaged in illicit sex in

Cambodia. He argued that the statute required that the illicit sexual conduct occur

during the travel. The *Clark* Court rejected this argument. *Clark*, 435 F.3d at

1107. It based its ruling on the language of the statute and on the fact that

Congress had purposely created subsection 2423(c) as an alternative to subsection

2423(b); while subsection 2423(b) requires proof of *travel with the intent* to have

illicit sex, subsection 2423(c) was designed "so that the government would only

have to prove that the defendant engaged in illicit sexual conduct with a minor

while in a foreign country." *Clark*, 435 F.3d at 1108; H.R. Conf. Rep. 108-66, at

51 (2002) (amending § 2423 to address "a number of problems related to persons

who travel to foreign countries and engage in illicit sexual relations with minors,"

including the need "to prove that the defendant traveled with the intent to engage

in the illegal activity").

Just one year after the *Clark* decision, this Court clarified that under 18

U.S.C. § 2423, when a United States citizen resettles abroad, his or her "travel"

ends. *United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir. 2007) ("a person

permanently settled in a location is no longer traveling, even if that place was not

his place of origin."). The *Jackson* opinion, which was not addressed below,

34

should have made clear that when Mr. Clemans settled in Thailand, his travel from the United States ended.

This Court recently overruled *Clark* in light of legislative changes made to 18 U.S.C. § 2423(c). *United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018). As discussed in *Pepe*, in 2013, Congress amended § 2423(c) as part of the Violence Against Women Reauthorization Act, Pub. L. 113-4, § 1211(b) (2013). The statute now penalizes a U.S. citizen "who travels in foreign commerce *or resides, either temporarily or permanently, in a foreign country*, and engages in any illicit sexual conduct." 18 U.S.C. § 2423(c) (emphasis added). In other words, the 2013 version of subsection 2423(c) explicitly distinguishes between travelling in foreign commerce on the one hand and taking up temporary or permanent residence in a foreign country on the other. In light of that change, this Court held that the phrase "travels in foreign commerce, and engages in any illicit sexual conduct" requires that the defendant engage in illicit sexual conduct *while* travelling; it does not apply to a person who relocates to a foreign country and then engages in illicit sexual conduct. *United States v. Pepe*, 895 F.3d 679, 691 (9th Cir. 2018).

*Pepe's* re-interpretation of the phrase "travels in foreign commerce" is significant to Mr. Clemans's case. First, *Clark* was the primary case on which the district court relied in denying Mr. Clemans' Rule 29 motion, and *Clark* is no longer good law. Second, *Pepe* clarifies the meaning of the element "travels in

foreign commerce." If it were not clear enough from this Court's *Jackson* decision, it is now indisputable under *Pepe* that a United States citizen who resides in a foreign country is not "travelling" while he is at his home in his resident country for the purposes of 18 U.S.C. § 2423.

For the purposes of Count One, Mr. Clemans travelled from the United States to his home in Thailand in September of 2013. That travel ended when Mr. Clemans reached his residence in Thailand, and that travel was not for the purpose of engaging in illicit sexual conduct but for the purpose of reaching his residence. He then travelled again between Thailand and the Philippines in November of 2013 for the purpose of engaging in illicit sexual conduct in the Philippines, but that travel had no nexus to the United States. Instead, Mr. Clemans was in the same position as the defendant in *Weingarten*, a United States citizen who had resettled abroad and whose trip between two foreign countries, Belgium and Israel, did not have a sufficient nexus to the United States to constitute "travel in foreign commerce" for the purpose of 18 U.S.C. § 2423(b). *Weingarten*, 632 at 71 ("18 U.S.C. § 2423(b) does not criminalize travel occurring wholly between two foreign countries and without any territorial nexus to the United States."). While the *Weingarten* Court recognized that stopovers in foreign countries on a multi-legged journey to or from the United States would not disrupt the trip's nexus to the United States, it did not deem Mr. Weingarten's travel between Belgium and Israel

36

to be a "stopover" despite the fact that a few months later he travelled between Israel and the United States. *Weingarten*, 632 F.3d at 63, 70. Similarly, Mr. Clemans' return from the United States to Thailand was not a "stop" in a multi-legged trip; it was a return to his residence and an end to his "travel" from the United States to Thailand.

With respect to Count Two, for nearly the entire time that Mr. Clemans and Tandeg communicated, Mr. Clemans was in Thailand and discussed possible travel in the future to the Philippines. There was no indication that he and Tandeg were conspiring to plan a trip that originated from, ended in, or included any stops in the United States. Thus whatever bad acts they were conspiring to do, those acts did not include a violation of 18 U.S.C. § 2423(b), which requires travel with a nexus to the United States.

