No. 18-10035

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

V.

MICHAEL CAREY CLEMANS,
DEFENDANT-APPELLANT.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
D.C. NO. 2:15-CR-227-JAM
_____

ANSWERING BRIEF OF THE UNITED STATES
_____

MCGREGOR W. SCOTT
United States Attorney

CAMIL A. SKIPPER
Assistant U.S. Attorney
Appellate Chief

ANDRÉ M. ESPINOSA
COLLEEN M. KENNEDY
Assistant U.S. Attorneys
Eastern District of California
501 I Street, Suite10-100
Sacramento, California  95814
Telephone:  (916) 554-2700

Attorneys for Appellee

TABLE OF CONTENTS

Table of Contents ....................................................................i

Table of Authorities .............................................................v

Statement of Jurisdiction ....................................................1

Issues Presented for Review.................................................1

Bail Status ............................................................................3

Statement of the Case..........................................................3

   I. Clemans is a United States citizen and resident
      who sometimes worked abroad....................................3

   II. While living in the United States in 2013, Clemans
      planned with an accomplice in Manila to travel
      there for sex with minors before leaving the United
      States for that purpose. ...........................................5

      A. Clemans traveled in foreign commerce to
         Thailand and on to Manila, affirming the intent
         he formed in the United States...........................7

      B. Clemans reached Manila and had sex with
         minor girls. ..........................................................9

   III.In 2014–2015, Clemans bought children to produce
      sexually explicit images and conspired to travel
      from Sacramento to Manila with the intent to
      engage in illicit sexual conduct with his child
      victims. ...................................................................10

      A. Tandeg accepted Clemans's offer to commit a
         variety of child exploitation crimes...................10

      B. Clemans's criminal plan included his offer that
         Tandeg take custody and control of children to
         produce child pornography for him....................12

C. Clemans made general and specific offers to obtain custody of girls for explicit photoshoots and planned sex with his victims.......................................13

D. Tandeg arranged photoshoots as Clemans planned travel to Manila for sex with victims..................15

E. Clemans "bought" his victims' virginity and planned to travel for sex with them..................................16

F. Clemans returned to the United States, was arrested and released, and planned to travel directly to Manila for sex with his victims. .......................19

G. Clemans gave investigators access to his Yahoo! account......................................................................21

IV. On the first day of trial, Clemans pleaded guilty to three counts, including conspiracy to produce child pornography; a jury convicted him of the remaining counts. .......................................................................22

V. The district court sentenced Clemans to life in prison...........................................................................23

Summary of Argument .....................................................27

Argument .........................................................................32

I. The evidence was sufficient to sustain Clemans's convictions for travel and travel with intent to engage in illicit sexual conduct.................................32

A. Standard of Review ...............................................32

B. The evidence demonstrated Clemans formed an intent to travel from the United States to Manila for sex with minors and did travel from the United States for that purpose. ....................................32

C. No authority requires a different conclusion.....................36

ii

II. The evidence was sufficient to sustain Clemans's conviction for conspiracy to travel with intent to engage in illicit sexual conduct ................................................... 42

    A. Standard of Review ........................................................... 42

    B. The evidence proved the conspirators made an agreement and completed multiple overt acts in furtherance of the conspiracy ............................................ 42

III. Sufficient evidence supports Clemans's conviction for buying children ................................................................... 46

    A. Standard of Review ........................................................... 46

    B. Clemans made multiple offers that were communicated and transported in foreign commerce. ............................................................................ 47

    C. Clemans's offers to purchase or obtain custody and control of his victims also affected foreign commerce. ............................................................................ 59

IV. The district court correctly found Clemans's did not demonstrate acceptance of responsibility. ............................. 61

    A. Standard of Review ........................................................... 61

    B. Clemans did not demonstrate acceptance of responsibility. ..................................................................... 62

V. The district court correctly added two levels to groups four and five because Clemans's offense involved sexual acts and sexual contact between Angel, Ishin, and Nicole. ........................................................... 69

    A. Standard of Review ........................................................... 69

    B. Clemans's offense involved sexual acts and sexual contact between Angel, Ishin, and Nicole. ............. 69

VI. The conspiracy guideline did not require any reduction in Clemans's offense level. .................................... 71

    A.  Standard of Review ............................................. 71

    B.  Clemans's conduct satisfied the exception to § 2X1.1, as did Tandeg's, and application of that guideline to his conspiracy convictions would not have affected his sentencing range. ............................ 72

VII.    The district court did not plainly err by applying an enhancement for possession of pornography that was sadistic, masochistic, and involved infants and toddlers. ................................. 76

    A.  Standard of Review ............................................. 76

    B.  There was no *ex post facto* violation because the 2014 and 2016 Guidelines contain § 2G2.1(b)(4), and application of the enhancement to relevant conduct for the receipt count could not have affected Clemans's sentencing range. ................................ 76

VIII.    The addition of a separate offense group for Clemans's crime of buying children was not plain error. ...................................................................... 80

    A.  Standard of Review ............................................. 80

    B.  Clemans's crime of buying children poses a distinct risk of harm. ........................................... 80

Conclusion ........................................................................ 83

Statement of Related Cases ............................................... 84

Certificate of Compliance ................................................. 85

Certificate of Service ........................................................ 86

iv

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. United Airlines*, Inc.,
  948 F.2d 536 (9th Cir. 1991) .................................................... 36, 46

*Bates v. United States*,
  522 U.S. 23 (1997) ...................................................................... 55

*Jackson v. Virginia*,
  443 U.S. 307 (1979) .......................................................... 32, 42, 46

*Johnson v. United States*,
  520 U.S. 461 (1997) ................................................................ 61, 62

*Peugh v. United States*,
  569 U.S. 530 (2013) ...................................................................... 77

*Russello v. United States*,
  464 U.S. 16 (1983) ........................................................................ 56

*United States v. Adkins*,
  883 F.3d 1207 (9th Cir. 2018) ...................................................... 71

*United States v. Bernhardt*,
  903 F.3d 818 (8th Cir. 2018) ........................................................ 45

*United States v. Bredimus*,
  234 F. Supp. 2d 639 (N.D. Tex. 2002) .......................................... 58

*United States v. Bredimus*,
  352 F.3d 200 (5th Cir. 2003) ....................................... 33, 37, 38, 58

*United States v. Buculei*,
  262 F.3d 322 (4th Cir. 2001) ........................................................ 54

*United States v. Cabrera,*
  288 F.3d 163 (5th Cir. 2002) ........................................................ 75

*United States v. Clark,*
  435 F.3d 1100 (9th Cir. 2006) ..................................................... 38

*United States v. Depew,*
  932 F.2d 324 (4th Cir. 1991) ....................................................... 75

*United States v. Depue,*
  912 F.3d 1227 (9th Cir. 2019) ..................................................... 61

*United States v. Frank,*
  599 F.3d 1221 (11th Cir. 2010) .................................................... 57

*United States v. Gallant,*
  136 F.3d 1246 (9th Cir. 1998) ..................................................... 62

*United States v. Gasca-Ruiz,*
  852 F.3d 1167 (9th Cir. 2017) ..................................................... 61

*United States v. Jackson,*
  480 F.3d 1014 (9th Cir. 2007) ..................................................... 39

*United States v. Korab,*
  893 F.2d 212 (9th Cir. 1989) .................................................. 56, 57

*United States v. Molina,*
  934 F.2d 1440 (9th Cir. 1991) ..................................................... 62

*United States v. Molina-Martinez,*
  136 S. Ct. 1338 (2016) ..................................................... 80, 81, 82

*United States v. Ochoa-Gaytan,*
  265 F.3d 837 (9th Cir. 2001) ....................................................... 62

*United States v. Olano,*
    507 U.S. 725 (1993) ................................................................. 62, 79

*United States v. Pendleton,*
    658 F.3d 299 (3d Cir. 2011)....................................................... 33, 37

*United States v. Pepe,*
    585 F.3d  (9th Cir. 2018) ....................................................... passim

*United States v. Schmidt,*
    845 F.3d 153 (4th Cir. 2017) ........................................................ 39

*United States v. Thomas,*
    893 F.2d 1066 (9th Cir. 1990) ....................................................... 57

*United States v. Weingarten,*
    632 F.3d 60 (2d Cir. 2011).................................................. 33, 37, 38

*United States v. Youssef,*
    547 F.3d 1090 (9th Cir. 2008) ....................................................... 56

## STATUTES

18 U.S.C. § 875(b) .................................................................. 57

18 U.S.C. § 2246(2) ............................................................... 69

18 U.S.C. § 2246(3) ............................................................... 69

18 U.S.C. § 2423................................................................... 65

18 U.S.C. §§ 2423(b)...................................................... passim

18 U.S.C. § 2423(c)........................................................... 37, 73

18 U.S.C. § 2251A(b)(1) ............................................... 22, 47

18 U.S.C. § 2251A(c)(2)................................................. 47, 59

18 U.S.C. §§ 2251(c) and (e), 2252(a)(2) ........................................ 22, 23

18 U.S.C. § 3231 ............................................................................. 1

28 U.S.C. § 1291 ............................................................................. 1

## Rules

Fed. R. App. P. 4(b) ........................................................................ 1

Fed. R. App. P. 32(a)(5) ................................................................ 85

Fed. R. App. P. 32(f) ..................................................................... 85

Fed. R. Cr. P. 29 ........................................................................... 23

U.S.S.G. Ch. 5 ........................................................................ 80, 82

U.S.S.G. § 1B1.11(a) ..................................................................... 77

U.S.S.G. § 1B1.11(a), (b) .............................................................. 77

U.S.S.G. § 1B1.3(a)(1) ................................................................... 78

U.S.S.G. § 2G1.3 ..................................................................... 23, 24

U.S.S.G. § 2G1.3(b)(4) ............................................................ 23, 24

U.S.S.G. § 2G1.3(b)(5) ............................................................ 23, 24

U.S.S.G. § 2G2.1 ..................................................................... 25, 31

U.S.S.G. § 2G2.1(b)(1)(A) ....................................................... 24, 25

U.S.S.G. § 2G2.1(b)(2)(A) ................................................... 24, 25, 69

U.S.S.G. § 2G2.1(b)(4) ........................................................... passim

U.S.S.G. § 2G2.1(b)(6)(B)(i) and (ii) ............................................. 25

U.S.S.G. § 2G2.1(4)(A) and (B) .................................................24

U.S.S.G. § 2G2.2 ...................................................................78

U.S.S.G. § 2G2.2(b)(4) ..........................................................78

U.S.S.G. § 2G2.3 ...................................................................25

U.S.S.G. § 2X1.1 ..............................................31, 72, 74, 75

U.S.S.G. § 2X1.1(b)(2) ....................................31, 72, 74, 75

U.S.S.G. § 3B1.1 ...................................................................24

U.S.S.G. § 3B1.1(c) ..............................................................25

U.S.S.G. § 3D1.2 ..........................................................23, 80

U.S.S.G. § 3D1.2(d) ..............................................................78

U.S.S.G. § 3D1.3(a) ..............................................................78

U.S.S.G. § 3D1.4 ..........................................................26, 79

U.S.S.G. § 3E1.1.......................................................2, 26, 65

U.S.S.G. § 1B1.3(a)(1) ..........................................................78

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231.
Judgment was entered on January 26, 2018. ER 42-43; CR 116.
Clemans filed a timely notice of appeal on January 26, 2018. Fed. R.
App. P. 4(b); ER 41; CR 117. This Court has jurisdiction pursuant to
28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Was the evidence sufficient to support Clemans's
   conviction for attempted travel and travel with intent to
   engage in illicit sexual conduct when he formed the
   requisite criminal intent in the United States and
   thereafter travelled to Manila, through Thailand, for the
   purpose of having sex with minors?

