No. 18-10035

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

MICHAEL CAREY CLEMANS
Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of California

Honorable John A. Mendez
United States District Judge

U.S. District Court Case No. 2:15-cr-227-JAM-1

———————————————

APPELLANT'S REPLY BRIEF

———————————————

HEATHER E. WILLIAMS
Federal Defender
CAROLYN M. WIGGIN
Assistant Federal Defender
801 "I" Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS

Table of Contents

Table of Authorities .............................................................................. iii

I.    Introduction .............................................................................................1

II.   Facts Regarding Mr. Clemans' Actual and Speculative Travel to the
      Philippines. ..............................................................................................2

      A.   2013 Travel to Philippines ...............................................................2

      B.   Talk of Later Travel to Philippines. ................................................2

III.  Argument .................................................................................................4

      A.   The Evidence is Insufficient to Support Counts One, Two, and Four. .........4

           1.   With respect to Count One, even if Mr. Clemans formed an intent
                to travel to the Philippines for illicit sex while he was in the
                United States, he did not "travel" between the United States
                and the Philippines for the purposes of  18 U.S.C. Section 2423(b). ........4

           2.   With respect to Count Two, the evidence is insufficient to show
                Mr. Clemans and Tandeg agreed to a concrete plan for Mr.
                Clemans to travel from the United States to the Philippines
                for illicit sex. ..........................................................................................11

           3.   The evidence is insufficient to support Count Four because
                Mr. Clemans never made an "offer" to purchase or obtain custody
                of a minor through a means or facility of interstate or foreign
                commerce, a computer, or mail. ...............................................................16

           4.   Mr. Clemans' money transfers to Tandeg do not supply a separate
                jurisdictional basis to support Count Four. ..............................................22

      B.   The District Court Made Numerous Prejudicial Sentencing Errors. ...........22

           1.   The district court's denial of an acceptance of responsibility
                downward adjustment contravenes this Court's precedent. .....................22

i

2.   Mr. Clemans' will move to strike portions of the Answering
     Brief that reference material outside of the appellate record...................25

3.   Use of U.S.S.G. Section 2X1.1 with respect to Counts Two and
     Three would have lowered Mr. Clemans' advisory Guidelines range. ...25

4.   The district court plainly erred in adding a four level adjustment to
     Group Three for images and videos that portrayed sadistic or
     masochistic conduct and/or included infants and toddlers. ....................27

5.   Count Four Should Have Been Placed Within Groups Three,
     Four, and Five. ..........................................................................................28

IV.  Conclusion .......................................................................................................30

Table of Authorities

Federal Cases

*Azar v. Allina Health Servs.*, __ U.S. __, 139 S. Ct. 1804 (2019)............................9

*Burks v. United States*, 437 U.S. 1 (1978) ...............................................................15

*United States v. Boyajian*, No. CR 09-933(A)-CAS,
    2016 WL 3751945 (C.D. Cal. July 11, 2016)........................................................8

*United States v. Bredimus*, 352 F.3d 200 (5th Cir. 2003)........................................7

*United States v. Bernhardt*, 903 F.3d 818, 822 (8th Cir.),
    *cert. denied*, __ U.S. __, 139 S. Ct. 578 (2018)....................................................15

*United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), *overruled by*
    *United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018) ...................................8

*United States v. Franklin*, 904 F.3d 793 (9th Cir. 2018) .........................................9

*United States v. Jackson*, 480 F.3d 1014 (9th Cir. 2007) .............................. 8, 9, 10

*United States v. Korab*, 893 F.2d 212 (9th Cir. 1989)............................................19

*United States v. LaPierre*, 998 F.2d 1460 (9th Cir.1993)........................................23

*United States v. McInnis*, 601 F.2d 1319 (5th Cir. 1979)..........................................5

*United States v. McRary*, 665 F.2d 674 (5th Cir. 1982) ...........................................5

*United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018)............................................8, 9

*United States v. Schmidt*, 845 F.3d 153 (4th Cir. 2017) ................................ 8, 9, 10

*United States v. Vance*, 62 F.3d 1152 (9th Cir. 1995) ............................................23

*United States v. Watt*, 910 F.2d 587 (9th Cir.1990) ...............................................23

*United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011) ............................... 4, 6, 7

*Yates v. United States*, 354 U.S. 298 (1957).............................................................15

Federal Statutes

18 United States Code Section 2.................................................................................20

18 United States Code Section 371.............................................................................20

18 United States Code Section 2251........................................................... 17, 18, 20

18 United States Code Section 2251A............................................................. *passim*

18 United States Code Section 2252...........................................................................20

18 United States Code Section 2423................................................................. *passim*

Child Protection and Obscenity Enforcement Act of 1988,
   Pub. L. No. 100–690, Title VII, Subtitle N, § 7512,
   102 Stat. 4181 (1988)...........................................................................................17

United States Sentencing Guidelines

United States Sentencing Guidelines Manual, Section 2G2.1.............. 25, 26, 27, 28

United States Sentencing Guidelines Manual, Section 2X1.1......................... 25, 26

United States Sentencing Guidelines Manual, Section 3D1.2................................28

United States Sentencing Guidelines Manual, Section 3E1.1 .......................... 23, 25

Other Authorities

Senate Proceedings and Debates of the 100th Congress, Second Session,
   Thursday, February 4, 1988134 Cong. Rec. S636-02,
   1988 WL 1081861 ...................................................................................... 17, 21

iv

No. 18-10035

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | United States District Court Case No. 2:15-cr-227-JAM-1 |
| Plaintiff-Appellee, | |
| v. | United States District Court, Eastern District of California, Sacramento |
| MICHAEL CAREY CLEMANS, | |
| | APPELLANT'S REPLY BRIEF |
| Defendant-Appellant. | |

## I.  Introduction

The government dedicates much of its Answering Brief to setting forth evidence of conduct Mr. Clemans has never denied.  It recounts Mr. Clemans' most noxious text messages regardless of their relevance to any appellate issues.  As set forth below, while Mr. Clemans behavior was reprehensible and he faces serious punishment for the charges to which he pled guilty, the evidence is insufficient to support Counts One, Two, and Four.  Moreover, numerous sentencing errors require vacation of the sentence.