In May of 2015, while Mr. Clemans was in the United States, he did ask Tandeg about the possibility of visiting the Philippines in the summer of 2015, but when she indicated she was busy and did not say he could visit, he acknowledged he could not visit her because she was busy. ER II pp. 125-26, 129; Gov't Exhs. 52-006-007, 52-010. Even when Mr. Clemans made these suggestions, he indicated any future trip would likely be from Thailand to the Philippines. ER II p. 130; Gov't Exh. 52-026; ER II p. 105; CR 136-2, p. 154 (RT p. 500). There was simply no evidence that Mr. Clemans and Tandeg ever entered an agreement to

commit the offense of having Mr. Clemans travel from the United States to the
Philippines for the purpose of having illicit sex in the Philippines.  As the Eighth
Circuit recently held in a case with factual similarities to the present one, when a
defendant communicated with a minor in the Philippines, discussed the possibility
of meeting her at a hotel in Manila and paying for sex, and did some research into
travel to the Philippines but did not purchase a plane ticket or reserve a hotel room,
there was not sufficient evidence that the defendant attempted to travel in violation
of 18 U.S.C. § 2423(b).  *United States v. Bernhardt*, 903 F.3d 818, 829 (8th Cir.),
*cert. denied*, 139 S. Ct. 578 (2018).  The Eighth Circuit observed that while the
defendant's conduct may have constituted an attempt to entice a minor to engage in
unlawful sexual activity, enticement is a separate offense from travelling to engage
in unlawful sex, and the defendant in *Bernhardt* simply did not have an a
sufficiently developed plan to travel to be guilty of an attempt.  *Bernhardt*, 903
F.3d at 828–29.  Similarly, Mr. Clemans and Tandeg never made an agreement
about an actual plan for Mr. Clemans to travel from the United States to the
Philippines, and thus the government did not prove the conspiracy alleged in Count
Two.

**C. The Evidence Was Not Sufficient to Support Count Four Because Any Offers to Purchase or Take Custody of Children Was Not Communicated or Transported in Interstate or Foreign Commerce.**

In Count Four, the government charged that between June 24, 2014, and July 24, 2015, Mr. Clemans offered to purchase or otherwise obtained custody or control of at least one minor, with knowledge that as a consequence the minor would be portrayed in a visual depiction engaging in sexually explicit conduct, with the intent to promote this conduct for the purpose of producing a visual depiction of it, and the offer was communicated and transported through interstate or foreign commerce, in violation of 18 U.S.C. § 2251A(b).

18 U.S.C. § 2251A requires proof of facts necessary for federal jurisdiction. It requires one of three jurisdictional facts to be proved, only one of which is relevant here:

> (2) any offer [to purchase or otherwise obtain custody or control of a minor to produce child pornography] was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail;[9]

---

[9] The legislative history of 18 U.S.C. § 2251A shows that Congress intended that this method of proving jurisdiction be linked to the actual illegal offer outlawed by the statute. The House Report for the Child Protection and Obscenity Enforcement Act of 1988 (H.R. 5210) includes a section-by-section analysis stating that the new Section 2251A "sets forth three jurisdictional circumstances for the new offenses: (1) In the course of conduct described, the minor or the actor traveled in or was transported in interstate or foreign commerce. (2) *Any offer described in the offense* was communicated or transported in interstate or foreign commerce

18 U.S.C. § 2251A(c)(2).

In the present case, prior to instructing the jury, the district court determined that the government had only pled a "(c)(2)" theory of jurisdiction in the superseding indictment.  ER II p. 56; CR 136-3, p. 45 (RT p. 593).  It denied the government's request to instruct the jury on the jurisdictional element contained in (c)(1) and instead ruled that the jury would only be instructed as to (c)(2)—the theory that an offer to purchase or obtain custody or control of a minor was communicated or transported in interstate or foreign commerce.  *Id.*  The jury was instructed that it had to find "the offer was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer."  ER II p. 58; CR 136-3, p. 117 (RT p. 665).

There was no evidence introduced at trial that any offer to purchase or obtain custody or control of a minor was actually made in interstate or foreign commerce.  Any "offers" made to the girls' parents or guardians were made in person by Atad within the Philippines.  Instead, the government's theory was that Mr. Clemans' communications to Tandeg could be considered "offers."  In its closing argument to the jury on Count Four, the government stated:

(including by computer) or by mail. (3) The conduct took place in any territory or possession of the United States."  134 Cong. Rec. E3750-01, 1988 WL 182584.