2. Was the evidence sufficient to support Clemans's
   conviction for conspiracy to travel with intent to engage in
   illicit sexual conduct when Clemans and his co-
   conspirator agreed that he would travel from the United
   States to Manila for that purpose and undertook multiple

overt acts in furtherance of the conspiracy while he was in the United States?

3. Was the evidence sufficient to support Clemans's conviction for buying children when he transmitted multiple offers via online chats in foreign commerce to obtain custody of children for the purpose of producing child pornography?

4. Did the district court abuse its discretion by denying a Guidelines reduction under U.S.S.G. § 3E1.1, when Clemans failed to demonstrate acceptance of responsibility for the counts of conviction?

5. Did the district court plainly err in applying the offense characteristic for images involving the commission of a sexual act or sexual contact to groups four and five, when the record evidence contained such images for each victim?

6. When calculating the Guidelines range for the conspiracy counts, did the district court plainly err by failing to apply

the conspiracy guideline when no changes to the offense level would have resulted?

7. Concerning group three, did the district court plainly err in applying the offense characteristic for sadomasochistic images when those images were relevant conduct and when any error could not prejudice Clemans?

8. Did the district court plainly err by creating a separate group for count four when that count resulted in distinct harm and when any error could not prejudice Clemans?

## BAIL STATUS

Clemans is serving the life sentence imposed in this case.

## STATEMENT OF THE CASE

## I.    Clemans is a United States citizen and resident who sometimes worked abroad.

Between September 30, 2012, and September 11, 2013, Michael Clemans lived in the United States, where he is a citizen.  SER II 502-05, 482-501. In 2010 through 2012, Clemans was a pilot in

Panama and Japan.[1] PSR ¶¶ 120–21. In September 2012, he returned home from Japan. SER II 502; PSR ¶ 120. He spent two weeks in Fiji in March 2013. SER II 502, 483.

In September 2013, Clemans began work for a Thai airline. SER 21; SER II 511-12, 488; PSR ¶¶ 119–20. He obtained a non-immigrant visa, which did not grant him residency and required he leave Thailand every 90 days. SER II 305; SER III 726, 775. Work took him out of Thailand frequently, satisfying his limited visa. *See* SER II 482-501.

Clemans regularly returned to Sacramento, living with his mother for up to six months. SER III 775. After September 2013, Clemans returned to the United States for May 2014, several weeks in September 2014, and on April 27, 2015, after which he was arrested in this matter in July 2015, at his mother's home. SER II 502; SER III 631, 644. Clemans used a Sacramento bank account associated with his mother's address. SER II 418-81. He made wire

---

[1] From 1993 through 2009, Clemans lived primarily in the United States with the exception of approximately four years he was a pilot based in Chile. *See* PSR ¶¶ 122–27.

4

payments that listed his mother's contact information. SER II 402-17; SER III 618-20; 622-27. In April 2014, Clemans had a computer delivered to her residence, which he described as "my home." SER 95.

## II. While living in the United States in 2013, Clemans planned with an accomplice in Manila to travel there for sex with minors before leaving the United States for that purpose.

In September 2013, Clemans chatted online from the United States with a person in the Philippines identified as "Nelia Cruz." ER 65–66, 72; SER 1-22; SER III 599-603. Clemans asked Cruz to send him images of girls between ages eight and 17, with "shaved pussies." SER 4. He asked for Cruz's "best looking" girls so he could "choose before I arrive next month."[2] SER 2-3.

On September 9, Clemans and Cruz discussed details of his plan to visit Manila for sex with minors. SER 4-13. Clemans discussed paying Cruz through Western Union. SER 4. They discussed Cruz's location and whether Clemans could "rent" girls in

---

[2] Clemans received child pornography from over 50 people, requested images from 23 people, and discussed traveling to the Philippines for sex with girls with 11 people. SER III 738-41.

5

her apartment. SER 5; SER III 664. Clemans understood they could not bring young girls to a hotel, and they discussed renting a condo, which Clemans said he had "tried . . . before." SER 5-6.

Clemans said he planned to travel to Manila "next month," but was leaving for another location first. SER 6. He reviewed photos Cruz sent and identified a 14-year-old girl as "the type of look I want." SER 6-7. Clemans offered Cruz money to send him photos of girls, but insisted they "must be available to rent next month." SER 7. Clemans said, "I would like to choose . . . before I come." SER 7-8.

Clemans sought reassurance he could trust Cruz for "good business" and warned he did not "want problems with the police." SER 8. He proposed meeting at a nearby mall called "[M]arket [M]arket" when he arrived; Cruz agreed. SER 8-9. They discussed his security concerns and his preference to arrive at night, without girls. SER 8-9.

They negotiated over price. SER 12. Cruz requested $250 per girl. SER 12. Clemans explained, "I have been paying $50 for girls in [M]anila overnight." SER 12. To pay more, he insisted he "need[ed] quality" virgins. SER 12. He offered $200 "for more than

one day," but less for under 12 hours.  SER 12.  He reviewed photos of Cruz's apartment to assess it as a location for sex with girls and suggested he might buy another mattress, "depending on the quality of the girl" Cruz offered.  SER 11-12.

On September 9, Clemans said he would not arrive for several weeks and asked Cruz to "be patient."  SER 13.  He explained he would provide his flight information "in a couple weeks," and they would continue planning.  SER 13.  He agreed to send money soon to "prove" he could.  SER 13.  On September 10, he said he was "preparing to leave" for Thailand and would contact Cruz from Bangkok.  SER 14.

### A. Clemans traveled in foreign commerce to Thailand and on to Manila, affirming the intent he formed in the United States.

On September 11, Clemans told Cruz he was in an airport, "en route" to Thailand.  SER 15.  He revealed his first name and asked about condos to use "during my stay with the girls."  SER 16-17.  He explained he did not "want to have to fight with the girls about fucking them on a hard floor."  SER 18.  That day, Clemans flew from Seattle to Korea.  ER 61; SER II 502, 485; SER III 642-48.

7

Clemans arrived in Thailand on September 13. SER II 485;
SER III 661. His initial visa required him to leave within 30 days.
SER 21; SER II 485. He slept in an apartment in Bangkok while not
working. SER III 778. On September 14, he told Cruz he planned
"to come to Manila shortly," possibly in "two or three weeks." SER
20. However, Clemans's work delayed the quick trip to Manila he
planned. SER 21. Complying with his visa, Clemans visited Laos in
October 2013. ER 133–36; SER II 485.

Thereafter, Clemans cemented details with Cruz. SER 23-77.
He requested more photos and revisited pricing. SER 23-24. He
insisted Cruz "promise" to produce girls, shared his full name, and
instructed her how to pick up money he wired. SER 27-40. On
October 8, Clemans selected "Bebe," a 12-year-old, from a photo.
SER 31-33; SER III 669-70. He said 12 was a "good age" and assured
Cruz he would find a date to visit Manila "early." SER 32-33. He
asked Cruz, "What will [Bebe's] mother say when I want to fuck her
daughter," and Cruz said he would be allowed if he paid. SER 33.

On October 14, Clemans told Cruz he would arrive in Manila in
10 days. SER 42. After missing that date, he told Cruz on November

8

3 he hoped to arrive "Friday possibly." SER 44. On November 5, Clemans told Cruz he was arranging a ticket for the weekend and planned to spend "3 or 4 days" in Manila. SER 44. He reminded Cruz that "usually girls that are 9 and under are difficult to have sex with" and that he would "be doing anal with the girls as well but [would] be gentle." SER 46. He warned, "I don't want any complaints." SER 46.

On November 11, Clemans informed Cruz he would be in Manila that week and requested more photos. SER 50. The next day, Clemans selected a second girl, 11-year-old "Jessa," who Cruz described as "not yet period" and Clemans described as "the type of girl I'm looking for." SER 51-53; SER III 675-76. Clemans told Cruz to have the girls "ready for fucking" and "anal," and sent more money. SER 56-58; SER II 404; SER III 676-81.

### B. Clemans reached Manila and had sex with minor girls.

On November 13, Clemans flew to Manila and arranged to meet Cruz at Market Market. SER 61; SER III 682-84. Cruz failed to appear and explained the girls refused anal sex and only wanted to "play," which angered Clemans. SER 63-24; SER III 685-86. He

9

replied, "I don't play. I fuck." SER 67. He told Cruz, "I only have a few days here. I am not going to waste a day." SER 66. He reminded her, "I am here to fuck a virgin." SER 67-75; SER III 686.

Clemans abandoned his effort with Cruz and, on November 15, turned to another contact identified as "Juvy Malicdem," whom Clemans paid to arrange for sex with two underage girls, at least one of whom resisted him. SER 78-91; SER III 683-93. Clemans was disappointed that neither was a virgin and wanted to "see some blood" on his next visit. SER 91-93. Clemans later gloated to Cruz he had met young girls "with much success." SER 76; SER III 771.

### III. In 2014–2015, Clemans bought children to produce sexually explicit images and conspired to travel from Sacramento to Manila with the intent to engage in illicit sexual conduct with his child victims.

#### A. Tandeg accepted Clemans's offer to commit a variety of child exploitation crimes.

Between June 2014 and July 2015, Clemans chatted online with Lyan Tandeg, a Philippine national, in pursuit of explicit images of, and sex with, young girls. ER 87–92, 101; SER 114, 99-400. Clemans proposed a plan in which he would (1) buy Tandeg a camera; (2) pay to rent a place; (3) pay for explicit photos of girls

10

Tandeg obtained, and more for sex with them; (4) pay Tandeg for photo sessions she managed; and (5) stay at a rental when in Manila. SER 108.  Clemans cautioned, "if I see one of the girls I want sex with, I will want you to keep her there with you until I arrive."  SER 107.  He emphasized he could "get photos anytime off the internet" and wanted sex with girls Tandeg obtained—"the young the better." SER 114-15, 130 131, 159-61.  Tandeg agreed to the partnership. SER 114-15.

Between June 2014 and July 2015, Clemans paid Tandeg $5,775 to support their criminal agreement, including for a camera; a computer; multiple photo shoots; and the virginity of two victims. SER II 390-92, 403-81, SER III 706-07, 711-13, 721-26.  This timeline presents Clemans's payments to Tandeg during the period:



**B.  Clemans's criminal plan included his offer that Tandeg take custody and control of children to produce child pornography for him.**

Their plan included taking custody of and transporting girls for explicit photoshoots according to Clemans's specifications.  SER 101, 107-15, 223; SER III 774.  Clemans envisioned Tandeg as a manager on whom he could rely to interface directly with girls for explicit photos and sex.  SER 103-05, 193; SER III 712-13.  Clemans paid Cruz a "salary" and was her "boss" in their "business."  SER 144, 166, 173, 229, 234, 252, 289-90.  They discussed paying girls' parents, or preying on orphans, typhoon victims, and runaways.[3]  SER 104, 111, 115, 125, 205-06, 211.  Clemans compared taking custody of girls for photos and sex to "renting a car," adding, "We can return the girl after a few days."  SER 193-94.  After selecting victims, Clemans paid Tandeg to "buy" their virginity, which he planned to take during visits to Manila and have Tandeg photograph.  SER 131, 161, 209-11, 224; SER II 388; SER III 721-26, 730-31.

---

[3] Clemans was "looking for girls that are homeless that will not argue and have no obligation but [to] have sex."  SER 211.

12

In response to Clemans's offer, Tandeg found at least three girls to photograph: "Ishin" (J.U.), age 11; "Nicole" (E.S.) age 10; and "Angel" (M.Q.), age seven. SER 108; SER II 534, 553; SER III 611, 786-87. Tandeg photographed Ishin once, Nicole twice, and Angel four times, accumulating more than 3,000 explicit images of them for Clemans. SER II 531-67, 534, 553; SER III 786, 633-42, 616-19, 784-94. Clemans sent Tandeg examples of how to pose the girls, dictating the appearance of their hair, bodies, and faces. SER 105, 141-42, 170, 197, 208, 227-29, 232; SER III 708-10, 712, 715-16. He directed Tandeg to focus photos on a girl's "hymen . . . up close . . . pussy and butt hole. :)" SER 203. Tandeg upload photos into cloud storage for him. SER 223-23, 250; SER II 350; SER III 604-17, 773. Tandeg also stored photos, at Clemans's direction, on a thumb drive he planned to retrieve while visiting Manila. SER 223, 233, 250-51; SER II 357; SER III 636-37.