**II. Facts Regarding Mr. Clemans' Actual and Speculative Travel to the Philippines.**

**A. 2013 Travel to Philippines**

From November 13-17, 2013, Mr. Clemans flew roundtrip from Thailand to the Philippines for a four-day visit to the Philippines.  Mr. Clemans does not deny that the trip's purpose was illicit sex.  He *does* deny that the trip had a nexus to the United States.

The government tries to bolster a fiction that Mr. Clemans' residence in Thailand during the fall of 2013 was merely a layover stop during a single incident of "travel" by implying that Mr. Clemans did not reside in Bangcok, Thailand, during the fall of 2013.  It describes Mr. Clemans' apartment as "an apartment" where Mr. Clemans "slept . . . while not working.  SER III, p. 778."  Answering Brief, p. 8.  In fact, SER III p. 778 is the cover page for a reporter's transcript.  It contains no testimony or support for the government's attempt to distance Mr. Clemans from his apartment in Bangcok, Thailand.  As the FBI Special Agent who investigated the case testified, Mr. Clemans resided in Thailand beginning in September of 2013. ER II p. 106; CR 136-2, p. 157 (RT p. 503).

**B.  Talk of Later Travel to Philippines.**

As the Government describes in its Answering Brief at pages 10-21, during the last half of 2014 through part of 2015, Mr. Clemans communicated with Lyan Tandeg, a woman who lived in the Philippines.  Mr. Clemans has never denied

that, as described in the Answering Brief, he paid Tandeg to produce child pornography. Mr. Clemans has never denied that in messages with Tandeg he discussed one day traveling to the Philippines and having sexual encounters with the girls Tandeg used to make child pornography. What the evidence does *not* show is that Mr. Clemans and Tandeg ever made or agreed upon a concrete plan for a trip from the United States to the Philippines.

The Government claims that in September of 2014, "Clemans was in the United States then and proposed traveling directly to Manila for sex with Angel and Nicole. SER 206-10; SER II 502; SER III 631, 644." Answering Brief, p. 15. SER pp. 206-210 is a printout of messages Mr. Clemans and Tandeg exchanged from September 7, 2014, to September 9, 2014, a brief period when Mr. Clemans was in the United States.[1] While the two discuss the Mr. Clemans' possible travel to the Philippines at some point in the future, they never made a concrete plan or any arrangements for such a trip.

In April of 2015, Mr. Clemans arrived in the United States and had his passport seized. Afterwards, he sent Tandeg messages about someday visiting the Philippines from *Thailand*. ER II, p. 130; Gov't Exh. 52-026; ER II p. 105; CR 136-2, p. 154 (RT p. 500). Even to the extent Mr. Clemans' messages can be read

---

[1] Mr. Clemans was in the United States from August 31, 2014, through September 15, 2014, and from April 27, 2015, to the present. SER 502, 631, and 644.

3

as contemplating a trip directly from the United States to the Philippines, Mr.
Clemans never bought an airline ticket or made an arrangement for lodging in the
Philippines. Further, Tandeg never agreed to help him plan a visit in 2015, instead
emphasizing she was "busy for now" with school and would "let [him] know" if
she had free time, which she never indicated she did. ER II pp. 125-26 (Gov't
Exh. 52-006).

## III.    Argument

### A. The Evidence is Insufficient to Support Counts One, Two, and Four.

1. **With respect to Count One, even if Mr. Clemans formed an intent to travel to the Philippines for illicit sex while he was in the United States, he did not "travel" between the United States and the Philippines for the purposes of 18 U.S.C. Section 2423(b).**

Count One involves Mr. Clemans' 2013 trip between Thailand and the
Philippines. Mr. Clemans did not buy his plane ticket and travel to the Philippines
until November 2013, *after* he had been living in Thailand for two months. The
government does not claim that the plane Mr. Clemans took from Thailand to the
Philippines stopped in the United States. The Government does not dispute that
"travel between two foreign countries, absent any territorial nexus to the United
States, does not constitute 'travel [ ] in foreign commerce' for the purpose of §
2423(b)." *United States v. Weingarten*, 632 F.3d 60, 61–62 (2d Cir. 2011).
Instead the Government offers two rationales to support Count One: (1) an

4

argument that forming intent to travel for illicit sex while one is in the United States provides the required nexus to the United States; and (2) the notion that from September 11, 2013, through November 13, 2013, Mr. Clemans engaged in a continuous act of "travel" from the United States to the Philippines. Answering Brief, pp. 32-42. Neither of these arguments has merit.