>    You know the defendant's offers were communicated in foreign commerce because it's undisputed. There is a stipulation between the parties, which means the defendant has agreed, that all of his Yahoo messages, including e-mails and instant messages, traveled through the U.S.
>
>    The stipulation, which you can read here, says that each of those messages during the time period we're talking about would necessarily have transited a Yahoo mail server located in the United States regardless of the physical location of the user of the account.

ER II p. 57; CR 136-3, p. 87 (RT p. 635).

The problem with the government's theory is that Mr. Clemans' communications with Tandeg regarding obtaining custody or control of a minor were not "offers" to obtain custody or control of a minor. Instead, they were suggestions or instructions to Tandeg to make such offers to guardians within the Philippines. Mr. Clemans himself never made an offer to a guardian or a child to obtain custody or control of a child. Mr. Clemans never indicated he wanted or expected Tandeg to make such an offer using interstate or foreign commerce. He expected her to communicate directly to people within the Philippines and, in fact, the offers to obtain custody or control of M.Q., J.U., and E.S. were all made in person, orally, by Atad to the guardians of the three girls. The evidence at trial simply did not show that offers were made in interstate or foreign commerce and thus is insufficient to support the conviction for Count Four.

41

In an analogous situation, this Court has found insufficient evidence to support a conviction. In *United States v. Korab*, 893 F.2d 212 (9th Cir. 1989), Korab was charged with violating 18 U.S.C. § 875(b), which provides that

> *Whoever*, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, *transmits in interstate or foreign commerce any communication containing any threat* to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(b) (emphasis added). The evidence showed that Korab made an interstate telephone call to his co-defendants asking them to extort a man who lived in Phoenix, and that the co-defendants then travelled to Phoenix and, through communications that happened entirely within Phoenix, made the extortionate threats. This Court found there was insufficient evidence that Korab or his co-defendants violated § 875(b). The extortionate threats were made entirely within Phoenix, not in interstate or foreign commerce. *Id*. at 214. While Korab made an interstate telephone call asking the co-defendants to engage in extortion, because the plain language of the statute provides that the extortionate threat be made in interstate or foreign commerce "telephone calls to organize an extortion do not satisfy the proof required of threatening calls." *Id*. at 215.

Similarly, in the present case, any offers to take custody or control of children were made entirely within the Philippines using face-to-face communication, not in interstate or foreign commerce. Furthermore, any communication Mr. Clemans made in interstate or foreign commerce asking Tandeg to make the prohibited offers to people within the Philippines were not themselves prohibited offers. Therefore, the evidence is insufficient to support Mr. Clemans' conviction for Count For.

### D. The District Court Made Sentencing Errors that Require Vacation of the Sentence and a Remand for New Sentencing Proceedings.

### 1. With Respect to Counts Two and Three, the District Court Plainly Erred in Using U.S.S.G. Sections 2G1.3, 2G2.1, Rather than Section 2X1.1, to Calculate Mr. Clemans' Advisory Guidelines Range.

As to several counts, Mr. Clemans was convicted of conspiracy. Count Two charged conspiracy to violate 18 U.S.C. § 2423(b) and (e). Count Three charged a conspiracy to produce child pornography in violation of 18 U.S.C. § 2251(c) and (e), and Mr. Clemans entered a plea of guilty to "conspiracy to produce child pornography. ER II p. 191; CR 136, p. 30 (RT p. 30).

"Where an offense involves a conspiracy, attempt, or solicitation, U.S.S.G. § 1B1.2(a) directs a district court to start its Guidelines calculation with U.S.S.G. § 2X1.1. *United States v. Simon*, 858 F.3d 1289, 1291 (9th Cir. 2017). When an

43

attempt, solicitation, or conspiracy is expressly covered by another offense

guideline section, the sentencing court should instead apply that guideline section,

but here neither of the conspiracy convictions was covered by another guideline

section. Therefore, as to Counts Two and Three, the district court should have

calculated the advisory Guidelines range using U.S.S.G. § 2X1.1.

Use of U.S.S.G. § 2X1.1 would have made a difference in this case. Mr.

Clemans would have only received adjustments for the substantive offense at issue

for "intended offense conduct that can be established with reasonable certainty."