## C. Clemans made general and specific offers to obtain custody of girls for explicit photoshoots and planned sex with his victims.

Clemans viewed his offers to Tandeg as direct offers to the girls' guardians. SER 194 ("If I offer Angel's mother $150–$200 USD, I

would need to keep her for four days and nights."). Moreover,
Tandeg proved she was able to obtain custody of girls in response to
Clemans's offers by delivering explicit images of girls over multiple
sessions. SER II 534, 553; SER III 786. Within a week of Clemans's
initial June 25 offer, Tandeg arranged a photoshoot of a minor in a
hotel. SER 124, 126-29, 131.

Clemans's later, more specific offers were often accompanied by
payments. On June 30, Clemans offered Tandeg $250 to shoot 300
explicit photos of a girl he knew Tandeg would transport to a hotel
without her parents knowledge. SER 136-39, 230; SER III 706-07.
On July 20, Clemans asked Tandeg to photograph the girl again.
SER 163 ("If I arrange another photoshoot, do you think you can get
closer to the girl and focus on her pussy this time?"). He requested
300 images, delivered sample poses, and sent Tandeg $300. SER
163-77; SER II 409, 447.

On July 1, Clemans negotiated to pay Tandeg to take four girls
to a hotel for explicit photographs. SER 145-57. One girl was a 4-
year-old Clemans told Tandeg to photograph "if she is cute." SER
150-51. Clemans reminded Tandeg to "decide the best hotel for me

and the girls for sex later." SER 151. Clemans paid Tandeg $550 for several photoshoots and to buy a computer. SER 156; SER III 710-12.

### D. Tandeg arranged photoshoots as Clemans planned travel to Manila for sex with victims.

On July 27, Clemans and Tandeg planned a photoshoot of Angel. SER 191. Clemans declared Angel "ready for sex" and planned to "arrange that later when I come." SER 192. Clemans reminded Tandeg to "never mention" where they were taking the girls. SER 193.

On September 6, Clemans paid Tandeg $300 and instructed her to arrange a photoshoot with Nicole and two new "models." SER 202-08; SER II 411, 456. Clemans was in the United States then and proposed traveling directly to Manila for sex with Angel and Nicole. SER 206-10; SER II 502; SER III 631, 644. He suggested using pornography to teach them about sex and warned he would not "rush to break their hymens." SER 209, 211. He planned "to use some force doing anal" and discussed consequences of injuries or pregnancy. SER 218-20, 211-16. Clemans postponed his trip to Manila because Angel was afraid to have sex and Nicole was not

"ready." SER 215, 219-21. He told Tandeg he was "not interested in investing money for photos of models I will not be able to fuck." SER 215, 218, 224.

### E. Clemans "bought" his victims' virginity and planned to travel for sex with them.

On September 14, before leaving the United States, Clemans made offers to Tandeg for more photoshoots with Nicole and others. SER 224. Clemans stated, "I would like to do more photos with [Nicole] if she agrees to do vaginal and anal sex during my next visit. I want to have a photo-session of us together having sex for my collection. . . ." SER 224. Clemans stated Nicole "owed" him 100 photos because "I only received under 300 for this last photoshoot." SER 224.

Clemans spent the next month planning sex with Nicole and Angel during a visit to Manila. SER 225-292. During that period, he paid Tandeg to "buy" Angel and Nicole and, on October 28, reminded Tandeg that he had "already bought Angel and Nicole. They will always be available for our photoshoots whenever we want them to pose." SER 292; SER III 620-23; 721-26. Clemans made specific offers and payments for each—Nicole on September 17 and Angel on

16

October 20—to purchase sex and additional explicit photoshoots.[4] SER 225-29, 256-65; SER II 456, 412, 460, SER III 795.  Tandeg completed a photoshoot of the girls together in early November, and Clemans paid her $200.  SER 265, SER II 293-96, 413, 464. Thereafter, Clemans pursued photos of others, but believed he had "purchased" Angel and Nicole for unlimited photo sessions and sex. SER 252; SER II 302, 307-24.

He warned, "It might take me three months to get there to visit . . . [and] I will need Angel and Nicole ready for me. . . . I will need both the girls available to me for as long as I want during my visit . . . It might be a couple of weeks and [they] will not be able to go home at night."  He concluded, "Once I pay the money in full, Angel is our[s] to do as we please."  SER 261-62.

On February 19, 2015, Clemans sent Tandeg $225 in support of an offer for photographs of Angel and Ishin, whom they called "the mix."  SER II 336, 342, 349-50, 415, 473.  Clemans reminded Tandeg

---

[4] Tandeg falsely told Clemans Angel was an orphan and Nicole's parents lived in rice fields, but demonstrated she could secure custody over both.  SER 205-06, 239-43; SER III 732-33, 761-62.

the photos should "confirm whether these girls are truly virgin or not," and he did "not want to be disappointed when I come visit them this year." SER _ (Ex. 49). He instructed Tandeg to find more girls and instructed Tandeg to "[m]ake sure these girls pose exactly the way I like . . . I want them to open themselves up to me [and] give themselves to me like their first lover. :)" SER II 342.

On April 23, Clemans sent $600 to Tandeg's sister to pay, in part, for more photoshoots. SER II 365-66, 416, 477; SER III 703. Clemans instructed Tandeg to use some of the money to arrange photoshoots with Angel and Ishin. SER 361-69, 378-80, 384. Three days later, Clemans asked about contraceptives: "So if I wanted to get pills for the girls I fuck, do I have to buy from Amazon.com or can I buy through a pharmacy there?" SER II 370. He asked whether a pharmacy would sell pills without a prescription if he paid more, and wondered, "What strength do I buy for a girl who is 12 or 13." SER 371. Clemans told Tandeg he was leaving for the United States the next morning and might travel directly back to the Philippines. SER 372.

18

**F.    Clemans returned to the United States, was arrested and released, and planned to travel directly to Manila for sex with his victims.**

On April 27, 2015, local law enforcement agents arrested Clemans at the San Francisco airport for possessing child pornography.  SER II 508-13;  SER III 729.  They seized his passport and released him, and by April 29, Clemans had accessed his cloud storage account from his mother's home in Sacramento.  SER II 512-15, 374-75; SER III 594-98.  The same day, Clemans instructed Tandeg to "Stop all photoshoots" but she had completed a session the day before.  SER II 373.

In early May 2015, chatting with Tandeg from his mother's home, Clemans told Tandeg he had been arrested.  SER II 374-75.  He said he would "know in a few months how this is going to end," and that he would "pay the price" if convicted and leave the United States permanently to live with Tandeg.  SER II 374-76.  He stated, "I will not live here in the United States any longer."  SER II 376.

Clemans asked Tandeg "how much" it would cost to buy Ishin and proposed visiting Tandeg in June, July, or August "for 4 or 5 days."  SER III 730.  He told Tandeg:  "I want to make love to you

and the girls . . . I think it will be more comfortable for them." SER II 380. He suggested Tandeg "find a nice location" and asked her to set up a new cloud storage account and "upload half of the photos" of Ishin and Angel so he could review them in Sacramento. SER II 380.

On May 5, Clemans sent Tandeg $300 to help pay for internet access and expenses. SER II 381-82, 417, 481. After sending the money, Clemans instructed Tandeg: "be sure that we do not lose [Ishin]." SER II 382. Tandeg confirmed Ishin was "ready for sex." SER II 384-86. Clemans instructed Tandeg to find a week-long rental for his visit and reminded her he wanted sex with Ishin and Angel—"But it must be private." SER II 387-88. Tandeg responded, "I will be a photographer," and Clemans complimented photographs she shared on girls urinating together. SER II 388-89; SER III 732.

Later, Clemans became convinced Ishin was not a virgin and focused his sexual interest on Angel. SER II 391-93. He worried about "protect[ing]" Angel's virginity and instructed Tandeg to take more photographs of Angel and find another "mix." SER II 394-99. Clemans told Tandeg, "spread [Angel's] lips wide open so I can see . . . but I do not want anything placed inside her labia lips to tear her

hymen . . . you have to be careful not to stretch it [too] wide." SER II 397. Tandeg assured Clemans "Angel is yours." SER II 397. Tandeg uploaded previously-deleted photos of Angel for Clemans, who accessed them in Sacramento. SER II 398-400; SER III 612-13.

On July 17, Clemans asked Tandeg about Angel and warned he "better not find out that she [was] sold . . . to another." SER III 797. Clemans said he would remain in Sacramento "until late August" and expected his passport to be returned "around the first of September," after which he would "probably" go to Thailand but, "if not, I will come visit you . . . before I return to Bangkok." SER III 798. Clemans asked Tandeg to "arrange for a week with a few of the girls," and she agreed. SER III 798.

On July 24, federal agents arrested Clemans at his mother's home in Sacramento. SER III 631.

### G. Clemans gave investigators access to his Yahoo! account.

Weeks after his arrest, Clemans agreed to turn over the password to his Yahoo! account to federal investigators, who used it to introduce an undercover persona to Tandeg. SER III 735-36, 764. *See* ER 16–17. Investigators turned over the new undercover

account to a human rights organization employee who worked with

Philippine investigators to arrange an operation that resulted in the

arrests of Tandeg and her co-conspirator, Shellina Atad.  SER II 519-

30; SER III 735-36.

## IV. On the first day of trial, Clemans pleaded guilty to three counts, including conspiracy to produce child pornography; a jury convicted him of the remaining counts.

On August 24, 2017, a grand jury returned a second

superseding indictment charging Clemans with attempted

travel/travel with intent to engage in illicit sexual conduct (count

one); conspiracy to travel with intent to engage in illicit sexual

conduct (count two); conspiracy to produce child pornography (count

three); buying children (count four); attempted production/production

of child pornography (count five); and receipt of child pornography

(count six).  18 U.S.C. §§ 2423(b) and (e), 2251(c) and (e), 2251A(b)(1),

2251(c), 2252(a)(2); ER 199–212; CR 79.

On August 28, the first day of trial, Clemans entered guilty

pleas—without a plea agreement—to three of the six charges against

him:  conspiracy to produce child pornography (count three);

attempted production/production of child pornography (count five);

22

and receipt of child pornography (count six).  18 U.S.C. §§ 2251(c)

and (e), 2252(a)(2); CR 89.

After a four-day trial, a jury convicted Clemans of the

remaining charges.  CR 97.  Clemans made a motion for judgement of

acquittal under Federal Rule of Criminal Procedure 29, which the

district court denied after the verdict.  ER 30–40.

## V. The district court sentenced Clemans to life in prison.

The court calculated Cleman's sentencing range using the 2016

Guidelines Manual.  PSR ¶ 28.  The counts of conviction were divided

into six groups.  *See* U.S.S.G. § 3D1.2.

Group one included count one, travel and attempted travel with

intent to engage in illicit sexual conduct.  PSR ¶¶ 29–35.  At

Clemans's request, the court used U.S.S.G. § 2G1.3 to determine an

adjusted offense level of 34.  ER 4; CR 109 at 3, 111 at 5–6.  The

court apparently found a base offense level of 24, added two levels

under § 2G1.3(b)(4) because the offense involved a sex act, and added

eight levels under § 2G1.3(b)(5) because the offense involved a minor

under 12.