Turning to the government's first argument, 18 U.S.C. § 2423(b) punishes a United States citizen who "travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct . . ." It criminalizes the act of travel with the requisite *mens rea*, not formation of intent to travel. Mr. Clemans' travel to the Philippines in 2013 had no territorial nexus to the United States; the flight Mr. Clemans took did not depart, stop over, or end in the United States. The fact that Mr. Clemans was in the United States in early September of 2013 when he began to conceive of an activity that would take place wholly outside the United States is not sufficient to connect that activity (travel between Thailand and the Philippines for the purpose of engaging in illicit sex) to travel in "foreign commerce," *i.e.* travel with a tie to the United States. *See also United States v. McRary*, 665 F.2d 674, 678 (5th Cir. 1982) (where statute prohibits kidnapping in "foreign commerce," there was no federal jurisdiction where defendant seized victim outside of United States and then transported victim to foreign country); *United States v. McInnis*, 601 F.2d 1319 (5th Cir. 1979) (there can be no transportation in

5

foreign commerce where the would-be kidnappers contrive a plan in the United States to entice their victim into Mexico so that he could be kidnapped in Mexico).

The government's effort to characterize Mr. Clemans' move from the United States to Thailand in September of 2013, and subsequent travel from Thailand to the Philippines in November of 2013, as one continuous act of "travel," is at odds with common sense and the statutory scheme punishing foreign travel for illicit sex. First, although "intermediate stop[s]" or layovers in foreign countries that that occur during a multi-legged journey between the United States and a foreign country will not immunize a defendant from liability under 18 U.S.C. § 2423(b),[2] Mr. Clemans' two months in Thailand cannot be characterized as a short stop on a trip to the Philippines. When he left the United States in September 2013, Mr. Clemans only had plans for his journey to Thailand. He moved to an apartment in Bangkok and began residence in Thailand. He started a job with a Thai airline. He had no airline ticket or concrete plan to visit the Philippines. It was not until two months after he moved to Thailand that Mr. Clemans bought an airline ticket for a four-day visit to the Philippines. Under any reasonable interpretation of the facts, Mr. Clemans' residence in Thailand from September through November of 2013 was not a layover or intermediate stop on a single act of travel from the United

---

[2] *Weingarten*, 632 F.3d at 71.

6

States to the Philippines. Instead, the trip to the Philippines was a short vacation Mr. Clemans' took from his residence in Thailand.

The government argues Mr. Clemans "never permanently resettled in Thailand and did not intend to" because he had a non-immigrant visa from Thailand. Answering Brief, p. 39. For purposes of 18 U.S.C. § 2423(b), however, the relevant question is whether Mr. Clemans continued to be "travelling" from the time he left the United States on September 11, 2013, to the time he arrived in the Philippines on November 13, 2013. It is only if Mr. Clemans' activities over that time and distance are deemed a single act of "travel" that his trip to the Philippines had a territorial nexus to the United States. While courts have held that layovers[3] and brief visits to destinations during a trip or vacation that starts and ends in the United States[4] do not interrupt "travel" for the purposes of 18 U.S.C. § 2423(b), no court has suggested that one continues to "travel" from the United States under § 2423(b) when one moves to a foreign country, obtains a job and apartment in that country, and has no return ticket to the United States. Such a holding would stretch the definition of "travel" beyond any tie to its meaning in the English

---

[3] *Weingarten*, 632 F.3d at 71.

[4] *United States v. Bredimus*, 352 F.3d 200, 202 (5th Cir. 2003) (prosecution under 18 U.S.C. § 2423(b) proper where defendant left his "residence" in Texas to travel to Thailand for the purpose of engaging in illicit sex where he merely made "stops" along the way in Hong Kong and Tokyo.

7

language: movement from one place to another or being on a trip or vacation. *United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir. 2007).

The government correctly points out that *United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018), pertains to 18 U.S.C. § 2423(c), not § 2423(b). Answering Brief, pp. 36-38. *Pepe*, *Jackson*, and *United States v. Schmidt*, 845 F.3d 153 (4th Cir. 2017), all of which pertain to 18 U.S.C. § 2423(c), are relevant because they address the term "travel" under 18 U.S.C. § 2423. Indeed, the district court relied on the definition of "travel" from § 2423(c) cases when it denied Mr. Clemans' Rule 29 motion. ER I pp. 35-36, CR 99, pp. 6-7 (relying on *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), *overruled by United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018), and *United States v. Boyajian*, No. CR 09-933(A)-CAS, 2016 WL 3751945 (C.D. Cal. July 11, 2016)).

About ten months after the district court denied Mr. Clemans' Rule 29 motion by relying on *Clark* and *Boyajian*, this Court decided *Pepe*. This Court re-examined the term "travel" under 18 U.S.C. § 2423 in light of the 2013 amendment which added the following italicized words to Section 2423(c): "travels in foreign commerce *or resides, either temporarily or permanently, in a foreign country,* and engages in any illicit sexual conduct." The amendment clarified that, contrary to the holding of *Clark*, Congress distinguished between "travel" on the one hand and temporary or permanent residence on the other. *Pepe* clarifies that "travel" under

8

18 U.S.C. § 2423 is distinct from residing, temporarily or permanently, in a foreign country. If this Court were to hold that Mr. Clemans was still "travelling" for purposes of 18 U.S.C. § 2423(b) after he took up residence, whether temporarily or permanently, in Thailand, it would give "travel" under 18 U.S.C. § 2423(b) a different meaning than it has under § 2423(c). Such a holding would run counter to the "normal presumption that, when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout." *Azar v. Allina Health Servs.*, __ U.S. __, 139 S. Ct. 1804, 1812 (2019); *United States v. Franklin*, 904 F.3d 793, 802 (9th Cir. 2018) (identical word in different parts of same statute presumed to have same meaning).