U.S.S.G. § 2X1.1(a). For example, as to Count Three, Mr. Clemans should not

have received the four levels enhancement under § 2G2.1(4)(A) and (B) on the

ground that he possessed images and videos that portrayed sadistic or masochistic

conduct or images of infants and toddlers because there was no evidence that he

intended for his conspiracy with Tandeg to include production of such images.

This change alone would have brought the offense level for Group Three, the

group with the highest offense level, down to 42. In addition, Mr. Clemans would

have received a three-level reduction for any conspiracy unless it was all but

complete when he was apprehended. U.S.S.G. § 2X1.1(b)(2). This certainly

would have led to a three-level reduction as to Count Two in that Mr. Clemans had

not even bought a plane ticket to the Philippines when he was arrested.

44

Because the district court used the wrong guideline section to calculate the advisory range as to Counts Two and Three, and because this affected the advisory range, Mr. Clemans' sentence should be vacated and the case remanded for new sentencing proceedings.

> **2. If the District Court's Use of U.S.S.G. Section 2G2.1 With Respect to Group Three Was Correct, the District Court Plainly Erred, or Violated *Ex Post Facto* Principles, in Adding Four Levels Under Section 2G2.1(4)(A) and (B) on the Ground that Mr. Clemans Possessed Other Images Portraying Sadistic or Masochistic Conduct or Images of Infants or Toddlers.**

Count Three involved Mr. Clemans' conspiracy to produce child pornography between June 24, 2014, and July 24, 2015 in violation of 18 U.S.C. § 2251(c) and (e). While Mr. Clemans contends that the district court should have used U.S.S.G. § 2X1.1 to calculate his advisory Guidelines range, if this Court determines that the district court was correct in using U.S.S.G. § 2G2.1, Mr. Clemans argues the district court plainly erred in adding the specific offense characteristic applicable when the offense "involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) an infant or toddler." U.S.S.G. § 2G2.1(b)(4). The use of this characteristic increased the offense level by four levels.

The offense at issue in Count Three was a conspiracy to produce child pornography involving M.Q., J.U., and E.S. Mr. Clemans did not conspire with

45

Tandeg to produce images of these girls that involved sadistic, masochistic or violent conduct or images of infants or toddlers. The PSR did not identify such images in connection with M.Q., J.U., or E.S. but instead referred to other images found in Mr. Clemans' general pornography collection. PSR ¶ 50. Where a defendant possesses child pornography images that are not "relevant conduct" to the offense of conviction—*i.e.* part of preparation of the offense, commission of the offense, or attempting to avoid detection for the offense—that pornography cannot be used as a specific offense characteristic of the offense of conviction under U.S.S.G. § 1B1.3(a)(1). *United States v. Fowler*, 216 F.3d 459, 461 (5th Cir. 2000). Here, no connection was made between the sadistic images, or images of infants and toddlers, and Mr. Clemans' offense of conviction.

Moreover, use of images of infants and toddlers to support the § 2G2.1(b)(4) violates the *Ex Post Facto* clause because the 4-level addition on the ground that the offense involved material that portrayed an infant or toddler was added in the 2016 amendments to the Guidelines. See U.S.S.G. App. C, Supp., Amend. 801 (2016). Mr. Clemans' offense conduct was complete by July 24, 2015. When the Guidelines in place on the date of sentencing produce a higher advisory range than those that were in place on the date of the offense, the district court is to use the Guidelines in place on the date of the offense to avoid a violation of the *Ex Post Facto* clause. *Peugh v. United States*, 133 S. Ct. 2072 (2013). If this Court

46

sustains the district court's use of the 2G2.1(b)(4) specific offense characteristic in this case, and it does so in part on the basis of a finding that Mr. Clemans had images of infants or toddlers, then Mr. Clemans' advisory Guidelines range should be recalculated using the 2014 Federal Sentencing Guidelines Manual.

> **3. With Respect to Groups Four and Five, the District Court Erred in Adding Two Levels Under Section 2G2.1(b)(2)(A) on the Ground that the Offenses Involved the Commission of a Sexual Act.**

Group Four consisted of Counts Three and Five with respect to E.S./ Nicole. PSR ¶¶ 56-64. U.S.S.G. § 2G2.1 was used to calculate the offense level. PSR ¶ 57. Two levels were added under § 2G2.1(b)(2)(A) on the ground that the offense involved the commission of a sexual act: E.S. kneeling before M.Q. with her tongue extended toward M.Q.'s vulva. PSR ¶ 59. Group Five Consisted of Counts Three and Five with respect to J.U./ Ishin. PSR ¶¶ 65-73. Again U.S.S.G. § 2G2.1 was used to calculate the offense level. PSR ¶ 88. Two levels were added under § 2G2.1(b)(2)(A) on the ground that the offense involved the commission of a sexual act: sitting on a tile surface and urinating. PSR ¶ 68.