Group two included count two, conspiracy to travel with intent to engage in illicit sexual conduct. Again at Clemans's request, the court used § 2G1.3 to determine an adjusted offense level of 36. ER 4; CR 109 at 3, 111 at 5–6. The court apparently found a base offense level of 24, added two levels under § 2G1.3(b)(4) because the offense involved a sex act, added eight levels under § 2G1.3(b)(5) because the offense involved a minor under 12, and added two levels under § 3B1.1 because Clemans supervised Tandeg and Atad.

Group three included counts three, five, and six—conspiracy to produce child pornography, attempted production and production of child pornography, and receipt of child pornography—concerning Angel. PSR ¶¶ 43–55. The offense level was calculated under § 2G2.1. PSR ¶ 46. The base offense level was 32. PSR ¶ 47. Four levels were added under § 2G2.1(b)(1)(A) because Angel was under 12. PSR ¶ 48. Two levels were added under § 2G2.1(b)(2)(A) because the offense involved a sexual act or sexual contact. PSR ¶ 49. Four levels were added under § 2G2.1(4)(A) and (B) because Clemans received images portraying sadistic or masochistic conduct and images including infants and toddlers. PSR ¶ 50. Two levels were

added under §§ 2G2.1(b)(6)(B)(i) and (ii) because the offense involved use of a computer. PSR ¶ 51. Two levels were added under § 3B1.1(c) based on Clemans's leadership role. PSR § 53. The adjusted offense level was 46. PSR ¶ 55.

Group four included counts three and five concerning Nicole. PSR ¶¶ 56–64. The offense level was calculated under § 2G2.1. PSR ¶ 57. The base offense level was 32. PSR ¶ 57. Four levels were added under § 2G2.1(b)(1)(A) because Nicole was under 12. PSR ¶ 58. Two levels were added under § 2G2.1(b)(2)(A) and two levels were added under §§ 2G2.1(b)(6)(B)(i) and (ii). PSR ¶¶ 59, 60. Two levels were added under § 3B1.1(c) based on Clemans's leadership role. PSR ¶ 62. The adjusted offense level was 42. PSR ¶ 55.

Group five included counts three and five concerning Ishin. PSR ¶¶ 65–73. The base offense level and enhancements were determined in the same manner as group four, with the same conclusions. The adjusted offense level for group five was calculated at 42. PSR ¶ 73.

Group six included count four, buying children. PSR ¶¶ 74–79. Under § 2G2.3, the base offense level was 38 and there are no specific

offense characteristics.  PSR ¶ 74.  The adjusted offense level for

group six was 38.

The offense were grouped:

| Group | Adjusted Offense Level | Units |
|---|---|---|
| Group one | 34 | 0.0 |
| Group two | 36 | 0.0 |
| Group three | 46 | 1.0 |
| Group four | 42 | 1.0 |
| Group five | 42 | 1.0 |
| Group six | 38 | 0.5 |
| Total units | | 3.5 |

Adding four levels to group three resulted in a combined offense

level of 50, seven levels above the highest level on the Sentencing

Table.  *See* U.S.S.G. § 3D1.4; PSR at 29.  Clemans sought a two-level

downward adjustment for acceptance of responsibility under § 3E1.1,

which the court denied because Clemans did not clearly demonstrate

acceptance of responsibility for all charges.  ER 6; PSR ¶ 85.

The Guidelines operated to lower the offense level to 43.  PSR

¶ 86.  Clemans was in criminal history category I, (PSR ¶¶ 92–94),

and his advisory sentencing range was life imprisonment.  PSR

¶ 135.  The court adopted that range and noted that count four

required a mandatory minimum sentence of 30 years.  ER 23.  The

court declined to vary downward and imposed 360 months on each of counts one, two, three, and five, life on count four, and 240 months on count six, all to run concurrently for a total term of life imprisonment. ER 26.

## SUMMARY OF ARGUMENT

This Court should affirm Clemans's convictions and sentence. Sufficient evidence supported the jury's determination that Clemans was guilty of the charged crimes beyond a reasonable doubt, and there was no reversible error in the district court's imposition of a sentence of life in prison.

1. The evidence supporting Clemans's conviction for travel/attempted travel with intent to engage in illicit sexual conduct, viewed in the light most favorable to the government, is more than sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. Clemans's 2013 chats with his accomplice (Cruz) demonstrated that he formed the requisite criminal intent, while in the United States, to travel to Manila for sex with young girls and then traveled for that purpose, with a planned stop in Thailand.

The evidence also showed Clemans never intended to permanently re-settle in Thailand and was traveling between September 2013 and April 2015, while he was a pilot based in Bangkok. During that time, Clemans's visa required him to leave Thailand regularly, he returned to the United States multiple times, used a United States bank account, and described the United States as his "home." The evidence was more than sufficient for a rational trier of fact to find his travel from the United States through Thailand and on to Manila was continuous.

2. Likewise, the evidence supporting Clemans's conviction for conspiracy to travel with intent to engage in illicit sexual conduct, viewed in the light most favorable to the government, is more than sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. Clemans's 2014-2015 chats with his co-conspirator (Tandeg) demonstrated their agreement that Clemans would travel to the Philippines for sex with underage girls after selecting victims from explicit images Tandeg took. They committed multiple overt acts in furtherance of the conspiracy, including Clemans's payments of more than $5,700 to Tandeg for a camera, explicit photos, and the

virginity of victims. More than once, the two discussed Clemans's travel from the United States to the Philippines to complete their conspiracy.

3. The evidence supporting Clemans's conviction for buying of children, viewed in the light most favorable to the government, is also more than sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. Clemans made repeated offers to Tandeg that she obtain custody of underage girls to create explicit images. He stipulated that those offers, transmitted in online chats, moved in foreign commerce. Tandeg complied with Clemans's instructions regarding the kind of girls and images he wanted, including how to pose the girls and what camera settings to use.

After Tandeg proved she could satisfy Clemans's offers to obtain custody and control of victims, he made offers to personally take physical custody of the girls, in future trips to the Philippines, when he intended to rape the girls and participate in explicit photo sessions with them and Tandeg. Clemans supported those offers with payments to Tandeg. The evidence was also sufficient to establish that Clemans's offers, supported by wire payments from the

United States to the Philippines, were communicated affecting interstate or foreign commerce, sufficient to trigger the statute's reach.

4. The court did not abuse its discretion by finding Clemans was not entitled to an offense level reduction for acceptance of responsibility. Clemans did more than make legal arguments at trial. Additionally, in a presentence interview Clemans offered self-serving justifications for his conduct and, at sentencing, elected not to affirmatively accept responsibility for his crimes. The court correctly concluded he failed to meet his burden to demonstrate acceptance of responsibility.

5. The district court correctly added two levels to Clemans's offense level in groups four and five because his offense involved sexual acts and sexual contact between his victims. The evidence contained multiple images produced at Clemans's direction depicting sexual acts and sexual contact affecting those victims, including images Clemans discussed in chats with Tandeg. Those images were made available in pretrial discovery to Clemans's counsel and several are filed under seal with this Court.

6. The court did not plainly err by applying § 2G2.1 to calculate the offense level for group three, instead of § 2X1.1. Tandeg completed all of the acts the conspirators believed necessary on her part, and the conspiracy was substantially complete when Clemans was arrested before leaving the United States for the Philippines. Consequently, a reduction under § 2X1.1(b)(2) was inapplicable. Clemans's offense level and sentence would not have changed under § 2X1.1.

7. There was no plain error in the application of an enhancement for Clemans's possession of images portraying sadistic or masochistic conduct or infants and toddlers. There was no *ex post facto* violation because the images satisfied offense characteristics in the 2014 and 2016 versions of § 2G2.1(b)(4). Additionally, group three, to which the enhancement applied, included the receipt of child pornography offense. Thus, the court could reasonably have found those images relevant conduct for the offense of conviction. Any error could not have affected Clemans's substantial rights.

8. The addition of a separate offense group for Clemans's crime of buying children was not plain error. The court could have

reasonably concluded the offense of buying children posed a distinct

risk of harm to Clemans's victims and was not part of one composite

harm with other offenses. Creation of a separate group based on this

distinct harm could not have affected Clemans's substantial rights.

## ARGUMENT

### I. The evidence was sufficient to sustain Clemans's convictions for travel and travel with intent to engage in illicit sexual conduct.

#### A. Standard of Review

This Court reviews sufficiency of the evidence claims *de novo*,

to see "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

#### B. The evidence demonstrated Clemans formed an intent to travel from the United States to Manila for sex with minors and did travel from the United States for that purpose.

The evidence was more than sufficient to prove Clemans

traveled from the United States to Manila after forming the intent to

engage in illicit sexual conduct and traveled for that purpose. This

Court should affirm Clemans's conviction.

As charged here, 18 U.S.C. § 2423(b) punishes "a United States citizen . . . who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person." "An offender violates the law when he embarks on travel with the requisite illicit purpose . . . and mere stops along the way do not deprive travel of its territorial nexus to the United States." *United States v. Weingarten*, 632 F.3d 60, 71 (2d Cir. 2011); *United States v. Bredimus*, 352 F.3d 200, 208, 210 (5th Cir. 2003) (finding "foreign travel with criminal intent" when defendant travelled from Texas to Thailand with stops in Japan and Hong Kong); *cf. United States v. Pendleton*, 658 F.3d 299, 304 (3d Cir. 2011) (comparing § 2423(b) to § 2423(c) and observing that a violation of § 2423(b) "is complete as soon as one begins to travel with the intent to engage in a sex act with a minor").

Here, the overwhelming evidence proved that in the first 10 days of September 2013, Clemans formed an intent to travel from the United States—where he lived at the time—to Manila to rape underage girls, and then left the United States and travelled in foreign commerce for that purpose. In chats from the United States

with Cruz, in Manila, Clemans requested images of minor girls he could choose from "before I arrive next month."  SER 2-3.  He planned to wire money to Cruz and asked to "rent" girls in Cruz's apartment.  SER 4-5; SER III 664.  They discussed Clemans's expected arrival in Manila "next month" and his planned stop in Thailand.  SER 6.

Clemans reviewed images of victims Cruz sent and insisted the girls "must be available for rent next month."  SER 7.  He haggled over price and argued for a better deal than Cruz's initial request for $250 per girl.  SER 12.  He updated Cruz about his plans—including from an airport—before departing the United States.  ER 61; SER 12-14; SER II 485, 502; SER III 642-48.  Chatting with Cruz from the airport, Clemans told her, "I just don't want to have to fight with the girls about fucking them on a hard floor."  SER 18.  Based on the above, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Yet, there was more.

In the 60 days before Clemans reached Manila from Thailand, he sharpened the criminal intent he formed in the United States.[5] SER 23-77. He selected specific victims, paid Cruz, and affirmed the rendezvous point he proposed from the United States. SER 23-40, 51-53, 56-61; SER III 668-70, 675-76. He told Cruz to have his victims "ready for fucking" and "anal," without "any complaints." SER 56, 46-47. When he arrived in Manila, he reminded Cruz, "I am here to fuck a virgin." SER 67-75; SER III 686.

That overwhelming evidence, which Clemans does not dispute, (AOB at 4–7), demonstrated beyond any doubt that he formed a criminal intent while living in the United States to travel in foreign commerce for the purpose of sex with underage girls in Manila. He departed the United States with that intent and sharpened it during his travel from Seattle, through Korea and a planned stop in Thailand, on to Manila, where he raped two underage girls. SER 6, 18, 21, 76, 90-92; SER II 485, 502; SER III 642-48; 683-84, 771. The

---

[5] Clemans originally planned to arrive in Manila sooner, but was delayed by unexpected obligations. SER 21.

district court correctly rejected Clemans's Rule 29 motion. This Court should affirm.