The government urges this Court to interpret the word "travel" "expansively" as was done in *Pepe*, *Jackson*, and *Schmidt*. Answering Brief, pp. 38-42. Mr. Clemans agrees that the "travel" definition in *Pepe*, *Jackson*, and *Schmidt* is appropriate, but that definition does not support a conclusion that Mr. Clemans was in a continuous act of "travel" from September 11 through November 13, 2013. While "travel" under those cases does not require that a defendant be literally on a moving vessel, it does require that a defendant be on a visit, vacation, or trip that is expected to come to an end. The *Pepe* Court pointed out that the 2013 amendment to 18 U.S.C. § 2423(c) indicates that "travel" "mean[s] a brief stay and [does] not include resettlement or intent to stay." *Pepe*, 895 F.3d at 687.

9

The *Jackson* Court held that a person "taking a vacation" from the United States is "travelling" the entire time he is abroad if he plans to return to the United States, but a person who has taken up residence or domicile in a foreign country is no longer "traveling," even if that person is using a United States passport. *Jackson*, 480 F.3d at 1022-1023. Finally, in *Schmidt* the Fourth Circuit held that a defendant was "travelling" in foreign commerce when he stayed in the Philippines and then Cambodia on tourist visas. *Schmidt*, 845 F.3d at 158.

Mr. Clemans was not "travelling" in Thailand from September 11, 2013, through November 13, 2013. He was not visiting Thailand on a tourist visa or United States passport. By October 7, 2013, the Kingdom of Thailand had issued Mr. Clemans a Non-Immigrant "B" visa that allowed him to work in Thailand. SER p. 488. Thailand's "B" visa requires, among other things, a letter of invitation from the company where one is going to work, a work permit issued by the Thai Ministry of Labor, an approval letter from the Ministry of labor, and various corporate documents.[5] Mr. Clemans did not simply visit Thailand as a tourist or traveller; he secured a job in Thailand, he obtained a visa allowing him to work in Thailand, and he rented an apartment in Thailand. He became a resident of Thailand and thus was no longer travelling for the purposes of 18 U.S.C. § 2423.

---

[5] https://thaiembdc.org/consular-services/non-immigrant-visas/non-immigrant-visa-category-b/ (last accessed October 9, 2019).

10

**2. With respect to Count Two, the evidence is insufficient to show Mr. Clemans and Tandeg agreed to a concrete plan for Mr. Clemans to travel from the United States to the Philippines for illicit sex.**

In Count Two Mr. Clemans' was charged with conspiracy to travel with intent to engage in illicit sexual conduct. The government alleged that between June 24, 2014, and July 24, 2015, Mr. Clemans conspired with persons to travel "from the United States, through Thailand, to the Philippines," for the purpose of engaging in illicit sex with a minor. ER II pp. 200-03; CR 79, pp. 2-5. To prove this charge, the government had to prove that in the relevant time frame, Mr. Clemans and another person, presumably Tandeg, entered an agreement to have Mr. Clemans travel from the United States, through Thailand, to the Philippines for the purpose of Mr. Clemans' engaging in illicit sex. The evidence was insufficient to prove the charge.

During most of the time Mr. Clemans and Tandeg communicated, any travel they discussed involved Mr. Clemans someday taking a trip from Thailand to the Philippines. The government discusses many messages between Mr. Clemans and Tandeg, citing SER 131, 161, 209-11, 224, SER II 388; SER III 721-26, 730-31 (Answering Brief p. 43), but as shown below none involve the two agreeing on an actual, specific plan for Mr. Clemans to travel from the United States to the Philippies for illicit sex:

11

(1) June 30, 2014 messages discussing the possibility of Mr. Clemans someday visiting the Philippines to have sex with the girls, with a caveat that Mr. Clemans has "not seen photos of these girls and have no Idea if I would even want sex with them." SER 131. Mr. Clemans was in Thailand during this exchange.[6] The two do not agree on a specific trip or any trip that will originate in the United States.

(2) July 4, 2014 messages from Mr. Clemans regarding whether the recruiter in the Philippines knows that Mr. Clemans wants to someday have sex with the girls. SER 161. Tandeg does not respond to any of these messages. Mr. Clemans was in Thailand during this exchange.[7] The two do not enter an agreement of any kind because Tandeg does not respond to Mr. Clemans' messages.

(3) September 9, 2014 messages written when Mr. Clemans was in the United States.[8] The two discuss the possibility of Mr. Clemans visiting the Philippines and having sex with the girls. SER pp. 209-11. Mr. Clemans says he wants four or five days with the girls (SER 210) and

---

[6] Mr. Clemans was in the United States from May 1, 2014, to May 31, 2014, and August 31, 2014 to September 15, 2014. ER II p. 101; CR 136-2, p. 140 (RT p. 486).
[7] ER II p. 101; CR 136-2, p. 140 (RT p. 486).

[8] *Id*.

12

Tandeg explains that the girls would not be available because of school. *Id.* Tandeg suggests that Mr. Clemans *not* come, and Mr. Clemans ultimately decides he might have more time on a future trip during his leave. SER p. 211. On September 13, 2014, Mr. Clemans sent messages to Tandeg explaining he will *not* stop in the Philippines on his trip from the United States to Thailand. SER p. 224.