The application notes to § 2G2.1 state that "'sexual act' has the meaning given that term in 18 U.S.C. § 2246(2)." U.S.S.G. § 2G2.1 cmt. app. n. 3. 18 U.S.C. § 2246(2) defines "sexual act" as

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

All of these definitions of "sexual act" include contact, penetration, or touching. The conduct described in the PSR does not fall within this definition.

### 4. Count Four Should Have Been Placed Within Groups Three, Four, and Five.

Under U.S.S.G. § 3D1.2, closely related counts, or those counts "involving substantially the same harm shall be grouped together into a single Group." Counts involving the same victim and transactions connected by a common criminal objective or constituting part of a common scheme or plan are to be grouped together. U.S.S.G. § 3D1.2(b). In the PSR, as to each victim, closely related counts were grouped together. Thus, with respect to Angel/M.Q. Counts Three (conspiracy to produce child pornography), Five (attempted production and production of child pornography), and Six (receipt of child pornography) were grouped together in Group Three. PSR ¶¶ 43-45. Similarly with respect to

48

E.S./Nicole, Counts Three and Five were grouped together in Group Four (PSR ¶¶ 56-64), and with respect to J.U./Ishin, Counts Three and Five were grouped together in Group Five (PSR ¶¶ 65-73).

Count Four involved the violation of 18 U.S.C. § 2251A(b), offering to purchase or otherwise obtain custody or control of a minor with knowledge that it would lead to the production of child pornography where the offer was communicated in interstate or foreign commerce. The government's evidence for this Count had to do with getting M.Q., E.S., and J.U. to the photo shoot sessions in which the child pornography addressed Counts Three and Five was produced. There does not appear to be any reason that Count Four was not included in Groups Three, Four, and Five.

The erroneous creation of Group Six led to an extra half unit when Mr. Clemans' adjusted offense level was calculated. PSR ¶ 80. On remand, Count Four should not be separated its own group but instead included in related groups.

**5. The District Court Misinterpreted the Guidelines or Abused Its Discretion in Failing to Deem Mr. Clemans Eligible for a Reduction in Offense Level for Acceptance of Responsibility.**

United States Sentencing Guidelines Section 3E1.1 states that if a defendant has clearly demonstrated acceptance of responsibility, his offense level is to be reduced by two levels. A district court may not withhold this reduction for on the

49

ground that a defendant has exercised his or her right to go to trial, failed to provide evidence against himself, or refused to make incriminating statements. *United States v. Hernandez*, 894 F.3d 1104, 1109–10 (9th Cir. 2018). A district court is directed to consider whether the defendant truthfully admitted the conduct comprising the offense of conviction and truly fully admitted, or did not falsely deny, additional relevant conduct. U.S.S.G. § 3E1.1. cmt. app. n. 1(A). The commentary states that the reduction should not apply to a defendant who puts the government to its burden of proof at trial "by denying the essential factual elements of guilt" but it can apply where a defendant goes to trial to "assert and preserve issues that do not relate to factual guilt . . . [such as] a challenge to the applicability of a statute to his conduct." U.S.S.G. § 3E1.1. cmt. app. n. 2. The district court is also to consider the defendant's voluntary assistance to the authorities after the offense. U.S.S.G. § 3E1.1. cmt. app. n. 1(E).

Here, prior to trial, Mr. Clemans openly admitted all of the factual elements related to Counts Three, Five, and Six. He entered guilty pleas to Counts Three, Five, and Six without any plea agreement. By doing so, he admitted that he and Tandeg entered an agreement to produce child pornography, that Tandeg produced child pornography at Clemans' direction, and that he received child pornography. ER II pp. 193-98; CR 81 (proposed factual basis for plea, which was largely adopted at entry of plea). At trial he did not deny being the person who

participated in the communication or engaged in the travel the government attributed to him in its effort to prove Counts One, Two, and Four. He went to trial to pursue purely legal challenges to the applicability of 18 U.S.C. § 2423 and 18 U.S.C. § 2251A to his conduct. He put on no defense case at all. He simply made serious, good faith arguments that the conduct at issue was not a violation of those statutes. This is precisely the type of exercise of the right to trial that the Guidelines state should not deprive a defendant of a reduction for acceptance of responsibility.