### C.   No authority requires a different conclusion.

Clemans argues that *United States v. Pepe*, 585 F.3d 679 (9th Cir. 2018), requires reversal of his conviction under § 2423(b). However, *Pepe* concerned the interpretation of an entirely different subsection of the statute, § 2423(c), that punishes entirely different conduct. Clemans's reliance on *Pepe* is misplaced.[6]

Section 2423(c), as charged in *Pepe*, previously applied to a United States citizen "who travels in foreign commerce, and engages in any illicit sexual conduct with another person." *Pepe*, 895 F.3d at 684. At issue in that case was the consequence of 2013 amendments to § 2423(c) that applied it to a United States citizen "who travels in foreign commerce *or resides, either temporarily or permanently, in a*

---

[6] Clemans appeals from the denial of his Rule 29 motion. Yet, he challenges the reach of § 2423(b), an argument he did not assert in his pre-trial motion to dismiss. CR 25. Thus, Clemans has preserved only the claim that the verdict was based on insufficient evidence that his travel from the United States to Manila was one trip. *See Alaska Airlines, Inc. v. United Airlines*, Inc., 948 F.2d 536, 546 n.15 (9th Cir. 1991) (holding "an appellate court will not reverse a district court on the basis of a theory that was not raised below").

*foreign country*, and engages in any illicit sexual conduct with another person." *Id.* at 684. This Court held that, prior to 2013, § 2423(c) did not reach citizens who were living abroad; rather, it was aimed at prosecuting citizens who were traveling when they committed illicit sexual conduct. *Id.* at 682. This Court held that the amendments by Congress clarified the focus of § 2423(c) was not on residency, but on travel. *Id.* at 691 ("[A] conviction under § 2423(c), when based on a defendant's travel in foreign commerce, requires proof that the illicit sexual conduct occurred while the defendant was traveling.").

Distinct from the requirements of § 2423(c), Clemans's conviction under § 2423(b) required proof only that he possessed the requisite illicit purpose and embarked on travel in foreign commerce with a territorial nexus to the United States *See Weingarten*, 632 F.3d at 71; *Bredimus*, 352 F.3d at 210. Thus, *Pepe's* historical analysis of the consequences of amendments to the particular wording of § 2423(c) has no bearing on Clemans's violation of § 2423(b). *See Pendleton*, 658 F.3d at 304 ("the *locus delicti* of § 2423(c) is the place where the illicit sex occurs, and not—as is the

37

case with § 2423(b)—where the intent to engage in the illicit conduct is formed").

That *Pepe* overruled *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), is also of no moment. *See Pepe*, 895 F.3d at 687–88. While the court here considered *Clark*, it relied primarily on *Weingarten* and *Bredimus*, cases interpreting § 2423(b), to find the evidence sufficient to prove Clemans's travel from the United States to Manila was continuous. *See* ER 31–37. The court correctly held, "[r]uling otherwise would condone *Weingarten*'s fear: It would immunize Clemans from prosecution for mere stops along the way." *Id.* at 36–37.

The jury and the court correctly rejected Clemans's argument that his stop in Thailand broke the territorial nexus of his travel in foreign commerce to Manila, which Clemans undertook with the requisite intent. ER 32–37. Those conclusions were based on the overwhelming evidence.

If it is relevant at all, *Pepe* supports Clemans's conviction. This Court in *Pepe* read the word "travels" "expansively," and "in line with several other circuits," including the Fourth Circuit's holding in

*United States v. Schmidt*, 845 F.3d 153 (4th Cir. 2017).  *Pepe*, 895
F.3d at 690.  In *Schmidt*, the Fourth Circuit held that a person "may
still be traveling even after a significant amount of time in a given
location so long as the visit is sufficiently transient or contemplates
some future departure."  845 F.3d at 157 (finding "travel" over 18
months when defendant did not resettle in foreign country); *see also*
*United States v. Jackson*, 480 F.3d 1014, 1023–24 (9th Cir. 2007)
(discussing alternative meanings of "travel" in § 2423(c), including
travel ending "only upon permanent resettlement in a foreign
country").

    This expansive definition of "travels" is consistent with the jury
and the court's rejection of Clemans's argument that his stop in
Thailand broke the United States territorial nexus of his travel in
foreign commerce.  Clemans never permanently resettled in Thailand
and did not intend to.  He had lived in the United States for a year
preceding September 2013.  SER II 502-05, 482-501.  He did not
obtain permanent resident status in Thailand and there is no
evidence he sought such status.  Rather, he held non-immigrant

39

visas that required him to leave Thailand 30 days after arriving and, later, every 90 days.  SER 21; SER II 305, 485; SER III 726, 775.

The evidence also demonstrated Clemans considered the United States his home and had no intention of permanently resettling in Thailand.  He maintained and used bank accounts in Sacramento, including to pay his criminal partners in Manila.  SER II 402-81; SER III 618-20, 622-27.  Those payments listed Clemans's Sacramento contact information, not information for any Thai residence.  SER II 402-17.  He maintained a United States passport and California driver license.  SER  482-501; PSR at 3.  He appears to have kept property he owned in Hawaii.[7]  PSR ¶ 132.

Clemans's own words demonstrate that he considered the United States his home.  In April 2014, he ordered a computer delivered to his mother's house in Sacramento and, in an email, described that residence as "my home" and stated, "I am overseas, at the moment," signaling his intention to return.  SER 95.  After his arrest in May 2015, Clemans told Tandeg that if convicted, he would

---

[7] The jury did not see evidence of Clemans's property holdings or driver license but that evidence is in the record.

leave the United States permanently to live with her.  SER II 374-76.
He stated, "I will not live here in the United States any longer."  SER
II 376.

Thus, under the expansive definition of travel set forth in *Pepe*
and other cases, between September 2013 and April 2015, Clemans
was traveling from the United States, with no intention of
permanently re-settling in Thailand.[8]  *See Pepe*, 895 F.3d at 691-92
(distinguishing between those who have "relocated" or "resettled,"
and those who travel temporarily, or contemplate a future departure
from their destination).  *See* PSR ¶¶ 123, 132; SER 597, 621, 775.  At
a minimum, Clemans was traveling when he continued from the
United States, through Thailand in November 2013 to Manila, to

---

[8] If the fact that an offender has a residence in a foreign country
were dispositive, this Court would not have remanded *Pepe* for
retrial.  *See Pepe*, 895 F.3d at 682, 692 (ruling that—although Pepe
"left . . . for Cambodia in March 2003 on a one-way ticket," "rented a
house, obtained a Cambodian driver's license, bought a car, . . .
secured employment," married a Cambodian citizen, and "became
involved in community activities"—the government could still prove
at retrial that "he was still traveling when he committed illicit sexual
conduct").

complete the travel he planned while in the United States, for the

purpose of sex with minors.  This Court should affirm his conviction.

## II.  The evidence was sufficient to sustain Clemans's conviction for conspiracy to travel with intent to engage in illicit sexual conduct.

### A.  Standard of Review

This Court reviews sufficiency of the evidence claims *de novo*,

to see "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable

doubt." *Jackson*, 443 U.S. at 319.

### B.  The evidence proved the conspirators made an agreement and completed multiple overt acts in furtherance of the conspiracy.

A conviction for conspiracy to travel with intent to engage in

illicit sexual conduct, in this case, required proof that (1) between

June 24, 2014, and July 24, 2015, Clemans agreed with one or more

persons to commit the crime of travel with intent to engage in illicit

sexual conduct; (2) Clemans became a member of the conspiracy

knowing of at least one of its objects and intending to help

accomplish it; and (3) a member of the conspiracy performed at least

one overt act for the purpose of carrying out the conspiracy.  *See* 18

42

U.S.C. § 2423(b), (e). The evidence of the conspirators' numerous overt acts in furtherance of their conspiracy was overwhelming, and any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. This Court should affirm Clemans's conviction.

During the relevant period, Tandeg agreed in online chats to take and deliver to Clemans explicit photos of young girls, and that Clemans would select girls whom he would travel to Manila to rape. SER 131, 161, 209-11, 224, SER II 388; SER III 721-26, 730-31. Clemans and Tandeg agreed to a written plan that included a step-by-step outline of each conspirator's role and updates about which steps remained. SER 108, 131, 148.

Throughout the conspiracy, Clemans reminded Tandeg he could "get photos anytime off the internet" and wanted sex with the girls Tandeg obtained. SER 107, 114-15, 130 131, 159-61. They frequently discussed his travel to Manila to rape his victims, both when Clemans was in Thailand and when he was in the United States. SER 131, 193-94, 209-11, 224; SER II 388; SER III 721-26, 730-31. In furtherance of the conspiracy, Clemans paid Tandeg at

least $5,775 for a camera, a computer, multiple photo-shoots of his
victims, and the virginity of at least two victims. SER II 390-92, 403-
81, SER III 706-07, 711-13, 721-26. Clemans paid Tandeg from the
United States and accepted and reviewed photos Tandeg prepared
for him while he was in the United States

In chats on October 23, 2014, Clemans instructed Tandeg to
deliver money he had sent to buy Angel's virginity: "Any evidence
that Angel has been fucked, we get our money back. . . . But I am
paying for her now. We basically will own her to do what we want
with her." ER 38; SER II 286-90. In May 2015, Clemans instructed
Tandeg to identify a private place to have sex with minors. ER 38;
SER II 387-88. In July 2015, while he was in the United States and
shortly before his arrest on federal charges, Clemans said he would
probably be in the Philippines by September 1st. ER 38; SER III
789.

Clemans's argument that the conspiracy did not contemplate
travel from the United States contradicts the evidence. Clemans and
Tandeg discussed his multiple trips home to the United States in
2014 and 2015, and more than once, Clemans presented the idea of

traveling to Manila directly from the United States for sex with girls Tandeg secured for him. SER 206-11; SER II 387-88, 502; SER III 631, 644, 798. The conspirators expressly discussed that possibility. It was unnecessary for Clemans to have actually travelled to Manila from the United States for the jury to find him guilty of the conspiracy, and, as the court found, there was "more than sufficient evidence" to deny Clemans's Rule 29 motion.

Clemans's reliance on *United States v. Bernhardt*, 903 F.3d 818, 829 (8th Cir. 2018), fails. AOB at 38. *Bernhardt* did not concern a conspiracy involving the numerous completed overt acts proved in this case. Rather, it involved an attempt to violate § 2423(b), in which the Eighth Circuit found the defendant's desire to have sex with a minor, mention of a hotel, and research into travel to the Philippines was not the sort of conduct that would have resulted in a crime if it had not been extraneously interrupted. *Bernhardt*, 903 F.3d at 829. *Bernhardt* provides no support for Clemans's argument.

As the court found, the evidence established that the conspirators' "criminal objective was [for Clemans] to travel to the Philippines for the purpose of illicit sexual conduct and all the steps

in furtherance of this criminal objective were accomplished but for Clemans actual trip." ER 38. In the light most favorable to the government, there was sufficient evidence for a jury to find Clemans guilty beyond a reasonable doubt for conspiring to travel with intent to engage in illicit sexual conduct. *See* ER 38.

## III. Sufficient evidence supports Clemans's conviction for buying children.

### A. Standard of Review

This Court reviews sufficiency of the evidence claims *de novo*, to see "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9] *Jackson*, 443 U.S. at 319.

---

[9] Clemans's appeal challenges the jurisdictional basis for his conviction on this count, an argument he did not raise in his Rule 29 motion. Below, he argued that the buying children statute was focused on whether the evidence demonstrated "custody or control." ER 38-40. Thus, Clemans has not properly preserved this argument. *See Alaska Airlines, Inc.*, 948 F.2d at 546 n.15 (holding "an appellate court will not reverse a district court on the basis of a theory that was not raised below").

### B. Clemans made multiple offers that were communicated and transported in foreign commerce.

There was more than sufficient evidence for a rational trier of fact to find Clemans guilty beyond a reasonable doubt of "buying of children," as defined in § 2251A(b). As charged here, the crime of buying children is committed by one who "purchases or otherwise obtains custody or control of a minor, or offers to purchase or otherwise obtain custody or control of a minor . . . with knowledge that, as a consequence," the minor will be portrayed in child pornography. *See* 18 U.S.C. § 2251A(b)(1) & (2); ER 206. The government must also prove that "any offer described [above] was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail." 18 U.S.C. § 2251A(c)(2); *see also* ER 206.

There is no dispute that Clemans directed Tandeg to obtain custody and control of prepubescent girls for the purpose of creating sexually explicit images and that Tandeg did so. Clemans admitted to this course of conduct in his guilty plea before trial to the charges

that he produced, conspired to produce, and received child pornography.  ER 191-92, 196-98.

Nor can Clemans dispute that his voluminous chat messages with Tandeg were communicated and transported using a means or facility of interstate or foreign commerce.  Tandeg lived in the Philippines, ER 196, and Clemans stipulated that their communications would necessarily have transited a server located in the United States, ER 57; CR 87.

Instead, Clemans contends the jurisdictional fact was not proven because none of his communications with Tandeg constituted an "offer" recognized by the statute, and that any offers to purchase or obtain custody and control of children to make child pornography were made by Tandeg to the minor victims in person, not by Clemans.  AOB at 40–41.  Clemans's argument is at odds with the evidence and the plain language of § 2251A.

Throughout the relevant period, Clemans repeatedly made explicitly detailed offers to Tandeg that she obtain custody and control of minor victims for the express purpose of creating pornographic images.  Clemans's business proposal to Tandeg was to

48

identify young virgins whom Tandeg could photograph for him so

that he could choose whom to rape when he next traveled to the

Philippines.  SER 84-87.  As he carried out this plan, Clemans set

the specific terms and conditions under which his offers would be

accepted and carried out, and Tandeg complied.

Clemans's direction of Tandeg to take custody and control of

the minor victims for pornographic "photoshoots" could hardly have

been clearer.  He gave her detailed instructions regarding the girls

he wanted her to obtain and the images he wanted her to create.  In

July 2014, early in their arrangement, Clemans instructed Tandeg

how to pose the girls and what camera settings to use.  He told her:

> I want to see their vagina hole clear and in
> focus.  Use a FINE stting on the camera and
> use MANUAL to focus on your focus points,
> Lyan.  It is not so important that their faces
> are in clear focus but they must smile for the
> camera. . . . [B]e sure to check each photo you
> take.  If it is not clear, try again.  You have all
> day with the girl.

SER 170.

Ten days later, he gave Tandeg extensive further direction.

SER 197.  He again instructed her how to use the camera settings to

his specifications, told her to use body oil and not to let the girls wear

49

jewelry. He told her to photograph Angel "as I would see her in bed." He said, "These girls are paid to model for us and I will not tolerate any complaints from the girls. They will do as we say." SER 197.

Throughout, Clemans communicated to Tandeg that he was in charge and that he expected his instructions to be carried out. In September 2014, he told Tandeg what he expected in the upcoming "photoshoot" with Nicole. He told her, "I want Nicole to open herself up so be sure she spreads her legs wide. I hope I like this photo shoot and she poses in the way I want her to. She will determine if I want to see more of her. . . . I hope she performs well for me." SER 208. In February 2015, regarding an upcoming session with Angel and Ishin, Clemans stated, "Make sure these girls pose exactly the way I like the photos. It might be uncomfortable for them to position themselves in some of the poses but you have all day and I want them to open themselves up to me." SER 342.

Tandeg repeatedly demonstrated she would follow Clemans's instructions and was capable of obtaining custody and control of underage girls at his direction. The evidence established that, during the relevant period, Tandeg sent Clemans hundreds of images

from at least five photoshoots of Nicole, Angel, and Ishin. SER II

531-67, 534, 553; SER III 786, 633-42, 616-19, 784-94. Clemans

approved of the photos. *See, e.g.*, SER 188. He sent Tandeg at least

$5,775 over time to further their business plan. SER II 390-92, 403-

81. Clemans therefore knew Tandeg could obtain custody and

control of prepubescent girls for him and had no reason to believe his

offers would not continue to be accepted and carried out.

Because Clemans came to trust Tandeg's ability to obtain

custody and control of his victims, he eventually made offers to

personally take physical custody of the girls himself, in future trips

to the Philippines, when he intended to rape the girls and participate

in additional explicit photo sessions with the girls and Tandeg.

These offers by Clemans unquestionably fall within the plain

language of § 2251A.

In September 2014, Clemans offered to purchase Nicole for sex

and photos. He told Tandeg, "I want you to find out about Nicole's

situation with her having sex now. If Angel is saying no maybe we

can get Nicole. Would her parents agree to 100 USD for two days

with her? I think Nicole is ready." SER 223. Two days later, he

went on: "I would like to do more photos with her if she agrees to do vaginal and anal sex during my next visit. I want to have a photosession of us together having sex for my collection of photos." SER 224.

A few days later, after transferring $500 to Tandeg to carry out his plan, Clemans wrote, "In return we get Nicole for a photo shoot and sex with me for 3 days. . . . I want you to get confirmation in writing . . . from the parents." SER 226.

The following month, Clemans confirmed that his payment had been intended to secure his right to personally take custody and control of Nicole: "There is no problem with Nicole's parents now, right? . . . Her parents understand that I have her for as long as I want. It might be a couple of weeks and she will not be able to go home at night. She stays with me." SER 262. Tandeg responded, "yes I already explained that to Nicole's parents." SER 262.

The same day, Clemans discussed another offer to Tandeg, this time to purchase Angel for future rapes and explicit photoshoots. He told Tandeg, "Once I pay the money in full, Angel is our[s] [t]o do as we please." SER 262. He explained, "It will be more than just sex

with her. I will need at least 7 more photo shoots in the next few months." SER 263.

Tandeg told Clemans that Angel lived at an orphanage, and Clemans believed the money to secure Angel was being paid to the orphanage director to secure Clemans's right to obtain future custody and control of Angel for rapes and photos. He asked, "So Angel stays at the orphanage and does photoshoots when you want and then when I come I have her for as long as I want?" SER 287. After Tandeg replied "yes," Clemans responded, "Angel will have to do as many photoshoots as we want then." SER 287.

Clemans left no doubt of his meaning or that he, not Tandeg, was the one calling the shots. In October 2014, he again confirmed his purchase of custody and control: "I have already bought Angel and Nicole." SER II 292. A month later, he stated again: "I paid $250 for Nicole. I get to use her for photoshoots anytime we like. . . . I can fuck her anytime I want for that money too." SER II 302. He went on: "How much did I pay for Angel? I think $350, right?" Tandeg responded, "No[,] $500 if I'm not mistaken." SER II 302. Clemans then stated, "But I can fuck her anytime too with

photoshoots when we want. . . . So I have bought the two girls for our use." SER II 302.

Some months later, Clemans reiterated a similar offer with respect to the third minor victim, Ishin. After Tandeg sent Clemans images from a recent photo shoot, she asked, "do you like Ishin?" Clemans responded, "Yes . . . I want her and Angel and you . . . But it must be private:)" SER II 387-88). Tandeg stated, "I will be a photographer," and Clemans responded, "Yes." SER II 387-88.

This evidence was more than sufficient for any rational jury to find that Clemans himself offered to purchase or obtain custody or control of the victims for both sex and the production of child pornography, and that his offers were communicated in foreign commerce. There is no basis in the statute to conclude otherwise. Because the statute unambiguously reaches Clemans's conduct, no further inquiry is required. *United States v. Buculei*, 262 F.3d 322, 331 (4th Cir. 2001) (rejecting the argument that the government's prosecution under § 2251A(b) was a "novel construction," and stating, "[i]f the statute unambiguously reaches the defendant's conduct, as it does here, our inquiry is complete").

54

That Clemans conveyed his offers to Tandeg, rather than to the victims' legal guardians, is of no moment. The plain text of the statute includes no requirement that an offer must be made directly "to a guardian or a child" as Clemans suggests. AOB at 41. Under well-established principles of statutory interpretation, the Court should "resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

Nothing in § 2251A(b) specifies to whom an offer must be conveyed, or requires that the offer be conveyed to someone who already possesses legal custody of the minor. Indeed, by criminalizing not only those who actually purchase or otherwise obtain custody or control of minor victims, but also those who offer to do so, the statutory language necessarily encompasses the possibility that custody or control will be obtained in the future. Here, Tandeg repeatedly proved her ability to obtain custody and control of the victims herself, at Clemans's direction. His offers to her were made presuming that she could and would carry them out at a future time. The statutory language does not require more.

Moreover, Congress did choose to use the phrase "legal guardian" in a different subsection of § 2251A. Section 2251A(a) refers to a "parent, legal guardian, or other person having custody or control of a minor." It must therefore be presumed that Congress intentionally chose to omit any similar language from § 2251A(b). *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations and citation omitted); *United States v. Youssef*, 547 F.3d 1090, 1094–95 (9th Cir. 2008). Had Congress wanted to specify that offers criminalized by § 2251A(b) must be made directly to the minor or their legal guardian, it could have done so. *See Russello*, 464 U.S. at 23; *Youssef*, 547 F.3d at 1094–95.

The single case Clemans cites in support of his argument, *United States v. Korab*, 893 F.2d 212 (9th Cir. 1989), does not support his asserted interpretation of § 2251A(b). In *Korab*, this Court interpreted an entirely different statute that criminalized an

56

entirely different type of communication—a "communication containing any threat . . . to injure the person of another." 18 U.S.C. § 875(b); *Korab*, 893 F.2d at 213. Applying the plain language of that statute, Korab's interstate call to his co-defendants "asking them to extort a man" (AOB at 42) was not itself a "communication containing a threat." *Id.* at 214 ("The plain language of section 875(b) makes clear that the communication must contain threats directed toward the victim."). Here, by contrast, the plain language of § 2251A(b) does encompass Clemans's conduct.

Clemans's interpretation would lead to absurd results. Any defendant who wanted to take control of a child from their guardian to produce child pornography could insulate himself from the application of § 2251A(b) by simply conveying the offer through an accomplice. This result would contravene the intent of Congress, which passed this statute to more effectively target sexual exploitation of minors. *See United States v. Frank*, 599 F.3d 1221, 1231 (11th Cir. 2010) ("Section 2251A is part of a comprehensive scheme created by Congress to eradicate the sexual exploitation of children . . . and . . .warrants a broad sweep."); *see also United States*

*v. Thomas*, 893 F.2d 1066, 1068 (9th Cir. 1990) (citing 18 U.S.C. §§ 2241–2257 in concluding "Congress has created a comprehensive statutory scheme to eradicate the sexual exploitation of children"); *United States v. Bredimus*, 234 F. Supp. 2d 639, 649–50 (N.D. Tex. 2002), *aff'd*, 352 F.3d 200 (5th Cir. 2003) (finding that, without extraterritorial application of § 2251A, "the comprehensive scheme to combat international . . . sexual exploitation and abuse of children could not be effectively implemented" as Congress intended because the "conduct proscribed by § 2251A(b)(2) would . . . escape the purview of federal authorities").

If Clemans's interpretation were accepted, anyone who, like Clemans, used an accomplice to identify or make arrangements with minor victims in a foreign country could not be prosecuted. Only those rare individuals who took the extraordinary risk of seeking out a minor's parent or legal guardian directly could be convicted. Prosecutions of sex tourists under § 2251A(b) would be all the more rare because such communications would be unlikely to occur through a means or facility of interstate or foreign commerce.

By contrast, it is hard to imagine a scenario in which a defendant's offers to purchase or obtain custody or control of minors could be more explicit than Clemans's offers. *See, e.g.*, SER 194 ("I need to be able to keep the girl over night and time for photos. . . . If I offer Angel's mother $150–$200 USD, I would need to keep her for four days and nights. I do not want Angel arguing about what I do with her."); 279 ("[I]f Angel is available and you think she is able to have sex with me, I will buy her."). If § 2251A(b) is held inapplicable to such conduct, that statute's reach will be severely circumscribed.

### C. Clemans's offers to purchase or obtain custody and control of his victims also affected foreign commerce.

The evidence was also sufficient to establish the alternate basis for satisfying the statute's jurisdictional provision: that the offer "was communicated or transported . . . affecting interstate or foreign commerce." 18 U.S.C. § 2251A(c)(2).

As the evidence demonstrated, and as the government argued at trial, Clemans's numerous offers to Tandeg affected foreign commerce because they prompted the transfer of thousands of

dollars, via Western Union, from Clemans's United States bank account to Tandeg in the Philippines. SER II 403-81; SER III 806.

For example, on September 17, 2014, Clemans sent $500 to Tandeg in Manila, which was withdrawn from his account in California. SER II 453-456; SER III 795. Less than five minutes after telling her that he "completed the money transfer," Clemans told Tandeg, "In return we get Nicole for a photo shoot and sex with me for 3 days. . . . I want you to get a confirmation in writing Lyan from the parents." SER 228.

Similarly, on October 20, 2014, Clemans discussed his offer to purchase Angel's virginity from the orphanage, explaining, "It will be more than just sex with her. I will need at least 7 more photo shoots in the next few months." SER 263. About 30 minutes later, he transferred $600 to Tandeg in Manila from his California account. SER II 412, 457-60. Seconds before he sent Tandeg the tracking number and instructions to retrieve the funds, Clemans said, "I will need the additional photoshoots and their promise to take care of her until I arrive." SER 265. Tandeg responded, "Now Angel is all yours." SER 265.

The evidence was therefore also sufficient for any rational jury to find that the offers to purchase or obtain custody and control of the victims affected foreign commerce. This provides an independent ground to affirm Clemans's conviction.

### IV. The district court correctly found Clemans's did not demonstrate acceptance of responsibility.

#### A. Standard of Review

This Court reviews a district court's selection and interpretation of Guidelines factors *de novo*, its factual findings for clear error, and its application of the Guidelines to particular facts for abuse of discretion. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (*en banc*).

When a defendant has failed to object to the district court's sentencing calculations, this Court reviews those determinations for plain error. *United States v. Depue*, 912 F.3d 1227, 1233 (9th Cir. 2019). Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520

61

U.S. 461, 467 (1997) (internal quotations and citations omitted).

"Plain" error is error that is "clear" or "obvious." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

### B. Clemans did not demonstrate acceptance of responsibility.

The court did not abuse its discretion in finding Clemans was not entitled to a two-level reduction for "acceptance of responsibility." Under § 3E1.1(a), the offense level may be decreased by two levels "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Clemans bears the burden of demonstrating how he has accepted responsibility for his actions. *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001). Further, acceptance of responsibility requires "admission of moral wrongdoing" and "the expression of contrition and remorse." *United States v. Gallant*, 136 F.3d 1246, 1248 (9th Cir. 1998); *United States v. Molina*, 934 F.2d 1440, 1451 (9th Cir. 1991) ("The sentencing judge must consider all the evidence bearing on the issue of the defendant's contrition—or lack thereof—and decide whether he has made the requisite showing."). The court properly found that Clemans made no such showing here.

The court properly considered all of the factors Clemans now argues: his guilty pleas, his limited assistance to authorities, and his claim he did not assert a "factual innocence defense" at trial. ER 5–6; AOB at 50–52. The court's comments evidence a careful weighing of these factors and that the court considered it a "close legal question." ER 6. Nevertheless, the judge concluded that, "given the totality of the charges in this case," he "[did not] see . . . a full and complete acceptance of responsibility of all these crimes." ER 6. This conclusion is amply supported by the record.

None of the facts Clemans identifies show contrition, remorse, or admission of moral wrongdoing. He never truthfully admitted the conduct comprising all of his offenses. While he entered a guilty plea to three of the six charges against him, he did not plead guilty to the arguably more serious charges. It would have been reasonable for the court to conclude that Clemans's guilty plea was strategic. The evidence proving production and receipt of child pornography was overwhelming, and his guilty pleas prevented him from having to make frivolous arguments to the jury. Those pleas also allowed his counsel to argue, as he did, that Clemans was not disputing

authorship of the chats or that child pornography was produced at his direction, but was merely disputing the government's overreach in charging more serious crimes than it could prove. SER III 802-04, 807-09 ("This is a case about child pornography. It's not a case about buying kids.").

Further, while perhaps not asserting "factual innocence," Clemans did challenge certain factual contentions at trial. For example, Clemans challenged the assertion that he truly intended to travel to engage in illicit sex with young girls. In his opening statement, defense counsel described Clemans's voluminous chats with his accomplices as mere "[w]ords," "boasts," and "internet chatter." SER III 804. His counsel asserted the jury would hear "no evidence of actual criminal actions for the three charges" at issue. SER III 804. Counsel stated that, although Clemans told multiple people "I'm coming to the Philippines to have sex with those little girls," Clemans "never did." SER III 803.

This statement was directly contradicted by voluminous evidence, including Clemans's own words and bank statements, that Clemans indeed traveled to Manila in November 2013 for sex with

64

underage girls.  *See* SER III 803.  In fact, when Clemans arrived to meet Cruz at their pre-arranged meeting point, he was irate and badgered Cruz to fulfill her promises to provide him with young girls for sex.  SER 65-66, 74-75.  But Clemans turned to Malicdem, who allowed him to fulfill the purpose of his trip.  He reported back to her that, of the two girls she brought him, the younger one was "perfect," but the older one "did not want to fuck" and "was not virgin either."  SER 90-91.  Clemans raped her anyway.  SER 91.  Later he gloated to Cruz that he met young girls, "[w]ith much success! :x"  SER 76.

Despite this evidence, Clemans's counsel told the jury, "Actually meeting young girls, touching girls, you're not going to hear from a single victim witness or anybody that he actually did."  SER III 804.

This is more than simply a "legal challenge to the applicability of 18 U.S.C. § 2423," as Clemans now argues.  It is certainly not the "rare situation," contemplated by the Guidelines, where a defendant "clearly demonstrate[s] an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial."  U.S.S.G. § 3E1.1, cmt. n.2.

Moreover, Clemans's post-trial statements are profoundly inconsistent with any expression of contrition or remorse, or admission of moral wrongdoing. When interviewed by the probation officer, Clemans did not admit to or describe any of his criminal conduct, even the conduct to which he plead guilty, and expressed no remorse. Instead, Clemans ignored the heinous nature of his conduct and was unwilling to acknowledge or grapple with it. He made the astounding claim that "he has always been good to his fellow man, and has never gone looking for trouble," that "he has always wanted to help people if he could," and that "[h]is parents instilled good values and morals in him." PSR ¶ 26. Needless to say, Clemans's self-descriptions are inconsistent with any recognition of his years of despicable crimes or their consequences for his victims.

Clemans also told the probation officer that "when he lived in foreign countries, he would always try to 'give back' to the community," and described how he "would give orphanages rice and other items" and do "other 'acts of kindness.'" PSR ¶ 26. Clemans's self-serving statements stand in stark contrast to his unguarded statements to Tandeg that he was seeking orphans to victimize. SER

66

205 ("Does the recruiter work only at orphanages?  It is probably the best place for recruitment."); 206 (Ex. 44-006) ("Nicole has no parents right?  Orphanage?").  The unspoken preface to each of Clemans's claims is:  "Except for the several children I have raped and planned to rape, and the thousands of images of child pornography I caused to be produced and collected . . ."  Regardless, it cannot reasonably be maintained that Clemans has made any real effort to account or atone for his offenses.

In fact, as the government argued, Clemans was incapable of even uttering the words to describe his conduct—even the crimes to which he plead guilty.  As the PSR stated:  "The defendant explained that he needs treatment for his 'addiction.'  When asked what addiction he was referring to, he noted 'for the charges.'"  PSR ¶ 27.  Recognizing that Clemans was incapable even of saying the words "child pornography," "sexual attraction to children," or describing in any other way his "addiction" to images (at least) of underage girls is not equivalent to improper consideration of Clemans's compliance with his attorney's advice not to discuss the offense.  In any event, the court did not "adopt the government's argument" on this point, as

67

Clemans argues, but simply stated: "I don't see, as the government argues, under these circumstances a full and complete acceptance of responsibility of all these crimes." ER 6. The court was correct, and there was nothing improper about expressing agreement with the government on the ultimate conclusion.

When sentenced, Clemans again had the opportunity to express contrition or recognition of the harm he caused, if only as to those charges to which he pleaded guilty. He said nothing. ER 23.

Considering all of the facts, it was also appropriate for the court to conclude that Clemans's post-arrest assistance to authorities by providing access to his Yahoo! account was insufficient to demonstrate acceptance of responsibility. While Clemans provided his password, he did not do so immediately, but only after some time had passed. SER III 764. He did not offer to provide any other assistance in locating or apprehending Tandeg or Atad or in recovering all of the victims of his conduct with those accomplices. Nor did he offer any information or assistance whatsoever regarding his 2013 criminal conduct with Cruz and Malicdem. Clemans

arguably made another strategic decision to do just enough to

support a claim that he assisted investigators.

The district court was therefore correct to conclude that, under

the totality of the circumstances, Clemans had not met his burden to

clearly demonstrate acceptance of responsibility for his offenses.

### V. The district court correctly added two levels to groups four and five because Clemans's offense involved sexual acts and sexual contact between Angel, Ishin, and Nicole.

#### A. Standard of Review

See Section IV.A., *supra*.

#### B. Clemans's offense involved sexual acts and sexual contact between Angel, Ishin, and Nicole.

Record evidence supports the court's conclusion that Clemans's

offenses involved the commission of sexual acts or sexual contact[10]

---

[10] While Clemans's opening brief refers only to a "sexual act" as defined in 18 U.S.C. § 2246(2), § 2G2.1(b)(2)(A) provides that the offense level may also be increased by two levels if the offense involved "sexual contact" as defined in § 2246(3). Sexual contact is shown by any "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3).

for each of the three minor victims.  Each posed for photographs taken by Tandeg, at Clemans's direction, that included some form of sexual act or sexual contact.

Clemans does not dispute that at least one such image was created of the seven-year-old Angel, as reflected in the PSR.  PSR ¶ 49.  But the images produced at Clemans's direction included multiple examples of sexual acts and sexual contact, affecting each of his three victims.  In his chats with Tandeg, Clemans discussed another image of Angel, which also includes ten-year-old Ishin, in which Ishin was spreading Angel's vulva with her fingers.  SER II 397.  Clemans told Tandeg that he was "nervous" about Ishin spreading Angel's labia too wide and accidentally tearing her hymen."  SER II 397.  In another image, Angel is pictured spreading Ishin's vulva and anus with her hands.  AAB Ex. 1.

There is also no question that nine-year-old victim Nicole engaged in sexual acts and sexual conduct in multiple images produced by Clemans and Tandeg.  For example, Tandeg sent Clemans two different images in which Nicole is spreading Angel's anus open with her hands.  AAB Ex. 2, AAB Ex. 3.  In another image,

Nicole's hand is touching Angel's vulva and Angel's hand is touching Nicole's breast.[11]  AAB Ex. 4.

All of these images of Angel, Ishin, and Nicole constitute both "sexual acts" and "sexual conduct" under § 2246, and were made available to Clemans's counsel for inspection in discovery.  SER III 779-83.  That the PSR referred to other images of Ishin and Nicole that may not have met the statutory definition does not create error because this Court "may affirm the district court's sentencing decision on any basis supported by the record."  *United States v. Adkins*, 883 F.3d 1207, 1213 (9th Cir. 2018) (internal quotations omitted).

The district court was therefore correct to apply these two-level enhancements for groups four and five as well.

## VI. The conspiracy guideline did not require any reduction in Clemans's offense level.

### A. Standard of Review

See Section IV.A., *supra.*

---

[11] The images, AAB Exs. 1-4, have been filed under seal with this Court and Clemans's appellate counsel was invited to inspect them.

**B.    Clemans's conduct satisfied the exception to § 2X1.1, as did Tandeg's, and application of that guideline to his conspiracy convictions would not have affected his sentencing range.**

There was no plain error in the district court's asserted failure to apply § 2X1.1 to Clemans's conspiracy convictions and application of that guideline would not have affected his sentencing range. Clemans was not entitled to a three-level reduction under § 2X1.1(b)(2) for either of his conspiracy offenses. The three-level reduction is not applied if: (1) "the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense;" or (2) "the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(b)(2). These exceptions apply to both of Clemans's conspiracy offenses.

Clemans admitted to producing child pornography in his guilty plea and does not now argue that the substantive offense was not completed. AOB at 44–45. That admission satisfies the exceptions in § 2X1.1(b)(2). Clemans's conspiracy to travel with intent to engage in illicit sex also satisfies those exceptions.

72

First, Tandeg completed all the acts necessary on her part for the successful completion of the offense. Her role in the conspiracy was to locate, obtain custody of, and photograph victims for Clemans to select for sex. She completed all of those acts multiple times, as the court found. SER II 411-17; SER III 616-17. They repeatedly discussed Clemans's future travel to the Philippines and where the sex would take place, and Tandeg assured Clemans the victims would be ready when he arrived. SER II 372, 380, 387; SER III 798. All that remained for Clemans to complete the substantive offense was for him to travel in foreign commerce for the purpose of engaging in illicit sexual conduct. *See* 18 U.S.C. § 2423(b); ER 38. Tandeg was not required to actually provide minors for sex in order for Clemans to complete the offense; travel in foreign commerce with the required *mens rea* would have sufficed. *Compare* 18 U.S.C. § 2423(b) *with* 18 U.S.C. § 2423(c). The three-level reduction therefore does not apply.

Second, the evidence also established that the co-conspirators nearly completed the substantive offense, but were interrupted by Clemans's apprehension. After his arrest on state charges in late April 2015, Clemans continued to discuss his future travel plans with

73

Tandeg, sent her an additional $300, and received images Tandeg had recently created with Angel and Ishin. SER II 378-89, 417; SER III 798. In July 2015, days before he was arrested on federal charges in Sacramento, Clemans told Tandeg he planned to return to Asia "around the first of September" and discussed coming to visit her in Manila "for a week with a few of the girls." SER III 798. Clemans told Tandeg, "I will get my passport back after my hearing in court." SER III 798. The following week, however, Clemans was arrested, preventing him from completing the conspiracy. SER III 631. See ER 38.

At the time of his arrest, the conditions were set and Clemans was preparing to travel. This is not a case where "the arrest occur[red] well before the defendant or any co-conspirator ha[d] completed the acts necessary for the substantive offense." U.S.S.G. § 2X1.1, cmt. n.4. There was no plain error in the district court's failure to apply a three-level reduction under § 2X1.1(b)(2).

Finally, the application of § 2X1.1 would not have affected the application of § 2G2.1(b)(4) in group three. That guideline provides for a four-level enhancement "[i]f the offense involved material that

portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) an infant or toddler." U.S.S.G. § 2G2.1(b)(4). Clemans does not dispute that he possessed images and videos in his possession that portrayed sadistic, masochistic, or violent conduct, or that he possessed pornographic images of infants and toddlers. Those images are detailed in paragraph 18 of the PSR. Clemans instead argues those images do not qualify as "intended offense conduct that can be established with reasonable certainty" under § 2X1.1(a). But if the images are considered relevant offense conduct under § 2G2.1(b)(4), § 2X1.1(a) does nothing to alter that conclusion.

The commentary to § 2X1.1 clarifies that the phrase "intended offense conduct" was meant to enlarge the scope of offense conduct beyond merely what has actually occurred. U.S.S.G. §2X1.1, cmt. n.2; *United States v. Cabrera*, 288 F.3d 163, 169–70 (5th Cir. 2002) (noting that, unless otherwise specified, the Guidelines' definition of "relevant conduct" that may be considered is limited to "conduct that has *occurred*"); *cf. United States v. Depew*, 932 F.2d 324, 330 (4th Cir. 1991) ("Under the conspiracy guideline, it is obvious that the intended offense conduct carries the same weight as actual

conduct."). There is no authority for Clemans's implicit assertion that § 2X1.1(a) was intended to narrow the scope of conduct that could be considered in sentencing for a conspiracy offense.

Because the application of § 2X1.1(a) would not have affected Clemans's offense level or resulting sentence, there was no effect on his substantial rights and no plain error.

## VII. The district court did not plainly err by applying an enhancement for possession of pornography that was sadistic, masochistic, and involved infants and toddlers.

### A. Standard of Review

See Section IV.A., *supra*.

### B. There was no *ex post facto* violation because the 2014 and 2016 Guidelines contain § 2G2.1(b)(4), and application of the enhancement to relevant conduct for the receipt count could not have affected Clemans's sentencing range.

It was not plain error to apply a four-level enhancement with respect to group three. As noted above, § 2G2.1(b)(4)—the guideline applicable to production of child pornography—provides for a four-level enhancement "[i]f the offense involved material that portrays (A) sadistic or masochistic conduct . . .; or (B) an infant or toddler." U.S.S.G. § 2G2.1(b)(4). While the images produced by Clemans and

Tandeg did not include such material, there is no dispute Clemans received multiple such images. PSR ¶¶ 18, 50.

As an initial matter, there was no *ex post facto* violation here because the images Clemans possessed satisfied offense characteristics in both the 2014 and 2016 versions of § 2G2.1(b)(4). Section 1B1.11 directs that the sentencing court shall use the Guidelines Manual in effect on the date of sentencing, unless use of such manual would violate the *Ex Post Facto* Clause. U.S.S.G. § 1B1.11(a), (b). Here, both Manuals included a four-level enhancement for sadistic, masochistic, or violent material, and Clemans possessed such material. PSR ¶¶ 18, 50. Use of the 2016 Manual therefore posed no risk that Clemans would receive a higher sentence, eliminating any potential *ex post facto* violation, and the court's use of the 2016 Manual was correct. *Peugh v. United States*, 569 U.S. 530, 544 (2013); U.S.S.G. § 1B1.11(a), (b).

Further, because group three, to which this four-level enhancement was applied, also included Clemans's offense of receipt of child pornography, the court could reasonably have concluded that such images were relevant to one of the "offense[s] of conviction"

77

included in this group.[12]  PSR ¶ 42; U.S.S.G. § 1B1.3(a)(1) (advising

offense level shall be determined based on "all acts and omission

committed . . . by the defendant . . . that occurred during the

commission of the offense of conviction").

However, under § 1B1.3(a)(2), "all acts and omissions . . . that

were part of the same course of conduct or common scheme or plan as

the offense of conviction" may only be considered "with respect to

offenses of a character for which § 3D1.2(d) would require grouping

of multiple counts."  Section 2G2.2 (governing receipt) is such an

offense, but § 2G2.1 (governing production) is not.  U.S.S.G.

§ 3D1.2(d).  Receipt of child pornography was an "offense of

conviction" in group three but it did not provide the "offense level

applicable to the Group" because it was not the most serious count.

*See* U.S.S.G. § 3D1.3(a).  Because there was ambiguity in whether

the court could consider Clemans's entire course of conduct with

respect to the receipt of child pornography in group three, any error

---

[12] The guidelines for production of child pornography and receipt
of child pornography both contain the same enhancement.  *Compare*
U.S.S.G. § 2G2.1(b)(4) *with* U.S.S.G. § 2G2.2(b)(4).

was not "clear" or "obvious," and was therefore not plain. *Olano*, 507
U.S. at 734 (1993).

Moreover, any error in applying this enhancement would not
have changed Clemans's Guidelines range, and therefore cannot
have affected his substantial rights. Reducing group three by four
levels would have resulted in a revised offense level of 42. To
calculate the new combined offense level, the units would have been
determined as follows (changes emphasized):

| Group | Adjusted Offense Level | Units |
|---|---|---|
| Group one | 34 | *0.5* |
| Group two | 36 | *0.5* |
| Group three | *42* | 1.0 |
| Group four | 42 | 1.0 |
| Group five | 42 | 1.0 |
| Group six | 38 | *1.0* |
| Total Units | | *5.0* |

As the chart depicts, the reduced offense level for group three
would have resulted in an increase in the units assigned to three
other groups. U.S.S.G. § 3D1.4. Five units would have required
adding four levels to the base offense level of 42, resulting in a
combined offense level of 46. *Id.* This would still have been three
levels higher than the highest offense level in the Guidelines

sentencing table. *See* U.S.S.G. Ch. 5, Part A, n.2. Clemans's advisory range would have remained life in prison, and the error could not have affected his substantial rights or caused any prejudice. *See United States v. Molina-Martinez*, 136 S. Ct. 1338, 1346 (2016) (acknowledging that "[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist").

## VIII. The addition of a separate offense group for Clemans's crime of buying children was not plain error.

### A. Standard of Review

See Section IV., A., *supra*.

### B. Clemans's crime of buying children poses a distinct risk of harm.

There was also no plain error in the district court's creation of a separate offense group—group six—for Clemans's conviction for buying children. While the court (and the PSR) did not explain why this count was grouped separately, § 3D1.2 provides that counts "involving substantially the same harm shall be grouped together into a single Group." Under § 3D1.2(b), counts are found to involve substantially the same harm when they "involve the same victim and

two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." But the commentary to § 3D1.2(b) explains that this subsection "does not authorize the grouping of offenses that cannot be considered to represent essentially one composite harm." *Id.*, cmt. n.4.

Here, it was reasonable for the district court to conclude that the offense of buying children posed such a distinct risk of harm to the minor victims that it was not part of "one composite harm" with the offenses of production and conspiracy to produce child pornography, and receipt of child pornography. Buying children under § 2251A(b) requires proof that the defendant purchased or obtained custody or control of a minor, or offered to do so, with knowledge that the minor would be portrayed in child pornography. This offense therefore necessarily entails removing a child from the care and protection of their parent or regular legal guardian, creating an additional risk of harm and imposing a more severe trauma. To create a separate group based on this distinct harm was not an error that was "plain."

However, even if this offense should have been included in groups three, four, and five, any such error did not affect Clemans's substantial rights because it had no impact on his sentencing range. Assuming the revised Guidelines calculation described above as the starting point (*see supra*, Section IV.E), the removal of group six would have resulted in four total units, rather than five. Under § 3D1.4, this would still have required adding four levels to the base offense level of 42, again resulting in a combined offense level of 46. Clemans would still remain one of the "rare cases" with a total offense level of more than 43. U.S.S.G. Ch. 5, Part A, n.2. His advisory Guidelines range would remain life in prison.

Thus, even if Clemans is correct, the creation of an additional group did not cause him any prejudice or affect his substantial rights. *See Molina-Martinez*, 136 S. Ct. at 1346 (acknowledging that "[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist").

## CONCLUSION

The government respectfully requests that this Court affirm

Clemans's convictions and sentence.

Respectfully submitted,

McGREGOR W. SCOTT
United States Attorney

/s/ André M. Espinosa
_____
ANDRÉ M. ESPINOSA
COLLEEN M. KENNEDY
Assistant United States Attorneys

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

## CERTIFICATE OF COMPLIANCE

This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2(a) and is 16,051 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

DATED:  August 9, 2019          /s/ André M. Espinosa
                                ANDRÉ M. ESPINOSA
                                Assistant United States Attorney

**CERTIFICATE OF SERVICE**

When All Case Participants are Registered for the
Appellate CM/ECF System

I hereby certify that on August 9, 2019, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECF

system.

I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the appellate CM/ECF

system.

/s/ André M. Espinosa

ANDRÉ M. ESPINOSA
Assistant United States Attorney