(4) May 8, 2015 messages in which Mr. Clemans asks Tandeg to upload pictures of Angel. SER II p. 388. These messages do not discuss travel for sex.

(5) Testimony by an FBI Special Agent regarding the agent's recollection of the subjects Mr. Clemans and Tandeg discussed in the messages described above. SER III pp. 720-31.

The messages Mr. Clemans and Tandeg exchanged after Mr. Clemans was arrested in the United States on April 27, 2015, do not reveal agreements or plans for an actual trip from the United States to the Philippines. On May 5, 2015, despite the fact that he did not have a passport, Mr. Clemans states he could come to the Philippines for four or five days in the summer of 2015. SER II p. 379. Tandeg states she will check her schedule and tell if that would work, but she never states that it will. SER II pp. 380-82. Later that day Mr. Clemans tells Tandeg that he plans to travel to Thailand on June 5th and but will *not* be visiting

13

the Philippines because Tandeg does not have free time.  SER III p. 383.  In May

of 2015 Mr. Clemans and Tandeg continue their exchange regarding the idea that

Mr. Clemans might someday visit the Philippines (SER II pp. 383-400), but Mr.

Clemans says his idea is to visit the Philippines from Thailand.  SER II p. 399.

The two never agree to a specific plan for Mr. Clemans to visit the Philippines,

much less on a plan for Mr. Clemans to visit the Philippines from the United

States.

In July of 2015, Mr. Clemans told Tandeg that he would probably return to

Thailand directly from the United States, but if not he would visit her in the

Philippines before returning to Thailand.  ER II, p. 105 (CR 136-2, p. 156 (RT p.

502)).  Mr. Clemans never actually planned a trip to the Philippines, however.

The government argues Mr. Clemans' occasional mention of the possibility

of visiting the Philippines *en route* from the United States to Thailand is sufficient

evidence that Tandeg and Mr. Clemans entered a conspiracy for Mr. Clemans to

travel from the United States, through Thailand, to the Philippines.  Answering

Brief, pp. 44-45.  As recounted in detail above, however, Mr. Clemans and Tandeg

never agreed on an actual trip Mr. Clemans would take from the United States to

the Philippines.  Instead, their conversations invariably ended in a decision that Mr.

Clemans would not visit the Philippines (SER pp. 210-11, 224; SER III p. 383) or

remained open-ended with no actual plan for a trip. ER II, p. 105 (CR 136-2, p. 156 (RT p. 502)).

As the Supreme Court has recognized, proof of a conspiracy requires proof "that the conspiracy is at work and is [not] a project still resting solely in the minds of the conspirators." *Yates v. United States*, 354 U.S. 298, 334 (1957) (internal citations and quotations omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978). The idea of Mr. Clemans travelling from the United States to the Philippines was always tentative; it was never more than a vague goal in the minds of Mr. Clemans and Tandeg. No one ever bought a plane ticket, made hotel reservations, or created an itinerary. There was simply not sufficient evidence of an agreement to arrange a concrete trip that would violate 18 U.S.C. § 2423(b). *See also United States v. Bernhardt*, 903 F.3d 818, 822, __ (8th Cir.), *cert. denied*, __ U.S. __, 139 S. Ct. 578 (2018) (although defendant had conversations with minor in the Philippines, sent her money, obtained nude images of her, and told her he would travel to the Philippines to have sex with her, where there was no evidence he ever purchased a plane ticket or booked a hotel room the evidence was "too thin" to support a conviction for attempted travel in violation of 18 U.S.C. § 2423(b)).

15

3.  **The evidence is insufficient to support Count Four because Mr. Clemans never made an "offer" to purchase or obtain custody of a minor through a means or facility of interstate or foreign commerce, a computer, or mail.**

The government does not dispute that Mr. Clemans communicated only with Tandeg in foreign commerce; he never communicated with the girls' parents or guardians. When Shellina Atad spoke to the girls' parents or guardians she did so face-to-face in the Philippines, not in interstate or foreign commerce or by use of a computer or mail. The key dispute between the parties, then, is whether Mr. Clemans' requests to Tandeg that Tandeg offer to pay the girls' parents or guardians to make the girls available for production of child pornography can be considered "offers" for the purposes of 18 U.S.C. § 2251A.

The plain language of 18 U.S.C. § 2251A, as well as its relationship with other child pornography statutes and its legislative history, clarify that "offers" refers to direct offers by or to a parent or guardian (hereafter "guardian") to obtain custody or control of a child to produce child pornography, and not communication asking an intermediator to make such offers. As discussed below, in its overall scheme to punish those involved in child pornography production, Congress has chosen to punish transactions involving guardians relinquishing custody of a child for child pornography production more severely than it punishes other means of child pornography production.

16

The idea for 18 U.S.C. § 2251A was first announced in February of 1988. At that time, federal law already punished any "parent, legal guardian, or person having custody or control" of a minor permitting the minor in their care to be used in child pornography production. 18 U.S.C. § 2251(a),(b) (1987). In commenting on the proposed Child Protection and Obscenity Enforcement Act, Senator Strom Thurmond explained that the new Section 2251A was needed because "[t]here have even been shocking instances in which parents have actually sold their children for use in [child pornography]". 134 Cong. Rec. S636-02, 1988 WL 1081861. 18 U.S.C. § 2251A was included in the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100–690, Title VII, Subtitle N, § 7512, 102 Stat. 4181 (1988). Congress inserted the new 18 U.S.C. § 2251A right after 18 U.S.C. § 2251 in the United States Code. *See Id*. at Section 7512(a).

The first indication that 18 U.S.C. § 2251A targets negotiations made with guardians over custody of a child is the unique and severe way such offers are punished. Subpart (a) of § 2251A makes it a crime carrying a penalty of at least *30 years* for a guardian to sell or transfer custody of the minor, or to "offer" to do so, for child pornography production. 18 U.S.C. § 2251A(a). By contrast, neighboring § 2251(b) makes it a crime punishable by *15-30 years* for a guardian to permit a minor to be used in child pornography production. 18 U.S.C. § 2251(b), (e). The fact that the *maximum* punishment a guardian can receive for

17

permitting their child to be involved in child pornography production is the same as the *minimum* punishment a guardian can receive for transferring (or "offering" to transfer) custody of their child for child pornography production indicates that Congress considers transactions with guardians for custody of a child particularly reprehensible.

Subpart (b) of § 2251A, the mirror image of subpart (a), applies the same mandatory minimum punishment of 30 years to anyone who purchases or obtains custody of a minor, or "offers" to do so, for the production of child pornography. 18 U.S.C. § 2251A(b). It is punishes transactions with guardians for custody of a child to produce child pornography far more severely than simple child pornography production, which generally carries a maximum sentence of 30 years, is punished. 18 U.S.C. § 2251(a), (e). Again, it is the transfer of custody from a guardian to another, or negotiation for such transfer, for production of child pornography that is singled out for uniquely severe punishment.

Mr. Clemans never made an "offer" to obtain custody of any of the girls in the Philippines to their guardians. It was Atad who spoke to the guardians face-to-face, not in interstate or foreign commerce as required by 18 U.S.C § 2251A(c)(2). The government may argue that Atad and Tandeg ultimately gained custody of the girls, but Mr. Clemans cannot be punished under 18 U.S.C. § 2251A for that custody because the circumstances do not satisfy the jurisdictional element of the

18

statute; no child traveled in interstate or foreign commerce (18 U.S.C. §

2251A(c)(1)), and custody or control did not take place in any territory or

possession of the United States.  18 U.S.C. § 2251A(c)(3).

The government argues that there is no evidence Congress intended to

punish only "offers" to obtain custody that are made guardians of a minor.

Answering Brief, p. 56.  However, as argued above, the structure of the statute, and

the especially severe punishment connected to arrangements for transfer of custody

of a child away from a guardian for child pornography production, indicate that it

is the act of obtaining, or asking to obtain, custody of a minor from a person who

has that custody and can relinquish it that is deemed particularly abhorrent.  This is

understandable from the standpoint of protecting a child: while it is hard to obtain

custody of a child from an uncooperative parent or guardian, if a parent/guardian

actually colludes with a child pornography producer to transfer custody of their

child to the producer it is difficult for law enforcement to detect and stop the

exploitation of the child.

The government also argues that *United States v. Korab*, 893 F.2d 212 (9th

Cir. 1989), is irrelevant because it applied to extortionate threats, not offers to

obtain custody of a child for production of pornography.  Answering Brief, pp. 56-

57.  However, in both cases Congress was concerned with a communicative act

that is inherently dangerous, and in both cases Congress provided a basis for

19

federal jurisdiction by requiring that the communication occur in interstate or foreign commerce.

Finally, the government argues that Mr. Clemans' interpretation would allow defendants to escape liability under 18 U.S.C. § 2251A by "simply convey[ing] the offer through an accomplice," thereby thwarting Congress's desire to eradicate the sexual exploitation of children. Answering Brief, pp. 57-58. There are a couple of major problems with this argument. First, if one uses an accomplice to commit a crime, generally one can be liable as an aider and abettor or co-conspirator. 18 U.S.C. § 2; 18 U.S.C. § 371. In this case, the problem is not a lack of ability to prosecute an accomplice, the problem is that no offer directed to a guardian was made in interstate or foreign commerce. Second, Congress has enacted many other statutes directed at combatting the sexual exploitation of children, several of which the government cites in its brief. Answering Brief, pp. 57-58. Although Mr. Clemans is not liable under 18 U.S.C. § 2251A for his actions with respect to the girls in the Philippines, he admitted guilt and is liable under 18 U.S.C. § 2251(c) and (e) (conspiracy to produce child pornography), 18 U.S.C. § 2251(c) and (e) (attempted production and production of child pornography), and 18 U.S.C. § 2252(a)(2) (receipt of child pornography). Congress has created many tools to fight the production and transmission of child pornography, some of which were effectively used in this case.

20

Contrary to the government's argument at pp. 58-59 of its Answering Brief, a holding that any "offer" under 18 U.S.C. § 2251A must be made by or to a guardian will not "severely circumscribe" the reach of the statute. First, anyone can be prosecuted if they actually transfer or obtain custody of a child in violation of the statute. Mr. Clemans' argument only pertains to cases in which the sole theory of liability is an "offer" to transfer custody. Second, 18 U.S.C. § 2251A applies in rare situations by design. When it was created Senator Thurmond said it was added to address "shocking instances" in which parents/guardians are directly involved in giving a child pornography producer custody or control over their child. 134 Cong. Rec. S636-02, 1988 WL 1081861. As set out above, its minimum punishment is twice that of the maximum punishment for guardians who allow their children to be used in child pornography, already a very serious offense.

The language of the statute, its history, and its role within Congress's broader scheme to combat child pornography, all indicate that the "offers" referred to in 18 U.S.C. § 2251A are offers made by a parent or guardian, or to a parent or guardian, to obtain custody of a child for the production of child pornography.

21

### 4. Mr. Clemans' money transfers to Tandeg do not supply a separate jurisdictional basis to support Count Four.

The government argues that Mr. Clemans' money transfers from United States bank accounts to Tandeg show that "offers to purchase or obtain custody and control of the victims affected foreign commerce," providing an "independent ground" to affirm Mr. Clemans' conviction on Count Four. Answering Brief, pp. 60-61. This argument fails. Regardless of the economic impact of Mr. Clemans' requests to Tandeg on foreign commerce, 18 U.S.C. § 2251A itself has a federal jurisdictional element: 18 U.S.C. § 2251A(c)(2) requires proof that an "offer" be transmitted using a means of interstate or foreign commerce or in and affecting in interstate or foreign commerce. As argued above, any "offers" made to parents or guardians in this case were made not by Mr. Clemans in interstate or foreign commerce but instead by Shellina Atad in face-to-face conversations.

### B. The District Court Made Numerous Prejudicial Sentencing Errors.

### 1. The district court's denial of an acceptance of responsibility downward adjustment contravenes this Court's precedent.

In defending the district court's denial of a downward adjustment for acceptance of responsibility (Answering Brief, pp. 62-69), the government does not deny that the district court based its decision on Mr. Clemans' choice not to discuss the offenses with the probation officer who interviewed him. It makes no attempt to address the three cases Mr. Clemans cited in his Opening Brief which

hold "the district court cannot consider the defendant's refusal to discuss the offense with the probation officer as evidence weighing against acceptance of responsibility." *United States v. Vance*, 62 F.3d 1152, 1157 (9th Cir. 1995); *see also United States v. LaPierre*, 998 F.2d 1460, 1468 (9th Cir.1993); and *United States v. Watt*, 910 F.2d 587, 592 (9th Cir.1990). Under this Court's precedent, the district court erred, as the district court itself acknowledged was a distinct possibility,[9] in denying the acceptance of responsibility.

The government discounts Mr. Clemans' open admissions to Three, Five, and Six, and admission that he authored the messages the government used to prove Counts One, Two, and Four, as a "strategic" decision to avoid making frivolous arguments to the jury. Answering Brief, p. 53. It is hard to imagine any guilty plea which could not be characterized as a "strategic" choice not to go to trial and raise frivolous defense theories, and yet generally persons who plead guilty and admit, or do not falsely deny, the facts underlying their offenses are entitled to the acceptance of responsibility adjustment. See 2016 U.S.S.G. § 3E1.1. cmt. app. n. 3.

The government also claims Mr. Clemans "challenged the assertion that he truly intended to travel to engage in illicit sex with young girls." Answering Brief, p. 64. All it can point to, however, is arguments his lawyer made to the jury about

---

[9] ER I p. 6; CR 134, p. 6.

what type of evidence it expected the government to introduce. The lawyer accurately told the jury that it would not hear evidence that Mr. Clemans travelled to the Philippines to meet M.Q./Angel, E.S./Nicole, or J.U./ Ishin., or that he ever had sex with any of these girls. SER III p. 804. This was not denial of an element of a charged offense because none of the charged offenses required him to meet or have sex with any of the three girls. The government also discusses the evidence that Mr. Clemans travelled to the Philippines in 2013 to have sex with minors (Answering Brief pp 64-65), but Mr. Clemans never denied that the trip occurred or that any particular event happened on that trip. His argument, on the contrary, went to the purely legal question of whether that trip had a sufficient nexus to the United States to fall within 18 U.S.C. § 2423.

It is true that, as the government points out, Mr. Clemans declined to allocate at sentencing. Answering Brief, p. 68. However, when Mr. Clemans made that decision (ER p. 23; CR 134, p. 23), the district judge had already denied him a downward adjustment for acceptance of responsibility. ER p. 6, CR 136, p. 6.

The government also argues the district court correctly discounted Mr. Clemans' assistance to authorities. Answering Brief, pp. 68-69. The government asserts Mr. Clemans did not give authorities his Yahoo password for "some time," (Answering Brief, p. 68), but the record does not show Mr. Clemans delayed once

a government agent asked for the password.  SER pp. 764-65.  As discussed in the Opening Brief, Mr. Clemans' assistance to the government stopped Tandeg and Atad, saved the three girls they were exploiting, saved future potential victims of Tandeg and Atad, and allowed the government to develop additional evidence against Mr. Clemans by finding the girls and having them travel to the United States to testify.  This is the type of action that should have weighed strongly in favor of an acceptance of responsibility downward adjustment.  2016 U.S.S.G. § 3E1.1. cmt. app. n. 1(E).

### 2. Mr. Clemans' will move to strike portions of the Answering Brief that reference material outside of the appellate record.

The government responds to Mr. Clemans' argument that the district court erred in adding two levels under U.S.S.G. § 2G2.1(b)(2)(A) to Groups Four and Five by referring to materials that are not part of the record on appeal.  Answering Brief, pp. 70-71.  Mr. Clemans will move to strike the portion of the brief that refers to materials that are not part of the record on appeal.

### 3. Use of U.S.S.G. Section 2X1.1 with respect to Counts Two and Three would have lowered Mr. Clemans' advisory Guidelines range.

The government does not dispute that U.S.S.G. § 2X1.1 should have been used in calculating the advisory Guidelines range for Counts Two and Three.  Instead, it argues that Mr. Clemans "was not entitled to a three-level reduction

under § 2X1.1(b)(2) for either of his conspiracy offenses" because he completed all of the acts necessary for completion of the substantive offenses. Answering Brief p. 72.

The inquiries required under U.S.S.G. § 2X1.1 should be made in the first instance by the district court on remand. However, the government makes false assertions. With respect to Count Two, neither Mr. Clemans or Tandeg were close to completing all acts necessary for Mr. Clemans to travel in foreign commerce for illicit sex. U.S.S.G. § 2X1.1(b)(2). No arrangements were made by Mr. Clemans or Tandeg for travel with the intent to commit illicit sex, the crime that was the object of their so-called conspiracy. The government states that "[a]t the time of his arrest, the conditions were set and Clemans was preparing to travel." Answering Brief, p. 74. In truth at the time of the arrest Mr. Clemans had just arrived in the United States. He had no ticket or hotel reservation for travel to the Philippines. With respect to Count Three, the government discusses the meaning of "intended offense conduct" under U.S.S.G. 2X1.1(a) at pages 75-76 of its brief, but it points to no evidence that Mr. Clemans and Tandeg intended to produce "material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) an infant or toddler." U.S.S.G. 2G2.1(b)(4).

26

**4. The district court plainly erred in adding a four level adjustment to Group Three for images and videos that portrayed sadistic or masochistic conduct and/or included infants and toddlers.**

The government argues that the district court did not violate the *Ex Post Facto* clause in adding a four level adjustment to the offense level for Group Three under § 2G2.1(4)(A) and (B) for "material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) an infant or toddler." Answering Brief, p. 76-77. It reasons that the 2014 United States Sentencing Guidelines Manual included a four-level adjustment if the offense involved "material that portrays sadistic or masochistic conduct or other depictions of violence." U.S.S.G. § 2G2.1(4) (2014).

Although the 2014 Guidelines manual did include an offense level enhancement for images portraying sadism, masochism, or violence, the government cannot point to evidence that Group Three, which consisted of Counts Three, Five, and Six with respect to M.Q/ Angel, involved material portraying sadistic or masochistic conduct or other depictions of violence. Neither the PSR nor the government identifies any sadistic, masochistic, or violent images Mr. Clemans produced, or conspired to produce, regarding M.Q./Angel, or any such images he received between May 8, 2015, and on or about May 24, 2015.

27

Therefore, as to Group Three, it was plain error to include a four level enhancement under U.S.S.G. § 2G2.1(4).

The government's final argument is that any error resulting from the enhancement under U.S.S.G. § 2G2.1(4) did not affect Mr. Clemans' substantial rights because his final offense level still would have exceeded 43, the highest level recognized by the Guidelines. Answering Brief, pp. 79-80. This argument assumes that Mr. Clemans will not prevail on any of the other issues he raises in this appeal. If any of the counts of conviction, grouping decisions, or offense level calculations are vacated, then the district court's improper addition of the U.S.S.G. § 2G2.1(4) enhancement to Group Three will affect his offense level.

### 5. Count Four Should Have Been Placed Within Groups Three, Four, and Five.

U.S.S.G. § 3D1.2 provides counts should be grouped when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Count Four charged Mr. Clemans with offering or actually obtaining custody or control of at least one minor for the production of child pornography. The government tries to justify the district court's failure to group Count Four with the other counts by arguing that the district court may have been targeting a different harm caused by 18 U.S.C. § 2251A. Answering Brief, p. 80-81. The government cannot point to anything in

28

the PSR or sentencing hearing, however, suggesting that the district judge thought the conduct underlying Count Four was not part of the common scheme or plan involved in Counts Three, Five, and Six.

The government argues the error in failing to group Count Four with the other counts did not affect Mr. Clemans' substantial rights because even without the error his offense level would be above 43. Answering Brief, p. 82. The government's argument assumes that none of the other components of Mr. Clemans' sentencing will change as a result of this appeal, a conclusion Mr. Clemans' disputes. This Court should identify each of the errors the district court made at sentencing and remand for new sentencing proceedings because although a single error may not change the advisory guidelines range, the combination of one or more errors will.

**IV.     Conclusion**

For the foregoing reasons, and the reasons presented in the Opening Brief,

Mr. Clemans asks that this Court reverse his convictions on Counts One, Two, and

Four.  Whether or not the Court reverses any or all of these convictions, Mr.

Clemans asks that the Court vacate his sentence and remand the case to district

court for new sentencing proceedings.


Dated: October 31, 2019

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender


*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS

30

No. 18-10035

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, | District Court Case No. 2:15-cr-227-JAM-1 |
| Plaintiff-Appellee, | |
| v. | Eastern District of California, Sacramento |
| MICHAEL CAREY CLEMANS, | |
| Defendant-Appellant. | |

BRIEF FORMAT CERTIFICATION
PURSUANT TO CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached brief is proportionately spaced, has a typeface of 14 points and contains 6,969 words.

Dated: October 31, 2019

Respectfully submitted

HEATHER E. WILLIAMS
Federal Defender

*s/ Carolyn M. Wiggin*
Carolyn M. Wiggin
Assistant Federal Defender

Attorneys for Defendant-Appellant
MICHAEL CAREY CLEMANS