In addition, Mr. Clemans voluntarily assisted authorities in finding Tandeg and Atad in the Philippines by giving the FBI access to the internet account he had used to communicate with Tandeg, thereby allowing the sting operation to go forward. He did this with no agreement from the government for any benefit in exchange. ER II pp. 119-20; CR 136-2, pp. 184-85 (RT pp. 530-31). This allowed authorities in the Philippines to find and prosecute two child predators, Tandeg and Atad, protecting both known and potential future victims. ER II pp. 140-46; CR 136-1, pp. 46-52 (RT pp. 258-64); ER II p. 120; CR 136-2, p. 185 (RT p. 531). Furthermore, because Mr. Clemans' cooperation allowed U.S. authorities to find Tandeg and Atad, it allowed them to find M.Q./Angel, E.S./Nicole, and J.U./ Ishin. The girls were saved from future exploitation by Tandeg and Atad and their testimony became a critical piece of the government's case against Mr. Clemans.

51

Finally, testimony and a videotape of the sting operation that Mr. Clemans'

cooperation enabled also became evidence in the case against him. ER II p. 149;

CR 136-1, p. 55 (RT p. 267).

The district court acknowledged that Mr. Clemans "did cooperate

somewhat" but seemed to give no weight to the fact that Mr. Clemans' cooperation

was absolutely necessary for the arrest and prosecution of Tandeg and Atad, the

rescue of M.Q./Angel, E.S./Nicole, and J.U./ Ishin, the protection of other children

from Tandeg and Atad, and the ability of the government to find M.Q./Angel,

E.S./Nicole, and J.U./ Ishin and have them testify in Mr. Clemans case. The

district court did not seem to recognize that Mr. Clemans' unrewarded cooperation

allowed the government to generate testimony and exhibits that were used against

Mr. Clemans. Surely Mr. Clemans cooperation should have weighed in his favor

in that he was willing to help his victims even though doing so was very much

against his own legal interests.

The district court acknowledged that Mr. Clemans put on a purely legal

defense and "not a factual innocence defense." ER I p. 6; CR 134, p. 6. However,

it stated it did not "see . . . a full and complete acceptance of responsibility of all of

these crimes." *Id.* The district court indicated it was adopting the government's

argument against the reduction, which itself relied on the PSR's note that at the

sentencing interview, Mr. Clemans, on the advice of his counsel, declined to make

statements about facts of the case, although he acknowledged his need for treatment.  PSR ¶¶ 24-27.

Mr. Clemans' compliance with his attorney's advice not to discuss the offense with the probation officer was understandable in light of the fact that an appeal was likely.  This Court has held that a "district court cannot consider the defendant's refusal to discuss the offense with the probation officer as evidence weighing against acceptance of responsibility."  *United States v. Vance*, 62 F.3d 1152, 1157 (9th Cir. 1995) (citing *United States v. LaPierre*, 998 F.2d 1460, 1468 (9th Cir.1993); *United States v. Watt*, 910 F.2d 587, 592 (9th Cir.1990)).  That is precisely what the district judge did in this case.

Mr. Clemans is entitled to a two-level reduction in the offense level for acceptance of responsibility or, at the very least, a new evaluation by the district judge that fully considers his admission to factual elements of the offense and important assistance to authorities.  Such a re-evaluation should not include consideration of whether he discusses the offense with a probation officer.

## VII.    Conclusion

For the foregoing reasons, Mr. Clemans asks that this Court reverse his convictions on Counts One, Two, and Four.  Whether or not the Court reverses any or all of these convictions, Mr. Clemans asks that the Court vacate his sentence and remand the case to district court for new sentencing proceedings.


Dated: February 25, 2019

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender


*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS

54

No. 18-10035

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL CAREY CLEMANS,

Defendant-Appellant.

District Court Case
No. 2:15-cr-227-JAM-1

Eastern District of California,
Sacramento

BRIEF FORMAT CERTIFICATION
PURSUANT TO CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that
the attached brief is proportionately spaced, has a typeface of 14 points and
contains 13,224 words.

Dated: February 25, 2019

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS

No. 18-10035

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | District Court Case No. 2:15-cr-227-JAM-1 |
| Plaintiff-Appellee, | |
| v. | Eastern District of California, Sacramento |
| MICHAEL CAREY CLEMANS, | |
| Defendant-Appellant. | |

STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendant-Appellant Michael Carey Clemans is not aware of any related cases.

Dated: February 25, 2019

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
CAROLYN M. WIGGIN
Assistant Federal Defender

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS